## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### DOCKET NO.: 21-10017-GG

---

CYNTHIA DIANE YELLING,

PLAINTIFF – APPELLANT,

v.

ST. VINCENT'S HEALTH SYSTEM,

DEFENDANT – APPELLEE.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2-17-CV-01607-SGC

---

### BRIEF OF APPELLANT

---

COUNSEL FOR APPELLANT:

Leslie A. Palmer
PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
Telephone: (205) 285-3050
Facsimile: (205) 285-3050
leslie@palmerlegalservices.com

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellant hereby certifies the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations and any publicly held corporation which owns 10% or more of the party's stock), and other identifiable legal entities related to a party that has an interest in this case.

1. Cynthia Diane Yelling – Appellant

2. St. Vincent's Health System – Appellee

3. Ascension Health, a non-profit, faith-based health care system – Appellee is a wholly owned subsidiary of Ascension Health.

4. Honorable Staci G. Cornelius, United States District Court for the Northern District of Alabama – Magistrate Judge – by Consent pursuant to 28 U.S.C. § 636(c).

5. Leslie A. Palmer – Counsel for Appellant

6. Tammy L. Baker – Counsel for Appellee

7. Shannon L. Miller – Counsel for Appellee

8. Palmer Law, LLC

9. Jackson Lewis, P.C.

Respectfully submitted this 26th day of April, 2021.

/s/ Leslie A. Palmer
Leslie A. Palmer
Attorney for Appellant

OF COUNSEL:
PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205)285-3050
leslie@palmerlegalservice.com

## STATEMENT REGARDING ORAL ARGUMENT

This case presents novel and complex issues regarding the application of the evidentiary frameworks and standards in race discrimination and retaliation cases. In *Bostock v. Clayton Co., GA.*, the Supreme Court utilized a but-for causation analysis similar to this Circuit's motivating factor test in *Quigg*. *See Bostock v. Clayton Cnty., GA*, 140 S.Ct. 1731, at 1739 (2020), *See also Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). Oral argument will assist in providing a thorough discussion as this Court addresses, for the first time, the appropriate evidentiary framework in race and retaliation cases after *Bostock.* Additionally, because current societal norms may differ from societal norms of decades-old cases, oral argument will also guarantee the reasonable person standard our precedent requires is appropriate and accurately applied by analyzing the totality of the circumstances of a severe or pervasive hostile work environment.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................. iv

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................... 4

     Course of the Proceedings and Disposition Below ........................ 4

     Statement of the Facts ................................................................... 4

STANDARD OF REVIEW .................................................................. 13

SUMMARY OF THE ARGUMENT ..................................................... 14

ARGUMENT ...................................................................................... 15

I. A Reasonable juror in Yelling's position, with life experiences, exposure to
contemporary societal views, and an understanding of current standards of
appropriate workplace conduct, could view the repeated racially derogatory
statements and inaction by SVH as severe or pervasive. ........................................ 15

     A.Statements and conduct before May 27, 2015 are relevant to the
     consideration of Yelling's hostile work environment claim. ....................... 17

     B.The evidence viewed in the light most favorable to Yelling shows the
     racist comments, stereotyping, and targeting were severe or pervasive. ..... 18

     1)The evidence supports that the racist statements were frequent over the
     course of Yelling's employment, especially in the last 10 months. ............. 23

     2)The evidence supports that the racist statements and racially exclusive
     conduct were severe. ................................................................... 25

3)The evidence supports that the racist statements and conduct were humiliating. .................................................................................. 26

4)The evidence strongly suggests that the racial statements and conduct interfered with Yelling's job performance. ................................... 27

5)Totality of the Circumstances ................................................... 28

6)Today's social context considerations. .................................... 31

II.  Yelling has presented sufficient circumstantial evidence to permit a reasonable juror to infer that SVH acted with discriminatory intent........................................ 32

A.Yelling has presented evidence that a reasonable juror could conclude that Race was a motivating factor and race and retaliation were but-for causes. 33

1)Yelling has shown that race was a motivating factor in her Title VII race discrimination claims. ................................................................... 33

2)The Supreme Court's holding in *Bostock* shows *McDonnell Douglas* is also inappropriate in mixed-motive claims under Title VII retaliation and § 1981 race and retaliation claims. ................................................. 35

B.A reasonable juror could conclude SVH's reason for terminating Yelling was pretextual.............................................................................. 40

1)Yelling proved a prima facie case under *McDonnell Douglas*. ................ 40

2)Whether Yelling has shown Pretext is a question for the jury................. 40

3)11th Circuit precedent shows Yelling has met her burden regarding pretext......................................................................................... 42

C.The District Court's dismissal of Yelling retaliation claim without any pretext analysis views the evidence and interferences in SVH's favor in violation of Rule 56....................................................................... 50

D.Yelling has presented a Convincing Mosaic of retaliatory and discriminatory conduct.................................................................. 54

CONCLUSION ................................................................................ 56

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)...................... I

CERTIFICATE OF SERVICE ................................................................... I

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Allen v. Tyson Foods*, 121 F.3d 642 (11th Cir. 1997) ............................................ 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................ 13

*Blash v. City of Hawkinsville and Pulaski Co. Ga., Sheriff's Office*, 2021 WL

    1561347 (11th Cir. Apr. 21, 2021) .......................................... 13, 54, 56

*Bostock v. Clayton Cnty., GA*, 140 S.Ct. 1731 (2020) .................................... passim

*Boutwell v. Federal Mogul Corp.*, 342 Fed. Appx. 541 (11th Cir. 2009).............. 39

*Burlington Northern and Santa Fe Ry., Co. v. White*, 548 U.S. 53 (2006)............ 50

*Combs v. Plantation Patterns Meadowcraft, Inc.*, 106 F.3d 1519 (1997) .................

    ........................................................................... 40, 41, 42, 43

*Comcast Corp. v. Nat'l Ass'n Of African American-Owned Media*, 140 S.Ct 1009

    (2020) ............................................................................... 32

*Cooper-Houston v. Southern Railroad Co.*, 37 F.3d 603 (11th Cir. 1994)...... 44, 45

*Fleming v. Boeing Co.*, 120 F.3d 242 (11th Cir. 1997).................................... 52, 53

*Hairston v. Gainsville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)... 41, 42, 43, 44

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) .............................................. 16, 23

*Henderson v. FedEx Express*, 441 F. App'x 502 (11th Cir. 2011) .................. 51, 52

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911 (11th Cir. 2018)................................. 17

*Jennings v. Univ. of N.C.*, 482 F.3d 686 (4th Cir. 2007)........................................ 26

*Jones v. UAB Health Sys.*, 2018 U.S. Dist. LEXIS 24897 (N.D. Ala. Feb. 15, 2018)

................................................................................................................... 39

*Jones v. UPS Ground Freight,* 683 F.3d 1283 (11th Cir. 2012) ...................... 24, 26

*Keil v. Select Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999)........................... 52, 53

*Lewis v. City of Union City, GA, (Lewis I),* 918 F.3d 1213 (11th Cir. 2019)......... 48

*Lewis v. City of Union City, GA*, *(Lewis II),* 934 F.3d 1169 (11th Cir. 2019) ...........

................................................................................................................... 33, 50, 54

*Lewis v. US Steel Corp.*, 2:18-cv-00428-RDP, Doc. 29  (N.D. Ala. December 13,

2019) (Procter, J.) ......................................................................................... 39, 50

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)................. 15, 32, 50, 54

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999)............................... 19, 25

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ......................................... 16

*Munoz v. Oceanside Resorts*, 223 F.3d 1340 (11th Cir. 2000) ............................. 39

*Nat'l RR Pass. Corp. v. Morgan*, 536 U.S. 101 (2002)................................... 17, 18

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998). ..................... 16, 18, 31

*Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016)............... passim

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010)...... 25, 26

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ........ 21, 22, 45

*Richardson v. Leeds Police Dep't*, 71 F.3d 801 (11th Cir. 1995) ................... 46, 47

*Sehridan v. E.I. DuPont De Nemours and Co.*, 100 F.3d 1061 (3rd Cir. 1996)..... 44

*Shockley v. Healthsouth Cent. GA Rehab. Hosp.,* (*Shockley II*), 293 Fed. Appx. 742 (11th Cir. 2008) ............................................................................................ 29, 30

*Shockley v. Rebound, Inc. d/b/a Healthsouth Cent. GA Rehab. Hosp.*, 2008 WL 350997 at (M.D. GA Feb. 7, 2008 ......................................................................... 30

*Smelter v. S. Home Care Servs.*, 904 F.3d 1276 (11th Cir. 2018) ................... 26, 29

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) ........................ 33

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001) ............................ 25

*St. Mary's Honor Center v. Hick*s, 509 U.S. 502 (1993) ....................................... 42

*Standard v. A.B.E.L Svc. Inc.*, 161 F.3d 1318 (11th Cir. 1998) ............................ 32

*Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ........................... 33, 40

*Walker v. Ford Motor Co.*, 684 F.3d 1355 (11th Cir. 1982) ................................. 26

*Walker v. Thompson*, 214 F.3d 615 (5th Cir. 2000) .............................................. 27

*Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991) .......................... 44

*White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008) ......................... 36

*Wilson v. B/E Aero., Inc.*, 376 F.3d 1079 (11th Cir. 2004) ................................... 21

**Statutes**

28 U.S.C. § 1343(a)(3) ............................................................................................ 1

28 U.S.C. § 636(c) ................................................................................................... ii

28 U.S.C. §1331 ....................................................................................................... 1

42 U.S.C. § 1981 .......................................................................................... 1, 4, 32, 35

42 U.S.C. § 2000e ........................................................................ 1, 4, 32, 35

**Rules**

Eleventh Circuit Rule 26.1-1 ..................................................................... ii

Fed. R. App. P. 32 ..................................................................................... I

Fed. R. App. P. 4(a)(1) ............................................................................. 1

Fed. R. Civ. P. 56 ................................................................................... 21

**Other Authorities**

Khristopher J. Brooks, *Nearlhy 60% of U.S. Workers Say They've Seen Workplace*

    *Discrimination*, CBS NEWS, Oct. 23, 2019. ...................................... 19

Joan C. Williams, Jodi Short, Jargo Brooks, Hilary Hardcastle, Tiffanie Ellis, &

    Rayna Saron, *What's Reasonable Now? Sexual Harassment Law After the Norm*

    *Cascade*, 2019 MICH. ST. L. REV. 139 ............................................. 19

## <u>STATEMENT OF JURISDICTION</u>

On September 19, 2017, Cynthia Yelling ("Yelling") filed suit against her former employer, St. Vincent's Health System ("SVH"), in part for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, and the similar § 1981. Jurisdiction was based on 42 U.S.C. § 2000e, and 42 U.S.C. § 1981, 28 U.S.C. §1331 and 28 U.S.C. § 1343(a)(3).

On December 2, 2020, the District Court granted summary judgment on all claims and entered a final judgment (Docs. 45, 46). This appeal is timely because Yelling filed a notice of appeal on December 31, 2020, within 30 days of the final judgment. (Doc. 47). See Fed. R. App. P. 4(a)(1). Because this appeal concerns the United States District Court for the Northern District of Alabama, jurisdiction in this Court is proper. See 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. In evaluating hostile work environment claims, a court must determine whether the conduct is severe or pervasive by applying the reasonable person standard. Does the reasonable person standard necessitate viewing the conduct as a reasonable juror would, under current and evolving, contemporary societal views of appropriate workplace conduct?

2. Did the District Court err by excluding evidence of a hostile work environment that occurred more than 180-days before the filing of the EEOC charge?

3. Did the District Court err by excluding offensive, derogatory statements made about the Employee's minority group made to the Employee?

4. *McDonnell Douglas* is not an appropriate framework for considering mixed-motive Title VII race discrimination claims. *Quigg*, 814 F.3d at 1237. Did the District Court err in applying *McDonnell Douglas* and adopting the Employer's reasons as true when the Employee presented evidence that race was a motivating factor in the Employer's adverse employment decisions?

5. In *Bostock v. Clayton Cty., GA*, 140 S.Ct. 1731 (2020), the United States Supreme Court reiterated that cases often have multiple but-for causes and an Employer cannot avoid liability just by citing some other factor that contributed to its decision. This holding shows *McDonnell Douglas* is not

appropriate for mixed-motive cases that require but-for causation. Considering *Bostock*, did the District Court err in applying the single-motive, *McDonnell Douglas* framework, and requiring the Employee to rebut and disprove each proposed reason?

6. Did the District Court err in granting summary judgment where the Employee presented sufficient evidence to allow a reasonable juror to infer the Employer acted with discriminatory and retaliatory intent?

## STATEMENT OF THE CASE

**Course of the Proceedings and Disposition Below**

Appellant Cynthia Yelling ("Yelling") filed a *pro se* multi-count suit against St. Vincent's Health Systems (SVH) on September 19, 2017. (Doc. 1). Counsel for Yelling filed an amended complaint on February 5, 2018 alleging race discrimination and hostile work environment under Title VII and § 1981 and retaliation related to her racially hostile work environment, disciplinary actions, and termination. (Doc. 9). The District Court granted summary judgment on all counts in favor of SVH and entered a final judgment dismissing Yelling's claims on December 2, 2020. (Docs. 45-46). Yelling timely appealed. (Doc. 47).

**Statement of the Facts**

Yelling, who is Black, earned her nursing degree from Lawson State Community College, and has worked as a registered nurse for more than twenty-five (25) years. (Doc. 34-1, 20:3-11, 291:9-17). She worked for SVH from June of 2010 to September of 2015 with good performance evaluations and no discipline. (Doc. 39-2, Doc. 34-7, 116:14-117:11). Yelling "did her job" and "took care of her patients[.]" (Doc. 34-7, 10:11-15). Yelling worked weekend days, but it was not unusual for her to pick up extra shifts during the week or for weekday staff to pick up shifts or rotate. (Doc. 34-1, 25:19-22, 29:7-10, 49:17-50:2). SVH utilizes a team approach to nursing requiring staff to work together. (Doc. 34-1, 46:13-23).

4

By 2015, Yelling's work environment had become "heated with the racially disparaging comments." (Doc. 34-1, 71, 11-13, 73:23-74:1, 249:9-17). Yelling's unit only had one Black nurse per six nurse shift. Yelling was the only Black nurse on the weekend shift.[1] (Doc. 34-1: 57:15-58:2). In March of 2015, President Barack Obama visited Lawson State. Yelling exhibited pride that the president chose to visit her alma mater. Jimmy Wilhite, her White supervisor, asked if President Obama was visiting Lawson State to "hand[ ] out food stamps[.]" (Doc. 34-1, 40:16-21). Wilhite's statement deeply offended and humiliated Yelling. (Id.). She understood the statement to be racist since Lawson State is a predominantly Black college and minorities are stereotyped as welfare recipients. (Doc. 34-1, 291:9-20). Wilhite had made several racial statements but that one stuck out to Yelling. (Doc. 34-1, 40:8-12). Yelling reported her supervisor's racist statement to Nurse Manager, Casi Dubose, and Administrative Nursing Director, Chuck Lacey. Dubose and Lacey, both higher level supervisors, took no action. (Doc. 34-1, 41:17-42:14).

---

[1] In Yelling's unit SVH employed one Black nurse on weekday days and one Black nurse on weekday nights. For a very short time, SVH hired another Black nurse for weekday nights and one of the discharge planning nurses was Black. (Doc. 34-1, 74:2-17, 76:23-77:6). The nurses worked three shifts per week there was only one Black nurse per shift.

Yelling's White co-workers routinely and frequently made racist comments. They "always" made these comments, it was "not unusual," there was a "culture," and they were not "holding back" their opinions of Blacks. (Doc. 34-1, 54:14-16, 56:4-6, 66:14-21, 70:8-13). Yelling could not recall every instance, but some stood out in her mind. (Doc. 34-1, 70:8-13). Sandy Sheffield, a White pool nurse, commented that "Michelle Obama looks like a monkey" and regularly called Black patients "welfare queens" and "crack heads." (Doc. 34-1, 44:9-11, 48:10, 50:14-20). Tiffany Hardy, who is White, also commented Michelle Obama looked like a "monkey" and made offensive remarks about Black patients being on welfare. (Doc. 34-1, 59:5-16). Hardy and another White nurse, Linda Powell, frequently declared President Obama should "go back to Africa" and made other derogatory remarks about Blacks in the news. (Doc. 34-1, 54:14-16, 55:18-21, 56:10-18). Yelling's co-workers referred to Black patients as "ghetto fabulous" and "boy" or "girl" instead of "man" or "woman." (Doc. 34-1, 59:22-60:3, 290:11-22). When Yelling was the only Black person at the nurses' stations, Tonya Larimore, Robin Calvert, and Charge Nurse Jennifer Laroe (supervisor), regularly bragged they were "rednecks," "confederate flag-flyers," and proud redneck card-carrying gun owners that carried 24/7. (Doc. 34-1, 64:15-18, 67:15-22; Doc. 34-3, p3¶2). Yelling knew these statements were racially motivated because "rednecks" and

"confederate flag-flyers" have a low tolerance for minorities. (Doc. 34-1, 68:8-12, 290:3-10).

Yelling reported the barrage of racist statements to her supervisors, Wilhite, Laroe, and Dubose and opposed the statements directly with the speakers. (Doc. 34-1, 51:3-18, 58:4-17, 250:14-21). All of Yelling's supervisors ignored her complaints and, in some instances, "laughed" them off. (Doc. 34-1, 53:3-13, 81:21-23, 267:8-9). Dubose could not recall any action she took to investigate, including whether she even spoke with Yelling or if she reported Yelling's complaints. (Doc. 34-6, 70:17-71:13).

On June 14, 2015, Yelling took her complaints to a higher supervisor.  When House Supervisor Kim Parrish reprimanded Yelling for her tone with co-workers, Yelling told her about the racist statements her White co-workers, including supervisors, were making around her. (Doc. 34-1, 248:21-250:21). Yelling also reported Dubose's "quota" of only staffing one Black RN per shift, and that Dubose was passing over Black nurses for acting Charge Nurse shifts that paid one dollar per hour more. (Doc. 34-1, 81:1-23; Doc. 34-6, 67:16-22; Doc. 34-3, p3¶3). Parrish, who is White, told Yelling Dubose was in charge and that it was "[her] unit." (Doc. 34-1, 80:23-81:23, 250:4-7, Doc. 34-4:79:11-22). Yelling then reported the discrimination, including by Dubose, directly to Dubose, who did not respond. (Doc. 34-1, 80:14-18, 250:2-3).

7

One week after Yelling complained directly to Dubose, on June 21, 2015, while Yelling continued to suffer the unrelenting racist statements, Yelling's White co-workers reported her for "reasonable suspicion" drug testing. (Doc. 39-3). SVH allowed Yelling to continue direct patient care for several hours without oversight after allegedly suspecting her of drug use. (Doc. 39-3). Yelling's White co-workers, including those making racial remarks, documented a large part of the "suspicion" as "interpersonal work relationships." (Doc. 39-3). The drug testing, which came back clear, humiliated Yelling. (Doc. 34-1, 184:10-16). Yelling immediately reported the retaliation to HR. (Doc. 34-7, 56:10-16). Five days later, Yelling reported the unit culture to HR, which SVH recognized as a complaint of race discrimination. (Doc. 34-7, 66:7-67:1). SVH has no process to ensure complaints to managers are addressed and has no record of follow-up on Yelling's complaints to Dubose. (Doc. 34-7, 26:12-18, 72:6-18). SHV did not drug test a White charge nurse when she fell out of her chair and injured her tail bone which her supervisor was aware of. (Doc. 34-1, 187:8-19).

In the days between Yelling's report to HR and return to work from her clear drug test, Dubose spoke with several staff members about Yelling's return, the importance of wearing tracking devices, and documenting all issues going forward. (Doc. 34-6, 57:13-22, Doc. 39-4). In contrast, Dubose did not speak to Yelling about the tracker, documenting other employees, or Yelling's complaints. (Id.).

When she returned, Yelling's White co-workers, including her supervisor Laroe, taunted weekly saying "Casi [Dubose] will fire you." (Doc. 34-1, 309:5-19). Dubose canceled Yelling's extra shifts in favor of White pool nurses which was a violation of SVH policy. (Doc. 34-1, 167:18-168:22). SVH requires HR involvement before a manager can terminate an employee.  (Doc. 34-7, 23:2-9).

After she reported their conduct, Yelling's White co-workers began papering her file with e-mails to Dubose. (Doc. 39-7, Doc. 39-5). Dubose then forwarded the e-mails to HR including trivial e-mails related to Yelling's "tone," patient care issues while Yelling was on lunch, Yelling using a "smell good spray" in a patient's room and Yelling moving furniture. (Doc. 39-5). no one addressed Yelling's continuing complaints of racist statements. The conduct became unbearable, and Yelling secured a second job, just in case. (Doc. 34-1, 30:1-10).

As Yelling continued to complain about discrimination and the racial statements, Dubose issued Yelling a corrective action placing her on step one of SVH's four-step progressive discipline policy in October of 2015. (39-7, 39-9, 34-4, 56:11-57:6). This corrective action included minor patient care issues SVH cited during the three (3) months between Yelling's first HR complaint and the discipline, where Yelling felt she was being micromanaged. (Doc. 34-1, 92:6-104:23). Notably, the corrective action included no mention of charting/tracker inconsistencies that SVH noted in a June chart audit. (Doc. 39-7; Doc. 39-6). When

Yelling reported she believed her White co-workers were targeting her, Director Lacy added to the discipline that Yelling should "go to each team member . . ." to see how she could better improve the relationship. Lacey did not address Yelling's complaints Dubose racial staffing or the co-workers' racist statements. (Doc. 34-4, 97:19-98:1). During this disciplinary meeting, Yelling complained that SVH had not disciplined a White RN that a patient had "fired" for poor patient care. (Id.). SVH had always evaluated Yelling's performance in the months of September or October but did not evaluate her performance in 2015 after she began complaining of race discrimination. (Doc. 34-7, 115:18-116:7).

Yelling's work environment, which was already strained and tense, devolved. SVH failed to address the racist statements and weekly taunts that Dubose was going to fire her. (Doc. 34-1, 309:7-12). In November, Yelling believed her co-workers had hidden lab slips from her. (Doc. 34-1, 119:19-121:6). Yelling privately complained to her charge nurse Laroe about it. (Doc. 34-1,109:11-19). Robin Calvert, a "confederate flag-flying" White nurse, hostilely interjected herself in the conversation, raising her voice at Yelling. (Doc. 34-1, 109:10-22). Yelling responded in kind, with frustration about the ongoing stress of the racist culture and threats of retaliation. Yelling quoted scripture and said hiding lab slips was wicked. SVH suspended Yelling for the day without pay and wrote her up. (Doc. 34-1, 109:18-110-17, 113:16-116:10; Doc. 39-10). In contrast, SVH

did not send Calvert home even though she was the instigator. (Doc. 34-1, 110:16-17). Yelling filed an EEOC charge, which SVH received within weeks. (Doc. 34-4, 120:15-121:2; Doc. 34-7, 135:10-12). After Yelling's November complaint, SVH issued Calvert a politely worded write-up. SVH did not direct her to go to any team member to see how she could improve the relationship. (Doc. 39-11).

In December of 2015, after SVH received Yelling's EEOC charge, Hardy hurled profanity at Yelling during shift start-up. (Doc. 34-1, 153:3-11). Yelling reported the attack, but SVH did not send Hardy home or discipline her, and did not ask her to speak to any team member about improving the relationship even thought she had a history of making racial comments. (Doc. 34-1, 153:3-11; Doc. 34-7, 112:10-18; Doc. 34-6, 75:5-19). Similarly, in January of 2016, Stephanie Edwards, a White RN new to the shift and unit, screamed at Yelling. Yelling filed a complaint against Edwards (Doc. 34-1, 141:3-7, 158:1-19). SVH did not discipline Edwards, send her home, or ask her to speak to any team member about improving the relationship. (Doc. 34-7, 113:17-114:1). Dubose initiated an chart audit against Yelling looking for inconsistencies like those noticed but not mentioned to Yelling just six (6) months earlier. (Doc. 34-6, 29:3-7; Doc. 34-7; 124:6-8).

On February 2, 2016, after months of complaints by Yelling, and two (2) months after receiving her EEOC charge, SVH bypassed two (2) progressive

discipline steps and terminated Yelling under the pretext of falsifying medical records. (Doc. 34-7, 135:13-136:6). Specifically, for "falsifying patient documentation in [her] assigned patients' charts [and] not maintain[ing] accurate patient official records for the system and provide the quality or quantity of work established for [the] job responsibilities." (Id.). SVH claimed Yelling's badge tracking did not match her patient charting, even though SVH knew the trackers were not reliable. (Doc. 39-12). Yelling had reported problems with her tracker. (Doc. 34-1, 298:2-23). Additionally, the unit secretary, who had helped paper Yelling's file, said Yelling's tracker "rarely tracked." (Doc. 34-6, 98:12-18, 117:10-22; Doc. 34-5, 29:13-30:3, 32:21-33:5). Yelling responded to SVH's accusations saying her charting was accurate, her badge did not track properly, and she did not falsify medical records. She also provided details of her patient treatment. (Doc. 34-1, 136:1-16, 142:13-143:1).

SVH knew the tracker information as unreliable because it tracked Yelling at 9:00 p.m., more than two (2) hours after the end of her shift and two and one-half (2 ½) hours after the previous last track. (Doc. 34-4, 141:2-142:8; Doc. 39-13). SVH HR and Director Lacey did not investigate, but instead relied on Dubose to investigation. (Doc. 34-7, 62:10-15, 125:16-20, 147:14-19; Doc. 34-4, 31:14-32:12). Dubose elicited witness statements from the White co-workers Yelling reported for making racist statements. Dubose provided the statements to Patient

Care Supervisor Haynes, ignoring the witnesses' motive and credibility. (Doc. 34-4, p82; Doc. 34-10).

Before her complaints of discrimination and retaliation, SVH never disciplined Yelling for tracker/charting inconsistencies. (Doc. 34-7, 135:13-136:6). SVH did not terminate Mike Pike, a White RN, or Felicia Parrish, a nurse who had not complained, for failing to make rounds or document rounds which creates an inaccurate patient official record and does not provide the quality or quantity of work required. SVH further did not terminated Yvonne Arrington or Linda Powell for failing to verify patient identifiers resulting in inaccurate patient official records and was below the quality or quantity of work required. (Doc. 34-6, 84:7-13, 86:3-6, Ex11). SVH replaced Yelling with a White RN. (Doc. 39-14 ¶6).

## STANDARD OF REVIEW

This Court reviews an entry of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of Yelling. *Blash v. City of Hawkinsville and Pulaski Co. Ga., Sheriff's Office*, 2021 WL 1561347 at *3 (11th Cir. Apr. 21, 2021). Summary judgment is inappropriate if there is genuine dispute as to any material fact. *Id.* at *4 (citing Fed. R. Civ. P. 56). At summary judgment the court is to believe Yelling's evidence and draw all justifiable inferences in her favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Because a reasonable jury could return a verdict for Yelling, a genuine issue of

material fact exists. *Id.* The evidence is not so one sided to entitle SVH to a judgment as a matter of law so summary judgment was inappropriate. *Id.*

## SUMMARY OF THE ARGUMENT

The reasonable person standard has been applied to hostile work environment claims for decades. A reasonable person is one in the Employees position, considering the social context and the Employee's experience. A hostile work environment exists where a reasonable person, viewing the totality of the circumstances, would find the harassing conduct severe or pervasive. There is no bright-line rule for what is severe or pervasive and the reasonable person standard guarantees that what severe or pervasive evolves as social norms and beliefs of appropriate and inappropriate conduct evolve.

By individualizing and excluding Yelling's evidence, including evidence beyond a 180-day window, the District Court failed to appropriately apply the reasonable person standard and did not view the facts and inferences in the light most favorable to Yelling. Applying the appropriate standards, Yelling has presented sufficient evidence that a reasonable juror could find SVH subjected her to a racially hostile work environment.

SVH took several adverse actions against Yelling in discipline and staffing. Some of the actions were because of or motivated by race, some were because Yelling opposed the discriminatory treatment and hostile work environment.

Yelling has presented sufficient evidence that a reasonable juror could conclude SVH had a discriminatory and retaliatory animus.

By forcing Yelling's claims into the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the District Court pushed Yelling to a higher burden than necessary at summary judgment and made inappropriate credibility determinations. *McDonnell Douglas* is not is not and was never meant to be an essential and necessary piece to surviving summary judgment. Viewing the facts and drawing all reasonable inferences in the light most favorable to Yelling, she has presented sufficient evidence under the analyses in *Bostock* and *Quigg* and under the broader convincing mosaic. Yelling has presented sufficient evidence permit a jury to find SVH acted with a discriminatory or retaliatory animus.

Because of the District Court's numerous errors, the Order dismissing Yelling's claims should be REVERSED and the case should be remanded to a jury, the appropriate factfinder.

## **ARGUMENT**

I.     **A Reasonable juror in Yelling's position, with life experiences, exposure to contemporary societal views, and an understanding of current standards of appropriate workplace conduct, could view the repeated racially derogatory statements and inaction by SVH as severe or pervasive.**

15

Context matters in employment discrimination cases. Factors such as how contemporary society views behavior informs and defines expectations in relationships. History has shown that behavior and language that was once socially acceptable is abhorrent in contemporary society. As the United States Supreme Court has observed, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81-82 (1998). When it granted summary judgment on her hostile work environment claim, the District Court erred by ignoring the context of the statements and conduct endured by Yelling.

"[E]mployees [have] the right to work in an environment free from discriminatory intimidation, ridicule, and insult[.]" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Whether conduct is so "severe or pervasive" that it alters the employment conditions and creates an abusive working environment is measured by if "a reasonable person would find [it] hostile or abusive." *Id.* at 67; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). Importantly, a reasonable person is one "in the plaintiff's position" considering the "social context" of the conduct and experience. *Oncale*, 524 U.S. at 81. The District Court failed to view the evidence in the light most favorable to Yelling and failed to consider the social

context and cumulative effect of the discriminatory and derogatory conduct. Yelling experienced continued racially insulting remarks from White management and coworkers. Her White co-workers ostracized and scrutinized her, micromanaged her work performance, and taunted her about being terminated. SVH allowed the conduct to continue and then terminated her. A reasonable person experiencing the same conduct could find it was so severe or pervasive that it altered the terms of Yelling's employment and created a hostile work environment, particularly considering current societal norms.

### A. Statements and conduct before May 27, 2015 are relevant to the consideration of Yelling's hostile work environment claim.

The District Court ignored established precedent that requires review of the totality of the circumstances when it excluded statements and conduct that occurred more than 180-days before the filing of Yelling's first EEOC charge from consideration in Yelling's hostile work environment claim.[2] Because a hostile work environment claim involves multiple acts, statements, and conduct viewed collectively, the claim will include acts outside of the 180-day period. *Nat'l RR Pass. Corp. v. Morgan*, 536 U.S. 101, 117 (2002). All evidence of a hostile work

---

[2] The District Court inappropriately held that Yelling waived any argument with regard to actions or statements before the 180 cut-off. Yelling did not waive any such claims as the facts were included in her argument for consideration. Additionally, "parties cannot waive the application of the correct law[.]" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018).

environment will be viewed collectively so long as "an act contributing to the claim occurs within the filing period[.] *Id.* The District Court explicitly excluded "any events which occurred prior to May 27, 2015" as untimely. (Doc. 45 at 14). This notably excluded SVH passing over Yelling and the other shift Black nurses for acting charge nurse and racially derogatory statements made by Yelling's supervisor that were the catalyst for Yelling's first internal complaints. (Doc. 34-1, 40:16-21, 81:1-23). This discrimination, beginning with Yelling's supervisors, is a necessary part of the discriminatory culture Yelling repeatedly opposed. It also adds to the severity of her hostile work environment because it involved conduct of supervisors. Afterall, if Yelling's supervisors can exclude Black nurses from equal terms and conditions and spout racist statements in the workplace, her White co-workers would feel free and truly emboldened to follow. All of Yelling's testimony touching on her racially hostile work environment is timely and should have been considered in the totality of circumstances by the District Court.

**B. The evidence viewed in the light most favorable to Yelling shows the racist comments, stereotyping, and targeting were severe or pervasive.**

The reasonable person standard requires a view of the conduct and totality of the circumstances through the eyes of a reasonable person in the Employee's position considering the social context and experience. *See Oncale,* 524 U.S. at 81. Viewing the conduct from Yelling's position means looking at the appropriateness of conduct in real time – today – not not a time set some number of years ago in a

18

specific past case. Social norms change, language evolves, facts evolve, what we consider acceptable evolves. Just as the view of inappropriate sexual conduct has changed from Dolly's 9 to5 after the "#metoo" movement,[3] individuals are less tolerant of race discrimination and more supportive of showings of solidarity in social and societal situations.[4] Employers continue to rely on *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999), as the standard, but inappropriately rely on the case to say that set conduct is not severe or pervasive as a matter of law. . In actuality, it is the *precedent* in *Mendoza* that is the standard, not the particular *conduct*. Using the conduct in decades old cases to set bright-line rules of what conduct is severe or pervasive goes against the reasonable person standard required in both *Mendoza* and *Oncale* creates inconsistent precedent. The conduct in each case must be considered on an individualized basis.

---

[3] For a thorough discussion on the changing norms in sexual harassment cases, *see* Joan C. Williams, Jodi Short, Jargo Brooks, Hilary Hardcastle, Tiffanie Ellis, & Rayna Saron, *What's Reasonable Now? Sexual Harassment Law After the Norm Cascade*, 2019 MICH. ST. L. REV. 139.

[4] A survey conducted by CBS news in 2019 showed nearly 60% of employees in the US have seen or experienced discrimination in the workplace. Younger employees have a higher reporting rate of race discrimination than older employees. Khristopher J. Brooks, *Nearly 60% of U.S. Workers Say They've Seen Workplace* Discrimination, CBS NEWS, Oct. 23, 2019, https://www.cbsnews.com/news/nearly-60-of-us-workers-say-they-seen-or-experienced-discrimination-at-their-job/

In the instant case, Dubose passed over Yelling and other Black nurses for acting charge nurse. (Doc. 34-1, 81:1-23). Dubose had a "quota" and staffed only one Black nurse per shift. (Doc. 34-3, p3 ¶3). Dubose canceled Yelling's extra shifts in favor of White pool nurses against SVH policy. (Doc. 34-1, 167:18-168:22). In March of 2015, Wilhite, a White charge nurse in a supervisory position over Yelling, said that President Obama's visit to Lawson State, a predominantly Black college, must be to "hand[ ] out food stamps." This highly offended Yelling because of stereotype that all Black are on food stamps. (Doc. 34-1, 40:16-21). Wilhite made this statement in front of Yelling and all White staff, emboldening Yelling's White co-workers to continue with their own racist and negative stereotypes. Yelling's White co-workers regularly made racist remarks around Yelling. (Doc. 34-1, 54:14-16, 56:4-6, 66:14-21, 70:8-13). White nurses call Black patients "welfare queens," "crack-heads," "ghetto-fabulous," and "pill seekers." They called Black patients "boy" and "girl" instead of "man" or "woman." (Doc. 34-1, 44:9-11, 48:10, 50:14-20, 54:14-16, 55:18-21, 56:10-18, 59:5-60:3, 70:8-13, 290:11-22).  When she approached the nurses as the only Black nurse, her White co-workers would entrench a conversation about being "proud rednecks," "confederate flag flyers," or proud 24/7 gun carrying rednecks who "weren't afraid to use it." (Doc. 34-1, 64:15-18, 67:15-22; Doc. 34-3 p3¶2). They would call Michelle Obama and President Obama as "pieces of shit," say they "looked like

monkeys," and that they should "go back to Africa." (Id.) Yelling testified this was the "culture", they "always" made these comments, it was "not unusual", and they were not "holding back" their opinions of Blacks. (Doc. 34-1, 54:14-16, 56:4-6, 66:14-21, 70:8-13).

The District Court does not dispute that many of these comments are racist, this case, like so many others, turns on whether the conduct is racist enough.[5] In considering the severity and pervasiveness, the District Court erred by not applying the reasonable person standard and by construing evidence and inferences in favor of SVH. The District Court discounted Yelling's testimony and viewed the evidence individually instead of collectively. Employment discrimination cases do not create a new or different rule for summary judgment. *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). The mandate of Rule 56, to protect the province of the jury, requires the court to view all facts and draw all reasonable inferences in the light most favorable to Yelling. *See* Fed. R. Civ. P. 56., *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000). The court must not make any credibility determinations, draw its own inferences from the facts, or weigh the evidence, and "must disregard all evidence favorable to the moving

---

[5] In light of the current social climate and the prevalence of racial injustices at the forefront of social issues, the fact that we are still asking "Is it racist enough?" speaks volumes to misapplication of the reasonable person standard.

party that a jury is not required to believe." *Reeves*, 530 U.S. at 150-51. The court can only give credence to evidence supporting the moving party that is uncontradicted, unimpeached, and comes from a disinterested witness. *Id.* at 151. By adopting SVH's inferences and facts, the District Court discredited and discounted Yelling's evidence of a racially hostile work environment.

The District Court improperly inferred that Yelling was regularly exposed to racial comments because she worked weekends and two of the co-workers specifically mentioned worked weekdays. (Doc. 45 at 20). This disregards Yelling's testimony that she picked up shifts and there were overall staff shortages. (Doc. 34-1, 25:19-22, 29:7-10, 49:17-50:2). The District Court also improperly trivialized Yelling's exposure alleging that she was not at the nurses' station often because she was providing care to patients. (Doc. 45 at 21). This disregards Yelling's testimony that when she walked up to the nurse's station the conversations would be entrenched and the reasonable inference that the nurses regularly worked at the nurses' station during their twelve-hour shifts. (Doc. 34-1, 71:19-72:1). Yelling testified to an overall culture which the District Court discounted by picking apart the specific examples she was able to provide.

The District Court also erred by utilizing conduct in decades old cases as bright-line rules of severe of pervasive conduct. The often cited four-factors are "a non-exclusive set of factors to consider." *Allen v. Tyson Foods*, 121 F.3d 642, 647

(11th Cir. 1997) (citing *Harris*, 510 U.S. at 23). "[W]hether an environment is hostile or abusive can be determined only by looking at all the circumstances." *Id*. By individualizing the conduct, and requiring Yelling to meet the four-factors, the District Court failed to consider all the circumstances. The District Court excluded a supervisor's racist statement, ignored the racial makeup of Yelling's shift and staffing "quota," and excluded the comments about guns, "rednecks," and "confederate flag flyers." The District Court also ignored SVH's acceptance of the conduct. (Doc. 45 at 17-18). The District Court discounted, minimized, and singled out statements, and failed to consider a totality of the circumstances or apply the reasonable person standard. Though not exclusive proof, even considering the four-factors, Yelling has shown the racist comments and actions were severe or pervasive.

### 1) *The evidence supports that the racist statements were frequent over the course of Yelling's employment, especially in the last 10 months.*

Yelling testified that her White co-workers "always" made these comments, it was not "unusual", there was a "culture" on the unit, and they were not "holding back" their opinions of Blacks. (Doc. 34-1, 54:14-16, 56:4-6, 66:14-21, 70:8-13). Though she could not recall every instance, Yelling was able to point to many specific instances of racist statements throughout the last ten months of her employment. (Doc. 34-1, 70:8-13). The District Court discounted this testimony,

improperly inferring that because Yelling was a weekend nurse, she only regularly worked with one nurse she had complained about. (Doc. 45 at 20). The record shows that Yelling picked up extra shifts and there was a staffing shortage. A reasonable juror could infer that other nurses picked up shifts and there were shift overlaps. (Doc. 34-1, 25:19-22, 29:7-10, 49:17-50:2). Yelling's White co-workers always made some type of racially derogatory statement, whether it was that the Obamas "look like monkeys" and should "go back to Africa," or calling Black patients "ghetto fabulous," "welfare queens," "crackheads," or "boy or girl" instead of "man or woman." (Doc. 34-1, 44:9-11, 48:10, 50:14-20, 54:14-16, 55:18-21, 56:10-18, 59:5-60:3, 70:8-13, 290:11-22). Yelling's White co-workers regularly bragged about being "proud rednecks," "confederate flag flyers," and "proud gun carrying rednecks who carry 24/7."[6] (Doc. 34-1, 64:15-18, 67:15-22; Doc. 34-3 p3¶2). Wilhite, a supervisor, made several statements, including that President Obama must be visiting Lawson State to "hand[ ] out food stamps." (Doc. 34-1, 40:8-21). The racist statements and conduct began before June of

---

[6] The District Court excluded Yelling's White co-workers confederate flag statements distinguishing the statements from wearing confederate memorabilia like the conduct recognized as racially motivated in *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1297 (11th Cir. 2012). In doing so, the District Court ignored the totality of the circumstances, the context of the statements (a group of White employees speaking in front of the only Black nurse), and that both wearing or speaking in support of the confederate flag are a display of support of the symbol.

2015, but by June, Yelling's work environment was "heated with the racially disparaging comments." (Doc. 34-1, 73:23-74:1, 249:9-17).

> ### 2) *The evidence supports that the racist statements and racially exclusive conduct were severe.*

The District Court discounted the severity of the statements and conduct Yelling endured by "isolate[ing] each piece" of evidence and "attempt[ing] to trivialize it by taking it out of context." *Mendoza*, 195 F.3d at 1262 (Tjofalt, J., dissenting). The District Court discounted all the racist statements about the Black patients and the Obamas as "directed at third parties – not Yelling." (Doc. 45 at 20). Conduct that is severe or pervasive can create a hostile work environment "even if the words are not directed specifically at the plaintiff." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010). *See also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (defining the contours of a plaintiff's environment can go beyond the dynamic between the supervisor and plaintiff). Yelling testified that she was exposed to the conversations that were regularly entrenched at the nurses' station when she walked up. (Doc. 34-1, 71:19-72:1). The District Court also trivialized the conduct because Yelling never heard anyone use the "N-word" and ignored the severity of the "monkey" and "Africa" comments. "Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable – perhaps even an obvious – conclusion that the use of monkey imagery is intended

as a racial insult where no benign explanation for the imagery appears." *Jones v. UPS Ground Freight*, 683 F.3d at 1297. In *Jones*, this Court noted that a Black employee viewed being called a monkey as "roughly equivalent" to the N-word. *Id*. at 1303. Moreover, the other statements Yelling complained about are "obvious racial slurs exhibiting highly offensive stereotypes." *Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1285 (11th Cir. 2018).

### 3)    *The evidence supports that the racist statements and conduct were humiliating.*

Again, trivializing and isolating the statements and conduct, the District Court says the conduct cannot be humiliating or threatening if it is about a third-party.[7] (Doc. 45 at 21). A harasser need not close the loop of discrimination by referencing the plaintiff, in particular to, show they view the plaintiff's class in a negative way. *C.H. Robinson*, 594 F.3d at 811. "The fact that many of the epithets were not directed at [the plaintiff] is not determinative." *Walker v. Ford Motor Co.*, 684 F.3d 1355, 1359 (11th Cir. 1982) (superseded by statute on other grounds). *See also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (holding sexual statements in a team setting were relevant to plaintiff's claim even if not directed

---

[7] The District Court also seems to say the conduct cannot be severe or pervasive if it is not physically threatening. However, this circuit has recognized many times over that conduct that is not physically threatening can still satisfy the humiliating factor.

specifically to her). Viewing the record in the light most favorable to Yelling,

Black nurses were degraded by being passed over for acting charge nurse and had

shifts canceled. (Doc. 34-1, 81:1-23; Doc. 34-3).  Dubose had a "quota," and

staffed one Black nurse per CDU shift. (Doc. 34-1, 81:1-23; Doc. 34-6, 67:16-22;

Doc. 34-3). Yelling's White co-workers the Obamas should "go back to Africa," a

country they never lived in. This is a highly offensive reference the kidnapping and

enslavement of many Black nations. They also regularly compared the Obamas to

"monkeys." (Doc. 34-1, 44:9-11, 48:10, 50:14-20, 54:14-16, 55:18-21, 56:10-18,

59:5-60:3, 70:8-13, 290:11-22) "To suggest that a human being's physical

appearance is essential a caricature of a jungle beast goes far beyond the merely

unflattering, it is degrading and humiliating *in the extreme*." *Spriggs*, 242 F.3d at

185 (emphasis added) (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir.

2000). They referred to Black patients as "ghetto fabulous", "welfare queens",

"crackheads", or "boy or girl" instead of "man or woman." (Doc. 34-1, 44:9-11,

48:10, 50:14-20, 54:14-16, 55:18-21, 56:10-18, 59:5-60:3, 70:8-13, 290:11-22). A

reasonable person in Yelling's position could and would be humiliated by the

dehumanizing and derogatory statements, even if made about third parties, when

the entire basis for the statement is the race the third person and victim share.

> **4)     The evidence strongly suggests that the racial statements and conduct interfered with Yelling's job performance.**

The District Court improperly asserts that because the racist statements usually occurred during conversations at the nurses' station, and because nurses were providing care, it was unusual for all nurses to be at the station at one time. (Doc. 45 at 21). The District Court again makes improper inferences about Yelling's experiences. Yelling's testimony is clear, the statements were "not unusual", there was a "culture" on the unit and her White co-workers were not "holding back" their opinions of Blacks. (Doc. 34-1, 54:14-16, 56:4-6, 66:14-21, 70:8-13). As repeated at length, the evidence and inferences viewed in the light most favorable to Yelling show she was exposed to racist remarks and conduct regularly. The statements interfered with Yelling's work because her environment became "heated with the racially disparaging comments" and in some instances, Yelling was denied shifts in favor of a White supplement staff nurse. (Doc. 34-1, 73:23-74:1, 81:1-23, 249:9-17; Doc. 34-3) SVH also utilizes a team nursing approach and told Yelling to work as a team with openly racist individuals. (Doc. 34-1, 46:13-23).

### 5) *Totality of the Circumstances*

When viewing how the District Court intertwined the factors during its analysis it becomes clear that the four-factors cannot and are not meant to be exclusive proof of a hostile work environment. The factors can help guide the court but because the evidence must be viewed "cumulatively and in the totality of the

circumstances" whether conduct is severe or pervasive "is not subject to mathematical precision[.]" *Smelter*, 904 F.3d at 1285. In *Smelter*, this Court found evidence of a hostile work environment where the plaintiff, the only Black person in the office, testified that she heard racist comments "every day" and was able to identify eight specific statements over a two-month period. *Id.* Smelter's co-workers referred to her once as a monkey and made similar statements about the Obamas. *Id.* at 1282. They said Black men were "lazy" and "scum of the earth" and Black women had "welfare babies." *Id.* One co-worker said she wished she could send a group of Black people she saw getting off the bus "back to Africa" and they looked like they were "chained together." *Id.* This Court noted this conduct was highly offensive and "sufficiently severe to create a hostile work environment." *Id.* at 1286. This Court looked to the four-factors, noted "no single factor is required[,]" and found ample evidence of humiliating conduct. *Id.* at 1286-87.

The conduct Yelling endured was nearly identical to that in *Smelter*, bar the one direct monkey reference and Smelter's supervisor calling her the N-word on her last day. Even if these two instances, in the totality of the circumstances, distinguish Yelling from Smelter, this Court has found evidence of a hostile work environment with far less than what Yelling endured. In *Shockley v. Healthsouth Cent. GA Rehab. Hosp.,* (*Shockley II*), 293 Fed. Appx. 742, 747 (11th Cir. 2008) , a

per curiam panel found evidence of a hostile work environment where a supervisor verbally harassed the plaintiff for an extended period of time making repeated comments about "you people" and spoke in a threatening manner. The Court noted that Shockley's failure to show interference with her work performance was not fatal. *Id.* Shockley was a licensed practical nurse, working under White supervision. *Shockley v. Rebound, Inc. d/b/a Healthsouth Cent. GA Rehab. Hosp.*, 2008 WL 350997 at *1-2 (M.D. GA Feb. 7, 2008) (reversed in part by *Shockley II*[8]). Shockley alleged her supervisor made multiple "you people" comments over the course of her year-long employment, including "You people are always complaining . . . That's why you people can't keep a job . . . ", "You people always jumping up and down like monkeys," and that the statements persisted for months. *Id.* at *2. Just as repeated "you people" comments over several months were severe or pervasive in 2008, so are the many comments Yelling testified to from 2015. Yelling's supervisors were fully aware of, condoned, and sometimes participated in the conduct.

---

[8] Though the facts surrounding the termination in *Shockley II* closely resemble Yelling's, the case is not dispositive for her claims beyond hostile work environment. Yelling disputes the misconduct where Shockley did not and as discussed below, because Yelling's cases presents a mixed-motive, the proper analytical frameworks arise from *Quigg* and *Bostock*, both cases developed after *Shockley II.*

The bottom line is, when considering the totality of the circumstances and social context, a reasonable person in Yelling's position would find SVH subjected Yelling to conduct and statements that were racially hostile and abusive. *See Oncale*, 524 US at 81. The reasonable person standard built into the hostile work environment analysis is flexible, evolving, and mandates a contemporary view of the conduct and totality of the circumstances. What a reasonable person in Yelling's position, considering the social context, would find racially hostile or abusive today, has likely and probably evolved from what a reasonable person in 1998 considered racially hostile or abusive in the workplace *See Oncale*, 524 U.S. at 81.

### 6) *Today's social context considerations.*

Even without statistical evidence, a quick internet search of "#whileblack," the vast number of protests and marches, the surge of confederate monument removals, and the sheer volume of race discrimination employment cases filed every day evidences the importance of race in societal views. The prevalence of this issue shows that societal norms are changing. A true evaluation of social norms, values, and ideals, requires full consideration of the current, contemporary views of what is appropriate and inappropriate in the workplace. Precedent built on the flexible reasonable person standard cannot confine conduct to a case-to-case comparison when the cases span decades. The District Court erred in discounting

31

and discrediting Yelling's evidence because it failed to view the totality of the

circumstances and made improper inferences in favor of SVH. The District Court

applied its own view instead of a reasonable juror when determining if the conduct

was severe or pervasive and compared the conduct to outdated cases instead of

looking to the conduct today. Because a reasonable juror in Yelling's position,

with life experiences, exposure to contemporary societal views, and an

understanding of modern standards of appropriate workplace conduct, could view

repeated racially derogatory statements and inaction by SVH as severe or

pervasive, the District Court's decision should be REVERSED.

## II.    <u>Yelling has presented sufficient circumstantial evidence to permit a reasonable juror to infer that SVH acted with discriminatory intent.</u>

An employer may not discriminate against an individual because of race or

retaliate against them for opposing racially motivated employment decisions. 42

U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981.[9] Though discrimination and retaliation

claims can be analyzed under multiple frameworks, employers and courts regularly

default to the burden shifting framework of *McDonnell Douglas*. This framework,

---

[9] Based on the similarities between the statutory language and causation standard, courts regularly analyze the statues together. *Standard v. A.B.E.L Svc. Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). "But-for" causation applies to both statutes, but Title VII cases may also survive under the lesser burden of "motivating factor." *See Comcast Corp. v. Nat'l Ass'n Of African American-Owned Media*, 140 S.Ct 1009, 1014 (2020) and *Bostock v. Clayton Cty.*, 140 S.Ct. at 1739-40.

however, is not always appropriate, and the ultimate question should always be whether the employee created a triable issue of fact. *Lewis v. City of Union City, GA, (Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "[A] plaintiff will ***always*** survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory [and retaliatory] intent." *Smith*, 644 F.3d at 1328 (emphasis added). Yelling created a triable issue concerning SVH's intent.

**A. Yelling has presented evidence that a reasonable juror could conclude that Race was a motivating factor and race and retaliation were but-for causes.**

 **1) *Yelling has shown that race was a motivating factor in her Title VII race discrimination claims.***

As this Court has held, "*McDonnell Douglas* is inappropriate for evaluating mixed-motive claims because it is overly burdensome when applied in the mixed-motive context." *Quigg*, 814 F.3d at 1237. Yelling has presented a mixed-motive claim for discrimination and retaliation where illegal bias and other factors motivated the decision. *Id.* at 1235. The *McDonnell Douglas* framework is "fatally inconsistent with the mixed-motive theory of discrimination because the framework is predicated on proof of a single, 'true reason' for an adverse action." *Id.* at 1237 (citing *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

33

In *Quigg*, this Court defined another analytical framework for examining mixed-motive Title VII race discrimination claims at summary judgment. In this analysis, the court must ask only whether the plaintiff has offered evidence sufficient to convince a jury that: (1) the employer took an adverse action against her and (2) her protected characteristic was a motivating factor for the decision. *Quigg*, 814 F.3d at 1239. In *Quigg*, the defendant school board did not renew the superintendent's contract after several board members made statements implicating a sexist bias. *Id.* Quigg claimed sex discrimination and the board claimed legitimate non-discriminatory reasons unrelated to sex or the bias statements. *Id.* This Court reversed summary judgment on Quigg's sex discrimination claim, pointing to the evidence of bias statements stating Quigg had "presented sufficient evidence for a reasonable jury to conclude that her sex or gender was a motivating factor in the decision not to renew her contract." *Id.* at 1241. The Court entered no analysis of whether the board's proposed reason was true, correct, or honestly believed, simply stating "taken together and in the light most favorable to Quigg, the statements establish a jury issue as to whether sex or gender-based bias was a motivating factor[.]" *Id.* at 1242.

Yelling presented a claim for race discrimination and SVH claimed it took the adverse actions because of a separate, legitimate, non-discriminatory reason, unrelated to race.  This, like most cases today, is a mixed-motive claim. Therefore,

34

*McDonnell Douglas* has no place in the analysis. *Quigg*, 814 F.3d at 1238.

Accordingly, the real inquiry is whether Yelling "has presented sufficient evidence of mixed-motive discrimination to establish a jury issue." *Id*. at 1240. Viewing the facts and inferences in the light most favorable to Yelling, she has presented sufficient evidence of mixed-motive discrimination. SVH excluded Black nurses from acting charge nurse and only employed one Black nurse per CDU shift. (Doc. 34-1, 81:1-23; Doc. 34-6, 67:16-22; Doc. 34-3, p3¶3). SVH maintained a racially hostile work environment despite repeated opposition by Yelling. (Doc. 34-1, 53:3-13, 81:21-23, 267:8-9; Doc. 34-7, 26:12-18, 66:7-67:1, 72:6-18). SVH suspended Yelling after a verbal altercation but did not suspend three White nurses for the same conduct directed at Yelling. (Doc. 34-1, 110:16-17, 112:10-18, 153:3-11; Doc. 34-6, 75:5-19; Doc. 34-7, 113:17-114:1). Yelling's supervisors made racially derogatory statements or otherwise ratified the statements by failing to intervene and correct the conduct. (Doc. 34-1, 40:8-21, 53:3-13, 81:21-23, 267:8-9). SVH depended on witness statements from racially bias White co-workers. (Doc. 34-4, p82; Doc. 34-10). Considering the evidence together and in the light most favorable to Yelling, she has established a jury issue regarding whether race was a motivating factor for the decision. *Quigg*, 814 F.3d at 1239.

> **2) *The Supreme Court's holding in Bostock shows McDonnell Douglas is also inappropriate in mixed-motive claims under Title VII retaliation and § 1981 race and retaliation claims.***

While *Quigg* applied to Title VII discrimination claims, the Supreme Court's holding in *Bostock* leads to the same analysis in mixed-motive Title VII retaliation and § 1981 claims because they require but-for causation. Writing for the Court, Justice Gorsuch made it clearer than ever that where an employee can point to any evidence of discrimination or retaliation, the case must go to a jury. The *Quigg* analysis is appropriate because there can be multiple but-for causes and "[a] defendant cannot avoid liability just by citing to some other factor that also contributed to the employment decision." *Bostock,* 140 S.Ct. at 1739. Accordingly, any mixed-motive case requiring but-for causation requires the same ultimate inquiry of "whether the plaintiff has presented sufficient evidence of mixed-motive discrimination [or retaliation] to establish a jury issue. *Quigg*, 814 F.3d at 1240. As the Sixth Circuit held in *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008), which this Court relied on in *Quigg*, "[i]n order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *Id.* Under *Bostock's* but for analysis, the same facts that support finding race was a motivating factor under *Quigg*, support finding race was a but-for cause under §1981. *See* Section II.A.(1) *supra.* Additionally, Yelling has presented evidence of a jury issue regarding whether retaliation is a but-for cause.

36

USCA11 Case: 21-10017    Document: 13    Date Filed: 04/26/2021    Page: 48 of 69


But-for causation requires the change of one thing at a time to see if the result changes. *Bostock*, 140 S.Ct. at 1739. SVH did not conduct a performance evaluation with Yelling and placed her in progressive discipline after she complained of race discrimination. (Doc. 34-1, 92:6-104:23; Doc. 39-7; Doc. 39-9, Doc. 34-4, 56:11-57:6; Doc. 34-7, 115:18-116:7). When Yelling reported she believed her White co-workers were targeting her, Director Lacy added to the discipline that Yelling should "go to each team member . . ." to see how she could better improve the relationship but never addressed Dubose racist staffing, or the racist statements by Wilhite, and other White nurses. (Doc. 34-4, 97:19-98:1). SVH conducted a chart audit and terminated Yelling when her charting did not match her GPS tracker report, even though SVH knew the trackers were not reliable (Doc. 39-12). Yelling had reported problems with her tracker. (Doc. 34-1, 298:2-23). The unit secretary, who had helped paper Yelling's file, said Yelling's tracker "rarely tracked." (Doc. 34-6, 98:12-18, 117:10-22; Doc. 34-5, 29:13-30:3, 32:21-33:5). Yelling responded that her charting was accurate, her badge did not track properly, and she did not falsify medical records. She also provided details of her patient treatment from that date. (Doc. 34-1, 136:1-16, 142:13-143:1). SVH noticed a similar inconsistency in Yelling's charting/tracking before her EEOC charge but was not concerned. (Doc. 39-7; Doc. 39-6). SVH had an additional good reason to treat the tracker information as unreliable and inaccurate because

the badge tracker report tracked Yelling at 9:00 p.m., more than two (2) hours after the end of her shift and two and one-half (2 ½) hours after the previous last track. (Doc. 34-4, 141:2-142:8; Doc. 39-13). SVH HR and Director Lacey depended on Dubose to investigate Yelling and resolve her complaints and conducted no independent investigation. (Doc. 34-7, 62:10-15, 125:16-20, 147:14-19; Doc. 34-4, 31:14-32:12). Dubose elicited witness statements from the White co-workers Yelling reported for making racist statements. Dubose provided the statements to Patient Care Supervisor Haynes, ignoring the witnesses' motive and credibility. (Doc. 34-4, p82; Doc. 34-10).

Yelling's opposition to race discrimination and her filing of an EEOC charge in November of 2015 is the only difference between the pre-2015 Yelling and post-2015 Yelling. The only factor that changed in Yelling's two instances of charting/tracking inconsistencies is that Yelling filed an EEOC Charge.

Additionally, Yelling disputes that she violated any work rule. (Doc. 34-1, 136:1-16, 142:13-143:1). Under *Quigg* and *Bostock*, whether SVH believed Yelling violated a work rule is irrelevant to summary judgment since there can be multiple motivating factors or but-for causes. To grant summary judgment in mixed-motive cases with circumstantial evidence of discrimination or retaliation, just because the employer asserts it believed the employee violated some work rule, would create different rules for employment matters and place one thumb on

38

the employer's side of the evidentiary scale. Additionally, it would erode the province of the jury. By comparison, when the defendant in an automobile collision asserts, he "honestly believed" his light was green, the question becomes one of fact and dispute and must be resolved by a jury. Likewise, where Yelling directly conflicts the assertion that she violated a work rule and race or retaliation is in consideration, summary judgment is not proper. *Munoz v. Oceanside Resorts*, 223 F.3d 1340, 1345 (11th Cir. 2000) (finding that where the employee and employer present directly contradictory testimony regarding the violation of a work rule, the issue must be resolved by a jury); *Boutwell v. Federal Mogul Corp.*, 342 Fed. Appx. 541, 546-547 (11th Cir. 2009) (finding that whether the employee did or did not satisfy the company's mandatory call in policy was a genuine issue of fact); *Lewis v. US Steel Corp.*, 2:18-cv-00428-RDP, Doc. 29 at 20-21 (N.D. Ala. December 13, 2019) (Procter, J.) (stating that the employer's honest belief that the employee disregarded his supervisors orders is based on disputed evidence and does not foreclose the plaintiff's pretext argument); *Jones v. UAB Health Sys.*, 2018 U.S. Dist. LEXIS 24897 at *19 (N.D. Ala. Feb. 15, 2018) (Cornelius, J.) (stating a reasonable juror could conclude plaintiff was terminated in retaliation for complaining in part because the evidence, if believed, could establish that the violation of the work rule was false and the employer knew or should have known it was false). The Court cannot, without taking over the jury's role, determine that

another proposed factor was the "true" factor. Because Yelling has presented evidence that race was a motivating factor and race and retaliation were but-for causes of the adverse actions including termination, the District Court's summary judgment should be REVERSED.

### B. A reasonable juror could conclude SVH's reason for terminating Yelling was pretextual.

#### 1) Yelling proved a prima facie case under McDonnell Douglas.

Though the *McDonnell Douglas* framework is not appropriate, the District Court recognized Yelling met the elements of a prima facie case of race discrimination and moved directly into the pretext analysis. (Doc. 45 at 27). The District Court improperly limited its pretext discussion to Yelling's argument that the GPS tracker was unreliable. The District Court adopted the statement of an interested witness, ignored the influence of racial bias, and determined SVH had fully and independently investigated the tracker/charting inconsistencies. (Doc. 45 at 27-28). A reasonable juror could disagree.

#### 2) Whether Yelling has shown Pretext is a question for the jury.

After the initial burden shifting of *McDonnell Douglas,* "the *factual* inquiry proceeds to a new level of specificity." *Combs v. Plantation Patterns Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (1997) (citing *Burdine*, 450 U.S. 248,255 & n.10) (1981)) (emphasis added). "[I]n discrimination cases, an employer's true motivations are particularly difficult to ascertain," making summary judgment

ordinarily inappropriate where a Plaintiff has established a prima facie case.

*Hairston v. Gainsville Sun Publ'g Co.*, 9 F.3d 913, 919-20 (11th Cir. 1993). "[T]he

grant of summary judgment, though appropriate when evidence of discriminatory

intent is *totally* lacking, is generally unsuitable in Title VII cases in which the

plaintiff has established a prima facie case because of the 'elusive factual question'

of intentional discrimination." *Meadowcraft*, 9 F.3d at 921 (citing *Burdine*, 450

U.S. at 256) (emphasis added). Because Yelling established a prima facie case for

discrimination the District Court erred in removing the fact intensive, weight of the

evidence, pretext analysis from the jury and granting summary judgment.

A view of the record in the light most favorable to Yelling shows that the

investigation behind her alleged record falsification was weak and likely meant to

cover up the appearance of discrimination and retaliation. The tracker was

unreliable, Yelling had a history of issues with the tracker and her supervisors were

aware of it. (Doc. 34-6, 98:12-18, 117:10-22; Doc. 34-5, 29:13-30:3, 32:21-33:5).

SVH knew Yelling's tracker issues created tracker/charting discrepancies in the

past but did not counsel or discipline her showing that SVH did not believe the

tracker/charting inconsistencies were of concern. (Doc. 39-7; Doc. 39-6). Dubose,

who Yelling stated had a Black "quota," and who had not addressed Yelling's

complaints of discrimination, was the one who initiated the chart audit. (Doc. 34-7,

62:10-15, 125:16-20, 147:14-19; Doc. 34-4, 31:14-32:12). Dubose elicited witness

41

statements from the White co-workers Yelling reported for making racist

statements. Dubose provided the statements to Patient Care Supervisor Haynes,

ignoring the witnesses' motive and credibility. (Doc. 34-4, p82; Doc. 34-10).

### 3) *11th Circuit precedent shows Yelling has met her burden regarding pretext.*

In *Hairston,* interpreting then new Supreme Court precedent,[10] this Court

reversed summary judgment stating the plaintiff's burden

> is not to show by a preponderance of the evidence that the reasons stated *were* pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that *could* form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext, and that the action taken was in retaliation for engaging in the protected activity. Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue.

*Hariston*, 9 F.3d at 921 (emphasis added). Utilizing *Hairston,* this Court regularly

reversed district court summary judgments where the plaintiff established the

prima facie case and provided ***some*** evidence that would allow a ***factfinder*** to

discredit the defendant's proposed non-discriminatory reason. *See Meadowcraft*,

---

[10] This circuit is bound by *Hairston*, the Circuit's first decision interpreting the Supreme Court's decision in *St. Mary's Honor Center v. Hick*s, 509 U.S. 502 (1993) because "the earliest panel opinion resolving [an] issue . . . binds this circuit until the court resolves the issue en banc." *Meadowcraft*, 9 F.3d at 1532 (internal citations omitted). The issue in *Hicks* was whether the ***factfinder's*** finding of pretext mandated judgment for the Plaintiff. *Id*. at 512-13.

106 F.3d at 1530-1533. (providing a "chronological review" of the 11th Circuits post *Hicks* cases). As this Court noted in *Meadowcraft*, nothing else is required to avoid summary judgment aside from the showing of a prima facie case and evidence that *could* permit the factfinder to disbelieve the Defendant's explanations. *Id.* at 1530.

In *Hairston*, a reporter with a good employment history started receiving criticism from a newly hired publisher. *Hairston,* 9 F.3d at 915. Even though he believed the criticisms were unfounded, he tried to comply, but still received a poor evaluation. *Id.* He disputed the evaluation stating the true reason was age discrimination. *Id.* After his complaint, the employer pointed to a few instances of alleged misconduct over the next year and ultimately terminated him claiming he was insubordinate. *Id.* at 915- 918. In reversing summary judgment and sending the case to a jury, this Court stated the plaintiff did not have to present evidence beyond his prima facie case but in this case he had. *Id.* at 920-21. The Court noted that the documented change in performance evaluations immediately before and after his complaints and increased scrutiny and harassment from the supervisor, were evidence that suggested the proffered reason, employee misconduct or insubordination, was pretext. *Id.* at 921. "[S]urveillance strongly suggests the possibility of a search for a pretextual basis for discipline, which in turn suggests

that subsequent discipline was for purposes of retaliation." *Id.* (internal citation omitted).

Like the plaintiff in *Hairston*, Yelling had a good employment record before she opposed racially derogatory statements, a Black nurse quota, and differential treatment of Blacks. (Doc. 34-7, 115:18-117:6-11). After her opposition, SVH placed Yelling in progressive discipline, drug tested her, sent her home from shifts, and subjected her to surveillance telling her charge nurse to "document everything." (Doc. 39-3; Doc. 34-1, 184:10-16, Doc. 34-6, 57:13-22, Doc. 39-4). Dubose, a supervisor Yelling had reported for discrimination, initiated a chart audit wherein SVH compared unreliable tracking data to Yelling's medical charting of one patient and gathered supportive statements from White co-workers who had a history of making racist statements. (Doc. 34-6, 29:3-7; Doc. 34-7, 124:6-8). SVH built a case against Yelling.[11]

This Court, in a per curium opinion, again reiterated that pretext was a question of fact in *Cooper-Houston v. Southern Railroad Co.*, 37 F.3d 603, 605 (11th Cir. 1994). The railroad alleged it terminated a Black special agent because she breached the company's confidentiality policy by disclosing facts of an

─────────────────

[11] An employer's actions of building a case against an employee is evidence of retaliation. *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991); *Sehridan v. E.I. DuPont De Nemours and Co.*, 100 F.3d 1061, 1074 (3rd Cir. 1996).

ongoing investigation. *Id.* at 604. After a bench trial the magistrate found "[s]he presented evidence that she was treated less favorably than her white co-worker in terms of work schedule, job assignments, absences, lateness and that her conduct was generally given greater scrutiny. . . . [and] presented evidence [of] racially derogatory remarks" by her co-workers and supervisor but dismissed the case. *Id.* at 605. Considering these facts, the Court reversed the judgement as a matter of law[12] because a fact-finder could have believed the company was motivated by racial animus. *Id.*

Like the plaintiff in *Cooper-Houston,* Yelling presented evidence that she was treated less favorably than her white co-workers. Several co-workers were not disciplined for screaming or cursing at Yelling, but Yelling was sent home and told to go to each co-worker to see how she could repair the relationship. (Doc. 34-4, 97:19-98:1, 110:16-17; 153:3-11; Doc. 34-7, 112:10-18, 113:17-114:1; Doc. 34-6, 75:5-19). Yelling's work was excessively scrutinized when she was reported for moving furniture and spraying smell-good spray in a patient's room and was chart audited. (Doc. 39-7, Doc. 39-5). Yelling also presented evidence of regular racially derogatory remarks by her White co-workers, including a supervisor, and SVH's repeated inaction. (Doc. 34-1, 40:16-21). White nurses call Black patients "welfare

---

[12] Summary Judgments and Judgments as a Matter of Law are subject to the same standard. *Reeves*, 530 U.S. at 150.

queens," "crack-heads," "ghetto-fabulous," and "pill seekers." Black patients were "boy" and "girl" instead of "man" or "woman." (Doc. 34-1, 44:9-11, 48:10, 50:14-20, 54:14-16, 55:18-21, 56:10-18, 59:5-60:3, 70:8-13, 290:11-22).  They would refer Michelle Obama and President Obama as "pieces of shit," say they "looked like monkeys," and that they should "go back to Africa." (Id.) SVH condoned the conduct, an important sign of pretext and racial animus.

The Court also vacated a judgment as a matter of law in *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806-08 (11th Cir. 1995). In *Richardson,* the department did not rehire a Black officer who had resigned and reapplied. *Id.* The department said it did not rehired Richardson was because he resigned citing burned-out. *Id.* Richardson said he told his supervisor he was resigning because he was not being treated equally, was denied promotions, and was just "burnt out," he also testified he had voiced concerns over the department's generally hostility toward Black citizens. *Id.* Richardson identified White officers the department rehired as comparators. *Id.* at 807. One was reinstated after leaving because he was not happy when he did not get a promotion. *Id.* Another was reinstated after leaving because of low pay and what he considered unfair treatment regarding his military leave. *Id.* The department asserted they were not comparators because the white officers were not "burnt out" which the District Court accepted as the true and only reason. *Id.* In reversing, the Court stated

46

Although the evidence would have permitted a reasonable jury to infer an innocent motive on the City's part--that the mayor viewed Richardson as a poor candidate for reemployment because he was "burned out" by police work and no longer inspired to perform to the best of his ability--a reasonable jury could also have concluded that Richardson's professed "burn out" was not the true reason he was not rehired. Like Richardson, two of the white officers who were rehired voiced dissatisfaction with their treatment within the Department . . . Apart from Richardson's race, the evidence did not demonstrate any circumstances peculiar to his situation which set him apart from the white officers who were restored to their jobs. In short, the evidence presented a question of fact as to whether the mayor's decision not to rehire Richardson was racially motivated.

*Id.* at 807-08.

Like the plaintiff in *Richardson*, Yelling stated she was not treated like White employees, was denied acting charge nurse shifts and extra shifts, and reported racially hostile statements toward Blacks and Black patients. (Doc. 34-1, 167:18-120:21). SVH suspended Yelling after a verbal altercation but did not suspend three White nurses for the same conduct directed at Yelling. (Doc. 34-1, 110:16-17, 112:10-18, 153:3-11; Doc. 34-6, 75:5-19; Doc. 34-7, 113:17-114:1). SVH chart audited Yelling and terminated her for "falsifying patient documentation in [her] assigned patients' charts [and] not maintain[ing] accurate patient official records for the system and provide the quality or quantity of work established for [the] job responsibilities." (Doc. 34-7, 135:13-136:6). SVH did not terminate Mike Pike, a White RN, or Felicia Parrish, a nurse who had not complained, for failing to make rounds or document rounds which would create

47

inaccurate patient official records and was a failure to provide the quality or quantity of work required. SVH further did not terminated Yvonne Arrington or Linda Powell for failing to verify patient identifiers resulting in inaccurate patient official records and not providing the quality or quantity of work required. Instead, SVH issued each progressive discipline. (Doc. 34-6, 84:7-13, 86:3-6, Ex11). SVH replaced Yelling with a White RN. (Doc. 39-14 ¶6).

This Court recently identified a comparator as an individual outside the plaintiff's class who is "similarly situated in all material respects." *Lewis v. City of Union City, GA, (Lewis I),* 918 F.3d 1213, 1218 (11th Cir. 2019). Stating comparators should not reasonably be distinguishable, the Court found the "nearly identical" test too strict. *Id.* at 1224, 1227. Comparator analysis is conducted on a case-by-case basis, there is not a bright-line, rigid test, but the court should ordinarily consider among other things, whether the individuals engaged in the "same *basic* conduct (or misconduct)[,]" were subject to the "same employment policy, guideline, or rule[,]" were under the same supervisor, and share a similar employment or disciplinary history. *Id.* at 1227-1228. (emphasis added).

Using these factors as guideposts, and considering the totality of the circumstances, Yelling has presented evidence that SVH treated Whites and individuals who did not complain more favorable than her. As discussed above with *Richardson*, Yelling has shown she was treated different from White

48

employees or employees who had not opposed discriminatory conduct. Viewing

the evidence in the light most favorable to Yelling, the verbal altercations all

constitute the same basic conduct. SVH's distinction in the employees merely by

Yelling's stage in the disciplinary process or distinguishing the alleged termination

reasons, is an attempt to apply the "nearly identical" standard this Court has

rejected. Though SVH claims it terminated Yelling for falsifying medical records,

a reasonable jury could determine otherwise. White, non-complaining nurses also

failed to "maintain accurate patient official records of the system and provide the

quality and/or quantity of work established for [the] job responsibilities[,]" but

were not terminated. (Doc. 39-12 at 2) SVH went against its own progressive

discipline policy by terminating Yelling when she was in stage two of the four-

stage progressive disciplinary process. The comparators need not be nearly

identical, but only not reasonably distinguishable and the guideposts are not boxes

to be checked from a list.

All these individuals worked under the same supervision, were subject to the

same policies and procedures, and exercised the same basic conduct. A reasonable

juror could conclude the only thing setting Yelling apart from the other individuals

was her race or protected activity. Even without comparators, the differential

treatment is not irrelevant and should be considered under the other, more

appropriate frameworks including motivating factor and convincing mosaic. *See*

*Lewis II*, 934 F.3d at 1187. Viewing all the evidence in the light most favorable to Yelling and drawing all reasonable inferences in Yelling's favor, a jury must decide if SVH construed "a false narrative" to cover a discriminatory motive. *US Steel Corp,* 2:18-cv-00428-RDP, Doc. 29 at 20-21.

**C. The District Court's dismissal of Yelling retaliation claim without any pretext analysis views the evidence and interferences in SVH's favor in violation of Rule 56.**

As stated previously, retaliation claims are subject to the mixed-motive analysis of *Quigg* and *Bostock*. However, even applying *McDonnell Douglas*, the District Court erred and summary judgment should be reversed with regard to Yelling's retaliation claim. The retaliation Yelling endured after opposing discriminatory conduct includes more than just her termination. Adverse actions are more broadly defined in retaliation cases. *See Burlington Northern and Santa Fe Ry., Co. v. White*, 548 U.S. 53, 63-64 (2006). Any action that would dissuade a reasonable employee in Yelling's position from taking a protected action is materially adverse. *Id.* at 68. SVH drug tested Yelling and suspended her pending the results just one week after she complained about White co-workers making racist statements. The same White co-workers reported her for "reasonable suspicion" of drug use because of "interpersonal issues." Neither the co-workers, or SVH prevented her from completing direct patient care while for several hours while they allegedly waited for approval to order the drug testing. (Doc. 39-3).

Yelling opposed the drug testing as retaliatory. Dubose met with Yelling's White co-workers about her, reminded them to wear their trackers, and told her charge nurse to "document everything." (Doc. 34-6, 57:13-22, Doc. 39-4). They began taunting her weekly saying "Casi [Dubose] is going to fire you." (Doc. 34-1, 309:5-19). SVH started scrutinizing her work by reporting everything, even the most trivial, to management and HR. (Doc. 39-7, Doc. 39-5). Her White co-workers ostracized her. SVH terminated Yelling within two months of receiving her EEOC charge. (Doc. 34-4, 120:15-121:2; Doc. 34-7, 135:10-136:6).

The District Court misapplied precedent and the summary judgment standard by finding Yelling's intervening conduct severed the causal connection. The District Court noted that Yelling had satisfied the causal link regarding her termination because the temporal proximity of two months was close enough to show that the protected activity and termination were not completely unrelated. (*See* Doc. 45 at 29-30). The District Court then, viewing the facts against Yelling, severed the causal relationship finding "Yelling had falsified medical records" and that "constituted intervening conduct to defeat any inference of a causal connection created by temporal proximity." (Doc. 45 at 30). The District Court relied on this Court's unpublished opinion *Henderson v. FedEx Express*, 441 F. App'x 502, 504 (11th Cir. 2011) for this holding, but *Henderson* is distinguishable.

In *Henderson*, the employer fired the plaintiff after a series of complaints when it discovered he had falsified his timecard. *Id.* at 504. More than six months had passed between his complaint and his termination. *Id.* Additionally, the testimony supported that unrelated to Henderson, the company had installed surveillance cameras at the time clock, which the company was able to review after suspicion that Henderson had arrived late and falsified his timecard. *Id.* Deposition testimony showed the surveillance video confirmed that Henderson only appeared at the time clock when he clocked out for the day. *Id.* Henderson did not dispute the video content, only its admissibility. *Id.* This Court, relying on a case from the 8th circuit found Henderson's timecard falsification "was an intervening act of misconduct that diminished any inference of causation that may have arisen [from an interview two weeks before his termination]." *Id.* at 507. Because Henderson did not dispute the content of the video, there was no credibility determination or weighing of evidence and the District Court did not invade the province of the jury. The same is not true of Yelling.

*Henderson* relied on *Keil v. Select Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999) and *Fleming v. Boeing Co.*, 120 F.3d 242 (11th Cir. 1997). *Keil* and *Fleming* both affirm that for conduct to severe the causal connection at summary judgment, it must be undisputed conduct.  In *Keil*, the employer terminated a deaf employee after he shouted at his supervisor and slammed his desk drawer when she said the

52

company would not purchase a TDD device. *Keil,* 169 F.3d at 1134. The employee did not dispute this conduct and in fact apologized for it. *Id.* The Court also noted that Keil had not presented any evidence of conduct or statements that would otherwise support his claim and that Keil was merely asking the court to allow a jury to determine if his conduct was severe enough to support termination. *Id.* at 1136. Similarly, in *Fleming*, this Court found that causation established by close temporal proximity was severed where there was ***no dispute*** that the plaintiff did not meet the minimum qualifications for the desired position and the company had never hired an applicant without those qualifications. *Fleming*, 120 F.3d at 248. The Court could find the misconduct severed the causation in *Henderson*, *Keil*, and *Fleming*, without making any credibility determinations or weighing the evidence because the plaintiffs did not dispute the misconduct (or disqualification). In contrast, Yelling vehemently disputes that she falsified medical records and even provided details about the patient care she provided.[13] (Doc. 34-1, 136:1-16, 142:13-143:1).

---

[13] Likewise, the surveillance video used in *Henderson* is not comparable to the tracker report used against Yelling because the content of the video was not disputed. Yelling has presented evidence that the trackers were not always reliable, that her tracker rarely tracked, that SVH was aware of the tracker issues, and that the specific report used to terminate her contained abnormalities – like the random track hours after her shift ended.

Additionally, the remaining evidence discussed throughout this brief supports a finding of pretext which the District Court did not even analyze. Even without a pretext finding for Yelling's discrimination claim, the facts lay and weigh differently in retaliation claims and require a separate analysis. Much like the evidence cited in support of a hostile work environment, the compilation of retaliatory treatment presents sufficient evidence of pretext for retaliation.

### D. Yelling has presented a Convincing Mosaic of retaliatory and discriminatory conduct

Even without considering *McDonnell Douglas, Bostock, or Quigg*, the District Court erred in granting summary judgment because Yelling has shown "sufficient circumstantial evidence to permit a jury to infer" that SVH acted with discriminatory and retaliatory intent. *Blash*, 2021 WL 1561347 at *3, (11th Cir. April 21, 2021). Yelling created a triable issue by painting a convincing mosaic of circumstantial evidence. *Lewis II*, 934 F.3d at 1185. As this Court noted in *Lewis II*, some of the ways a plaintiff may paint a convincing mosaic including showing suspicious timing, ambiguous statements, and bits and pieces leading to an inference of discrimination, and pretext. *Id.* Without restating all the evidence already set out herein, a few examples of Yelling's mosaic tiles include:

- the regular and severe racist statements of her supervisor and co-workers, (Doc. 34-1, 44:9-11, 48:10, 50:14-20, 54:14-16, 55:18-21, 56:4-18, 59:5-60:3, 64:15-18, 66:14-21, 67:15-22, 70:8-13, 290:11-22; Doc. 34-3, p3¶2),

54

- the shift makeup of only one Black nurse per shift, (Doc. 34-1: 57:15-58:2),

- SVH replaced Yelling with a White nurse, (Doc. 39-14 at ¶6),

- SVH's inaction on any of Yelling's complaints of discrimination, (Doc. 34-1, 53:3-13, 80:14-18, 81:21-23, 267:8-9, 250:2-3; Doc. 34-7, 26:12-18, 72:6-18),

- Yelling's pre-complaint performance evaluations compared to post complaint discipline and lack of evaluation, (Doc. 39-2, Doc. 34-7, 116:14-117:5),

- the close timing (eight weeks) between Yelling's EEOC charge and termination, (Doc. 34-4, 120:15-121:2; Doc. 34-7, 135:10-136:6),

- the weakness in SVH's investigation into Yelling's tracking/charting inconsistencies and the different employment decision between the pre and post EEOC charge chart audit. (Doc. 34-1, 98:2-23, 136:1-16, 142:13-143:12,; Doc. 34-6, 98:12-18, 117:10-22; Doc. 34-5, 29:13-30:3, 32:21-

33:5; Doc. 34-7, 62:10-15, 125:16-20, 135:13-136:6, 147:14-19; Doc. 39-7;

Doc. 39-6; Doc. 39-12).[14]

In *Lewis II*, this Court found a convincing mosaic where the employer's action was arbitrary, where the stated reason was pretextual, where the employer treated employees differently – even if the employees were not similarly situated comparators, and where the employer made suggestive comments. As stated at length throughout, Yelling has shown each of these tiles of a mosaic. These tiles should be considered with other evidence by a jury to determine whether Yelling has presented a convincing mosaic of race discrimination and retaliation.

## <u>CONCLUSION</u>

The District Court misapplied the reasonable person standard and forced Yelling's claim into the inappropriate *McDonnell Douglas* framework. Yelling has presented sufficient evidence that a reasonable juror could find SVH subjected her to a hostile work environment because of race and that race and retaliation were motivating factors or but-for causes of her discipline and termination. Yelling has created a triable issue by presenting sufficient circumstantial evidence to permit a

---

[14] The District Court further erred in adopting SVH's claim that it conducted an independent investigation. While Yelling asserts SVH did not conduct an independent investigation, "[a]n independent investigation by the decisionmaker does not automatically shield the employer from liability" where a bias report relied on is a causal factor. *Blash*, 2021 WL 1561347 at *6 (April 21, 2021, 11th Cir.).

jury to find SVH's acted with discriminatory and retaliatory intent. For these errors, the District Court's Order should be REVERSED, and this matter remanded for a jury trial on the merits.

Respectfully Submitted,

/s/ Leslie A. Palmer
Leslie A. Palmer
ATTORNEY FOR APPELLANT

PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
E-mail: leslie@palmerlegalservices.com
Tel: (205) 285-3050
Fax: (205) 386-4383

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)</u>

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 12,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-counting feature of Microsoft Office 365.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point-font Times New Roman.

Dated: April 26, 2021                    /s/ Leslie A. Palmer
                                                     OF COUNSEL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Tammy L. Baker
Shannon L. Miller
**Jackson Lewis, P.C.**
800 Shades Creek Parkway
Suite 870
Birmingham, AL 35209
bakert@jacksonlewis.com
millers@jacksonlewis.com

                                                     /s/ Leslie A. Palmer
                                                     OF COUNSEL

I