# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
## APPEAL NO. 21-10017-GG

_____

## CYNTHIA YELLING,

**Appellant-Plaintiff,**

**v.**

## ST. VINCENT'S HEALTH SYSTEM,

**Appellee-Defendant.**

_____

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

---

## BRIEF OF APPELLEE ST. VINCENT'S HEALTH SYSTEM

Tammy L. Baker (ASB-9522-B62T)
tammy.baker@jacksonlewis.com
Shannon L. Miller (ASB- 8026-R60S)
shannon.miller@jacksonlewis.com
JACKSON LEWIS P.C.
800 Shades Creek Parkway. Suite 870
Birmingham, Alabama 35209
Telephone:  205-332-3106/3102
Facsimile:  205-332-3131

## APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee St. Vincent's Health System ("Appellee" or "St. Vincent's"), pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, hereby submits its Certificate of Interested Persons and Corporate Disclosure Statement, and certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.   Ascension Health – Parent to Appellee, St. Vincent's Health System;

2.   Baker, Tammy L. – Counsel for Appellee;

3.   Cornelius, Staci G. – United States Magistrate Judge, Northern District of Alabama;

4.   Equal Employment Opportunity Commission – Amicus Curiae;

5.   Goldstein, Jennifer S. – Associate General Counsel, EEOC;

6.   Jackson Lewis, P.C. – Law Firm of Counsel for Appellee;

7.   Miller, Shannon L. – Counsel for Appellee;

8.   Oxford, Susan R. – EEOC Attorney;

9.   Palmer, Leslie A. – Counsel for Appellant;

10.  Palmer Law LLC – Law Firm of Counsel for Appellant;

11.     Reams, Gwendolyn Young – Acting General Counsel, EEOC;

12.     St. Vincent's Health System – Appellee;

13.     Theran, Elizabeth E. – Assistant General Counsel, EEOC; and

14.     Yelling, Cynthia – Appellant.

Appellee St. Vincent's Health System states that it is a wholly controlled subsidiary of Ascension Health, a non-profit, faith-based healthcare system headquartered in Edmundson, Missouri.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary.  This case involves the application of well-developed case law to the applicable facts.  There are no novel issues of law or fact, the facts and legal arguments are adequately presented in the briefs and the record, and oral argument would not significantly aid the decisional process.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal of a final decision of the United States District Court for the Northern District of Alabama.

# **TABLE OF CONTENTS**

APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... iv

STATEMENT OF JURISDICTION................................................................... v

TABLE OF CONTENTS.................................................................................. vi

TABLE OF AUTHORITIES ......................................................................... viii

STATEMENT OF THE ISSUES....................................................................... 1

STATEMENT OF THE CASE........................................................................... 3

   I.   COURSE OF PROCEEDINGS AND DISPOSITION BELOW ................... 3

   II.  STATEMENT OF THE FACTS ..................................................................... 3

       A.   St. Vincent's Dedication to Patients and Commitment to Equal
           Employment Opportunity for its Associates ........................................... 3

       B.   Yelling's Employment with St. Vincent's................................................. 4

       C.   Black Patient Care Tech's June 14, 2015 Complaint About Yelling...... 5

       D.   June 21, 2015 Drug Test after Patient Complaint of Yelling Leaving
           Personal Prescription Bottle in Patient Room ......................................... 6

       E.   Additional Coworker Complaint about Yelling's Tone and Patient
           Complaint Regarding Yelling's Unsolicited Prayers and Poor Care ...... 7

       F.   October 2015 Coaching for Yelling's Pattern of Failures to Follow
           Physician's Orders ................................................................................... 8

       G.   Yelling's November 2015 Argument with Fellow Associates................ 9

       H.   Yelling's December 2015 and January 2016 Verbal Workplace
           Violence Complaints About Coworkers.................................................. 10

       I.   Yelling's Falsification of Medical Records............................................ 11

       J.   Yelling's Coworkers' Alleged Offensive Comments............................. 12

       K.   Yelling's EEOC Charges ....................................................................... 14

SUMMARY OF ARGUMENT ...................................................................... 15

ARGUMENT ................................................................................................. 16

   I.   Standard of Review......................................................................... 16

II.  District Court Properly Dismissed Yelling's Race Discrimination Claims ..17

    A.  Untimely Claims Appropriately Dismissed ............................................17

    B.  *Bostock* Decision Did Not Overturn *McDonnell Douglas* Framework .18

    C.  Non-Adverse Employment Actions Appropriately Dismissed .............19

    D.  Yelling Failed to Identify Any Comparators .........................................21

    E.  Yelling's Failure to Demonstrate Pretext ..............................................22

    F.  No Convincing Mosaic ..........................................................................28

III. District Court Properly Dismissed Retaliation Claims ...................................33

    A.  Yelling's Falsification Constitutes Intervening Act .............................33

    B.  Drug Test Not Retaliatory ....................................................................36

IV. Yelling's Hostile Work Environment Claim Properly Dismissed ...............37

    A.  District Court Utilized Proper Factors in Analysis ...............................38

    B.  Yelling Rarely Worked with Those Making Offensive Comments ......40

    C.  EEOC Concedes Yelling's Allegations Not Extreme ..........................43

    D.  Comments Did Not Interfere with Yelling's Performance ...................46

    E.  Comments Mistakenly Excluded Do Not Change Analysis .................46

    F.  St. Vincent's Investigations Constitute Prompt Remedial Action ........48

CONCLUSION .......................................................................................................50

CERTIFICATE OF COMPLAINT WITH TYPE-VOLUME LIMIT, TYPEFACE
REQUIREMENTS AND TYPE-STYLE REQUIREMENTS ................................51

CERTIFICATE OF SERVICE ...............................................................................52

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Austal, U.S.A., L.L.C.,* 754 F.3d 1250 (11th Cir. 2014)..........................44

*Alvarez v. Royal Atl. Developers*, 610 F.3d 1253 (11th Cir. 2010)........................22

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)................................................18

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).................................................................................................36

*Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000).................... 16, 17, 19, 23

*Clark v. Coats & Clark, Inc.*, 990 F.2d 1217 (11th Cir. 1993)...............................35

*Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008)....................................... 20, 33

Damon v. Fleming Supermarkets of Fl., 196 F.3d 1354 (11th Cir. 1999) ..............28

*Edwards v. Wallace Community Coll.*, 49 F.3d 1517 (11th Cir. 1995)............ 39, 43

*Ellis v. England*, 432 F.3d 1321 (11th Cir. 2005)...................................................42

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991).................... 22, 25

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)...........................................39

*Gupta v. Fla. Bd. of Regents,* 212 F.3d 571 (11th Cir. 2000).................... 35, 38, 39

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316 (11th Cir. 2012).. 31, 33

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ........................................ 38, 39, 46

*Henderson v. Fedex Express*, 442 Fed. Appx. 502 (11th Cir. 2011).......................34

*Holifield v Reno*, 115 F.3d 155 (11th Cir. 1997) ....................................................24

*Howard v. Walgreen Co.*, 605 F.3d 1239 (11th Cir. 2010) .....................................20

*Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276 (11th Cir. 2005)....23

*Jones v UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) ....................... 44, 45

*Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752 (11th Cir. 1996) ...... 48, 50

*Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169 (11th Cir. 2005)..........18

*Lewis v. City of Union City, Ga.*, 934 F.3d 1169 (11th Cir. 2019) (*Lewis* II).........28

*Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019) .................21

*Lewis-Webb v. Qualico Steel Co.*, 929 F. Supp. 385 (M.D. Ala. 1996), *aff'd without op.*, 113 F.3d 1251 (11th Cir. 1997) .......................................................23

*Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249 (11th Cir. 2001 ...............................17

*Mabra v. United Food & Commercials Workers Local Union No. 1996,* 176 F.3d 1357 (11th Cir. 1999)....................................................................................32

*McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008) ...............................................39

*Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016)............. 31, 32

*Rowell v. BellSouth Corp.*, 433 F.3d 794 (11th Cir. 2005).....................................42

*Smelter v. S. Home Care Servs.*, 904 F.3d 1276 (11th Cir. 2018)................... 42, 43

*Stallworth v. Shuler*, 777 F.2d 1431  (11th Cir. 1985) ...........................................19

*Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023 (11th Cir. 1994) .........................23

*Summerlin v. M&H Valve Co.*, 167 Fed. App'x 93 (11th Cir. 2006).....................20

*United States v. Al-Arian*, 514 F.3d 1184 (11th Cir. 2008) ....................................17

*United States v. Harris*, 608 F.3d 1222 (11th Cir. 2010) .......................... 17, 45, 47

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)...... 31, 35, 36

*Watson v. Blue Circle, Inc.*, 324 F.3d 1252 (11th Cir. 2003)..................................50

*Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991) ...........................37

*Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482 (11th Cir. 2020).....19

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004) ............................26

## STATEMENT OF THE ISSUES

1.    Did the district court properly grant summary judgment to defendant St. Vincent's where plaintiff Yelling failed to establish a *prima facie* case of race discrimination with respect to claims occurring years prior to her EEOC Charge, claims not rising to the level of adverse employment actions, and claims with no proper comparators?

2.    Did the district court properly dismiss Yelling's race-based termination claim where Yelling failed to rebut St. Vincent's legitimate, nondiscriminatory reasons when Yelling falsified patient care records while on corrective action for failing to follow physicians' orders?

3.    Did the district court properly dismiss Yelling's retaliation claims where Yelling failed to demonstrate her complaints of alleged discrimination were the but-for reason for the termination of her employment after she falsified patient care records?

4.    Did the district court properly dismiss Yelling's race-based hostile work environment claim where Yelling admittedly had heated exchanges with both black and white coworkers, where Yelling infrequently worked with coworkers allegedly making insensitive comments and where Yelling cursed her coworkers, their children, and their children's children?

5.      Whether under this Court's *de novo* review, considering the limited alleged comments that the district court did not consider, Yelling's allegations fail to meet this Court's stringent standard for establishing a racially hostile work environment?

## STATEMENT OF THE CASE

### I.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW

St. Vincent's agrees with Yelling's statement of the procedural history of this case.

### II.    STATEMENT OF THE FACTS

#### A.    St. Vincent's Dedication to Patients and Commitment to Equal Employment Opportunity for its Associates

St. Vincent's, a non-profit health care provider located in Birmingham, Alabama, is part of a Catholic health system committed to meeting the needs of its patients, visitors, and associates by providing the highest quality patient care coupled with an outstanding customer service experience as embodied by the core values – Creativity, Dedication, Integrity, Reverence, Service of the Poor, and Wisdom. (Doc. 34-9 at 2; Doc. 34-4 at 11).

St. Vincent's affords equal employment opportunities to all individuals, without regard to race, color, religion, sex, age, national origin, disability, or any other protected category and maintains a harassment prevention policy, as well as an on-line system for associates to report concerns. (Doc. 34-1 at 23-24 and 84-85; Doc. 34-5 at 7).  St. Vincent's also maintains a progressive discipline policy referred to as Positive Redirection which is designed to help its associates achieve their potential and abide by the standards of conduct expected of them. (Doc. 34-1 at 24, 87-89; Doc. 34-9 at 2).

### B.    Yelling's Employment with St. Vincent's

In 2010, St. Vincent's hired Yelling (black female) to work as a pool Registered Nurse ("RN") and in 2011, Nurse Manager Casi Dubose (white female) hired Yelling to work as an RN in the Clinical Decision Unit ("CDU"), a unit focused on patients needing observation for conditions such as chest pains. (Doc. 34-1 6-8, 65).

Yelling describes her direct supervisor, Patient Care Supervisor Christal Haynes (white female), as "really nice," concedes she never said anything racially inappropriate to Yelling and has no complaints about her. (Doc. 34-1 at 7, 10). Haynes reported to Nurse Manager Dubose with whom Yelling rarely worked. (Doc. 34-1 at 10-11). Dubose never made any racially insensitive or inappropriate comments. (Doc. 34-1 at 11). Yelling claims Dubose refused to return her calls because of her race while at the same time acknowledging that Dubose likewise refused to return white employees' calls. (Doc. 34-1 at 22, 72).

Yelling originally worked a weekday night shift in the CDU and then transitioned to a weekend-only night shift, for which she was paid a higher hourly rate. (Doc. 34-1 at 8). When working the weekend-only night shift, Yelling's Charge Nurse, akin to a shift supervisor, was Jim Wilhite (white male), and after 2013,[1] when Yelling transferred to weekend-only day shift, Yelling's Charge

---

[1] Before Yelling transferred to weekend-only shifts in 2013, she claims Dubose failed to assign

Nurse was Jennifer Laroe (white female). (Doc. 34-1 at 8, 65; Doc. 34-10 at 2; Doc. 34-5 at 5). On the weekend-only day shift, Kimberly Parrish (white female) worked as the House Supervisor in charge of hospital operations. (Doc. 34-4 at 12; Doc. 34-11 at 2).

Throughout her employment at St. Vincent's, Yelling's supervisors observed Yelling's shortcomings in her ability to interact with her coworkers in a positive and collaborative manner. (Doc. 34-10 at 2-3; Doc. 34-5 at 5, 11, p. 36; Doc. 34-11 at 2; Doc. 34-4 at 6, 43).

In fact, Yelling's direct supervisor Haynes frequently received complaints that Yelling used a bullying and belittling tone with her coworkers and was rude to patients. (Doc. 34-10 at 2-3; Doc. 34-11 at 2). For her part, Yelling concedes she had "run-in's" and "bumped heads" with both black and white coworkers. (Doc. 34-1 at 38).

### C.     Black Patient Care Tech's June 14, 2015 Complaint About Yelling

Consistent with Yelling's concessions of these run-ins, a black patient care tech complained on June 14, 2015 that Yelling was disrespectful and barked orders at her. (Doc. 34-11 at 3-4). House Supervisor Parrish met with Yelling to advise Yelling to watch her tone of voice when working with her colleagues. (Doc. 34-11

---

black RNs to work as relief Charge Nurses (Doc. 34-1 at 20-23; Doc. 34-10 at 2). Although Yelling does concede there were occasions that she did work such a shift (Doc. 34-1 at 21).

at 3-4).  Yelling claims that during this same meeting with Parrish, she complained that some of her coworkers made racist comments. (Doc. 34-1 at 64).

### D.    June 21, 2015 Drug Test after Patient Complaint of Yelling Leaving Personal Prescription Bottle in Patient Room

In addition to receiving complaints about Yelling's interactions with her coworkers, Parrish received a complaint in early 2015, from a patient's daughter that she found one of Yelling's personal prescription bottles in her mother's hospital bed. (Doc. 34-11 at 3).  Thereafter, on June 21, 2015, Parrish received a report from a nurse working at another unit of the hospital that Yelling appeared to be under the influence of some intoxicant. (Doc. 34-11 at 3-4).  After a delay in connecting with St. Vincent's HR for a consult on how to proceed and receiving other reports that Yelling was unsteady and lethargic, Parrish personally observed Yelling asleep at her desk and suspended Yelling pending a drug test. (Doc. 34-11 at 3-4; Doc. 34-5 at 8; Doc. 34-7 at 14, 16).  Yelling consented to the test and when the results of this drug test were negative, St. Vincent's returned Yelling to work with pay for the period of her suspension. (Doc. 34-1 at 48).

Yelling claims that Dubose discriminated against her based on her race and retaliated against her by ordering the June 2015 reasonable suspicion drug test and that Dubose has not ordered white associates with impaired behavior to drug tests. (Doc. 34-1 at 47-48).  However, Dubose did not actually order the June 2015 drug test and has not observed any white associates in the CDU unit with impaired

6

behaviors to raise suspicion of drug use. (Doc. 34-6 at 15-16). Yelling readily admits she did not report such behavior to anyone in management. (Doc. 34-1 at 48).

In late June 2015, Yelling met with St. Vincent's Director of Human Resources, Kristin Costanzo, and told her that she did not believe her prior complaints had been addressed. (Doc. 34-7 at 16). However, Caitlin Griffin, an HR Business Partner with St. Vincent's, had looked into Yelling's June 2015 concerns and was unable to verify anything other than Yelling's inability to get along with coworkers or accept personal responsibility (Doc. 34-9 at 3).

## E. Additional Coworker Complaint about Yelling's Tone and Patient Complaint Regarding Yelling's Unsolicited Prayers and Poor Care

On July 21, 2015, one of Yelling's coworkers (who Yelling had not alleged made any racist comments) complained that Yelling was a bully and degrading in her interactions with fellow coworkers. (Doc. 34-4 at 49-52). Also, in late July of 2015, a patient complained that she did not feel comfortable with Yelling praying with her and that Yelling did not provide appropriate care unless the Charge Nurse or a physician was in the room. (Doc. 34-10 at 3).

Yelling's supervisor Haynes, Haynes' supervisor Dubose, along with Dubose's supervisor, Administrative Director of Nursing Chuck Lacey (black male), met with Yelling to explain the need to respect patients' requests and the

importance of following physicians' orders. (Doc. 34-1 at 12, 27; Doc. 34-10 at 3; Doc. 34-7 at 11-12, 23; Doc. 34-4 at 18).

### F.    October 2015 Coaching for Yelling's Pattern of Failures to Follow Physician's Orders

After receiving multiple reports in August and September 2015 from physicians and patients of Yelling's failure to properly carry out physician orders and to promptly administer patient care, Haynes, along with Dubose and Lacey, again met with Yelling and issued her a Coaching Agreement, the first step in the Positive Redirection process. (Doc. 34-6 at 27; Doc. 34-10 at 3; Doc. 34-4 at 26). This Coaching outlined Yelling's failure to follow physician's orders by disconnecting IV fluids in July 2015, failing to administer medication and failing to timely administer blood in September 2015, and failing to properly administer an IV pump in October 2015. (Doc. 34-1 at 90-91; Doc. 34-10 at 3; Doc. 34-4 at 26, 69-70). Yelling did not lose any pay as result of the Coaching, but generally disagreed that the performance deficiencies listed in the Coaching were her fault and claimed it was racially discriminatory because the patient she cared for in one of the incidents was racist, demanding and difficult. (Doc. 34-1 at 25-27).

In this October 2015 meeting, Lacey also instructed Yelling to work on improving her relations with her coworkers. (Doc. 34-1 at 24, 90-91; Doc. 34-10 at 3; Doc. 34-6 at 22, 27; Doc. 34-4 at 26).

### G.    Yelling's November 2015 Argument with Fellow Associates

Just one month after she received this Coaching, Yelling accused her coworkers of engaging in "wicked acts" and threatened that God would "bring curses upon" them, their children and their children's children as a result of these coworkers allegedly removing lab documentation from a printer. (Doc. 34-1 at 28; Doc. 34-11 at 6-7; Doc. 34-4 at 30).

Yelling's fellow RN Robin Calvert (white female) raised her voice in response to Yelling's threats. (Doc. 34-1 at 29; Doc. 34-10 at 3-4). After Yelling's threats were brought to the attention of House Supervisor Parrish, she sent Yelling home for the remainder of her shift. (Doc. 34-1 at 28; Doc. 34-11 at 6-7; Doc. 34-6 at 26).

St. Vincent's investigated the matter, including interviewing all associates who witnessed the incident, and Haynes, with consultation with Dubose and HR Business Partner Griffin, placed both Calvert and Yelling on Positive Redirection. (Doc. 34-10 at 3-4; Doc. 34-6 at 26, 43-47; Doc. 34-11 at 6-7). Because it was Calvert's first step in Positive Redirection, she received a Coaching, while Yelling received a Verbal Agreement (the second step in Positive Redirection) because of Yelling's October 2015 Coaching for her performance failures that were reported by patients and physicians. (Doc. 34-10 at 3-4; Doc. 34-1 at 29, 92-93).

9

Yelling disagreed with this discipline because she claims Calvert yelled at her during the discussion where she cursed her coworkers and their families; and she claims her coworkers removed the lab slips from the printer because of her race because she was the only black RN working that shift. (Doc. 34-1 at 30, 32-33).

### H.    Yelling's December 2015 and January 2016 Verbal Workplace Violence Complaints About Coworkers

Shortly after receiving the second step in the Positive Redirection Process, Yelling submitted two separate complaints to St. Vincent's online complaint system about interactions with her coworkers which she characterized as verbal workplace violence. (Doc. 34-1 at 39, 95-103).

In the first complaint, Yelling claimed unit secretary Tiffany Hardy (white female) once spoke to her in a hostile tone when she said to Yelling "I don't give a s%&t what you do." (Doc. 34-1 at 40).  Notably, Yelling made no mention of any alleged race discrimination (or for that matter race at all) in this complaint. (Doc. 34-1 at 95-103).  In the second of these complaints, Yelling accused fellow RN Stephanie Edwards (white female) of verbally attacking her when Edwards complained about having to perform Yelling's job while Yelling shirked her duties for caring for a patient assigned to Yelling. (Doc. 34-1 at 36-37, 41).  Yelling stated that she was not sure if Edwards was using this harsh tone with her based on

her race because she had not worked with Edwards frequently and had never heard her make any racial inappropriate comments. (Doc. 34-1 at 37-38).

St. Vincent's investigated both of these complaints and determined that the two comments made by Yelling's fellow associates did not amount to workplace violence and at most were heated disagreements between associates. (Doc. 34-9 at 3-4).

## I.    Yelling's Falsification of Medical Records

When reviewing records concerning the care for the patient that led to the dispute between Yelling and Edwards, St. Vincent's learned that Yelling had falsified patient's medical records by charting that she had conducted a patient assessment when she had not actually entered the patient's room. (Doc. 34-1 at 35; Doc. 34-10 at 4-5; Doc. 34-6 at 30; Doc. 34-7 at 32; Doc. 34-9 at 4).

For patient safety reasons, St. Vincent's tracking system monitors the physical location of its associates as well as their access to patient rooms. (Doc. 34-1 at 35).  Based on the records from the tracking system, which St. Vincent's had confirmed was operational in the patient room in question, compared to the patient's chart and other information, it was apparent that Yelling falsified the patient records.  Falsification of patient records is an extremely serious and terminable offense. (Doc. 34-10 at 4-5; Doc. 34-7 at 33; Doc. 34-4 at p. 34, 41).

11

After HR Business Partner Griffin and Haynes independently confirmed Yelling's falsification of records, Lacey, Dubose and Griffin met with Yelling to explain their decision to terminate her employment based on this falsification while on corrective action for her failure to follow physician orders and delaying patient care. (Doc. 34-1 at 34; Doc. 34-4 at 32-35, 69-70; Doc. 34-9 at 4; Doc. 34-10 at 4-5).

Yelling denies she falsified these records and claims that the tracking system was not always accurate though she understood from her coworkers that Dubose was serious about employees wearing their trackers, even posting a picture of the proper tracker attire in the break room. (Doc. 34-1 at 35-36, 69, 76).

According to Yelling, her termination was based on her race because Dubose did not interview the patient[2] involved in her dispute with Edwards. Yelling claims her termination was in retaliation for her complaints of alleged discrimination. (Doc. 34-1 at 36, 77).

## J.    Yelling's Coworkers' Alleged Offensive Comments

Yelling claims three individuals, floating RN Sandy Sheffield (white female), supplemental RN Linda Powell (white female) and Unit Secretary Hardy, all made inappropriate racial comments, including referring to former President Obama as a "piece of s$%t," "stupid," who "should go back to Africa;" stating that

---

[2] St. Vincent's does not have a practice of interviewing patients during investigations such as these and this particular patient was in an altered mental state. (Doc. 34-9 at 4; Doc. 34-6 at 30).

former First Lady Obama "looked like a monkey;" and describing black patients as "crackheads," "welfare queens" and "ghetto fabulous". (Doc. 34-1 at 13-16, 79). Yelling claims that it was not unusual for these three coworkers to make racially insensitive comments when expressing their opinions, particularly when current affairs and politics came up in general conversation at the nurse's station. (Doc. 34-1 at 15, 74).

Yelling concedes that she was not often at the nurse's station, the only place where these offensive conversations allegedly took place, because she was providing care to patients and that she rarely worked with Powell and Hardy because they did not routinely work weekends. (Doc. 34-1 at 12, 14, 19).

Yelling claims that other coworkers made comments that they were "rednecks[3]," "gun toting," and "confederate flag flyers" and that Charge Nurse Wilhite once asked in March of 2015, if the President was visiting Alabama to hand out food stamps, all of which she found racially offensive. (Doc. 34-1 at 11, 17-18,74). For her part, Yelling says she would respond to these comments with positive comments about the Obamas, and by making sarcastic comments back to her coworkers. (Doc. 34-1 at 14).

---

[3] Yelling was not consistent in her testimony with respect to an alleged comment attributed to Charge Nurse Jennifer Laroe. (Doc. 34-1 at 14). Plaintiff claims that Laroe bragged about being a proud redneck but also testified that she did not recall Laroe making any race related comments and that Laroe "tried to keep the peace." (Doc. 34-1 at 19).

During her employment, Yelling acknowledges that no one at St. Vincent's used the n-word and she is unable to recall any of her coworkers making racially insensitive comments personally directed at her. (Doc. 34-1 at 12, 16-17).

Admittedly, Yelling did not raise issues of alleged race discrimination at St. Vincent's until June 2015, after another black coworker complained of Yelling using a disrespectful tone. (Doc. 34-1 at 20 and 64; Doc. 34-11 at 4-6).  When Yelling first complained to HR in June of 2015, HR Business Partner Griffin was unable to substantiate any of Yelling's concerns. (Doc. 34-9 at 3; Doc. 34-7 at 28). From that point on, Griffin attempted to keep lines of communication open between Yelling and HR. (Doc. 34-9 at 3; Doc. 34-7 at 20).

### K.    Yelling's EEOC Charges

Just days after she called her coworkers' acts "wicked" and cursed them and their families, Yelling filed an EEOC Charge alleging that St. Vincent's discriminated against her based on her race, color, sex, religion, age and disability and after her termination, filed her second EEOC Charge, again alleging that St. Vincent's discriminated against her on the basis of race, color, sex, religion, age and disability and in retaliation for her complaints of discrimination.[4]  (Doc. 34-1 at 41, 43, 49, 104).

---

[4] Despite claiming these other types of alleged discrimination in her EEOC Charges and original Complaint, Yelling stipulated the only claims in this lawsuit are race discrimination, racially hostile work environment and retaliation pursuant to Title VII and Section 1981. (Doc. 34-1 at 50).

## SUMMARY OF ARGUMENT

Yelling attempts to transform a routine race discrimination and retaliation case into a novel precedent-reversing matter.  This Court should continue to follow its well-developed precedent in affirming the district court's well-reasoned decision below.

In following this Court's precedent, the district court properly dismissed actions occurring more than 180 days prior to Yelling's EEOC charge and also properly dismissed those employment actions failing to reach the level of an actual adverse employment action.  The district court did not improperly credit St. Vincent's business reasons for disciplining and terminating Yelling's employment; rather, the district court's findings are directly supported by evidence demonstrating Yelling's failure to follow physicians' orders and falsification of medical records.

Despite the district court viewing the facts in the light most favorable to her, Yelling failed to meet the burden to establish pretext.  Likewise, Yelling failed to present any sequence of events to support a convincing mosaic of race discrimination or retaliation.  Further, Yelling failed to demonstrate race was a motivating factor or that her complaints were the but-for cause of any adverse employment action.

15

Finally, the district court properly dismissed Yelling's racially hostile work environment claim because the offensive comments of a few of her coworkers with whom she rarely worked were not sufficiently severe or pervasive to amount to a hostile work environment. No one at St. Vincent's ever used a racial slur or even directed any racially offensive comments at Yelling. Even if the district court mistakenly failed to include some of the alleged offensive comments, the analysis remains the same, providing this Court with an independent basis for affirming this dismissal. Additionally, St. Vincent's investigated Yelling's complaints, that were intertwined with complaints about Yelling herself, and was unable to substantiate anything other than Yelling's own misconduct.

## ARGUMENT

### I.    Standard of Review

This Court reviews *de novo* a district court's grant of summary judgment, applying the same standards as the district court. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). Summary judgment is appropriate if:

> [T]he evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact

> does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Id.* (quotations omitted). Moreover, this Court may affirm for any reason, even those that were not relied upon by the district court in rendering its decision. *See United States v. Harris*, 608 F.3d 1222, 1227 (11th Cir. 2010) (quoting *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008)); *see also Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1256 (11th Cir. 2001)(affirming summary judgment for reasons not relied on by district court).

## II.  <u>District Court Properly Dismissed Yelling's Race Discrimination Claims</u>

It is difficult to discern the exact parameters of Yelling's appeal of the district court's dismissal of her race discrimination claims because the appellant brief references St. Vincent's acting "with discriminatory intent" but does not clarify which of the alleged adverse actions are actually at issue in this appeal. *See e.g.,* App. Brief at 33. No matter the criticism, the district court properly granted St. Vincent's summary judgment motion as to all of Yelling's race discrimination claims.

### A.    **Untimely Claims Appropriately Dismissed**

The district court appropriately held that some of the actions about which Yelling complained were untimely. (Doc. 45 at 14-15, 24). As the district court properly noted, "an Alabama plaintiff must file a charge of discrimination with the EEOC within 180 days of the offending conduct. *Ledbetter v. Goodyear Tire &*

*Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005)." (Doc. 45 at 14-15). Because Yelling filed her first EEOC Charge on November 23, 2015, any Title VII claims based on actions that occurred prior to May 27, 2015 were untimely. The district court properly dismissed Yelling's claim that St. Vincent's denied her the opportunity to work as a fill-in charge nurse because Yelling concedes this occurred prior to her 2013 transition to weekend shifts, more than one year before Yelling filed her first EEOC Charge. (Doc. 45 at 24). Regardless, as the district court noted, Yelling testified that there were occasions when she did work as the fill-in charge nurse. (Doc. 34-1 at 21). This dismissal of untimely claims was appropriate and should be affirmed.

### B.    *Bostock* Decision Did Not Overturn *McDonnell Douglas* Framework

Yelling argues that the United States Supreme Court somehow abandoned the longstanding *McDonnell Douglas* framework with its decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), but such an assertion is simply inaccurate. The *Bostock* decision interpreted Title VII to encompass discrimination based on sexual orientation. *Id.* at 1754. The Supreme Court made no ruling on the applicability of the *McDonnell Douglas* framework and certainly did not overrule decades of Title VII jurisprudence without saying so. This Court has continued to apply this burden-shifting framework to analyze Title VII claims post-*Bostock*. *See e.g., Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 488 (11th

Cir. 2020) (per curiam). Yelling's misguided interpretation of the *Bostock* case does not change the analysis properly conducted by the district court in assessing Yelling's race discrimination claims.

### C.    Non-Adverse Employment Actions Appropriately Dismissed

As the district court appropriately explained, following the *McDonnell-Douglas* approach, a plaintiff must first establish a *prima facie* case. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Generally speaking, to establish a *prima facie* case of race-based disparate treatment, a plaintiff must demonstrate that she (a) was a member of a protected class; (b) was qualified for her job, (c) suffered an adverse employment action; and (d) was treated less favorably than a similarly situated individual outside of her protected class. (Doc. 45 at 23).[5]

As the district court noted, Yelling raised three timely alleged adverse employment actions: (1) June 2015 drug test; (2) October and November 2015 progressive discipline; and (3) her 2016 termination. However, with respect to the drug test and the progressive discipline, the district court properly held that these complaints did not amount to adverse employment actions. (Doc. 45 at 24-27).

---

[5] The district court appropriately applied the Title VII analysis for race and retaliation discrimination claims to those brought under Section 1981 as this Court instructs. (Doc. 45 at fn. 6 citing *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985)).

The district court properly followed this Court's requirement that a plaintiff "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). "[C]onduct falling short of an ultimate employment decision must, in some substantial way, 'alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee.'" *Id.*

Because Yelling did not suffer any tangible employment loss as a result of the drug test or the progressive discipline, the district court appropriately concluded that these actions did not amount to adverse employment actions for the purposes of establishing a *prima facie* case of disparate treatment. (Doc. 45 at 25). *See e.g. Summerlin v. M&H Valve Co.*, 167 Fed. App'x 93, 97 (11th Cir. 2006) (a reprimand that does not "have an impact on an important condition of employment, such as salary, title, position, or job duties," is not an adverse employment action); *see also Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (holding that threatening plaintiff's job did not rise to adverse employment action because no action occurred). This Court should affirm the district court's holding on Yelling's failure to demonstrate a *prima facie* case with respect to the drug test and progressive discipline.

20

### D.    Yelling Failed to Identify Any Comparators

Although the district court did not reach the issue, this Court, under its *de novo* review could affirm the dismissal of Yelling's race discrimination claim related to the drug test and progressive discipline because Yelling failed to demonstrate proper comparators to support these claims.  Yelling claims that a white coworker fell off of her chair and was not sent for a drug test; however, she readily and candidly admitted at her deposition that she never brought these allegations to the attention of St. Vincent's management. (Doc. 34-1 at 49). Because it is undisputed that St. Vincent's was not aware of the alleged conduct, this coworker is not a proper comparator, providing an independent basis for affirming the dismissal of the claim related to the drug testing.

Likewise, Yelling failed to identify any proper comparator with respect to any progressive discipline.  As to the November 2015 progressive discipline, St. Vincent's also placed the white comparator in progressive discipline, demonstrating that St. Vincent's did not take this action based on Yelling's race. (Doc. 34-10 at 3-4).   Yelling's failure to point to any similarly situated comparators provides another reason for dismissal of her discrimination claims. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1229 (11th Cir. 2019) (*en banc*) (clarifying that to satisfy the *prima facie* case, the comparator must be "similar in all material respects" to the plaintiff).

21

### E.    Yelling's Failure to Demonstrate Pretext

The district court appropriately held that Yelling failed to demonstrate St. Vincent's reason for the termination of her employment was pretextual.[6]   The district court held that Yelling satisfied the *prima facie* case of race discrimination with respect to her termination, and that St. Vincent's met its burden of demonstrating a legitimate, nondiscriminatory reason for the termination based on Yelling's falsification of medical records. (Doc. 45 at 27).  There is no evidence that the articulated reason for Yelling's termination was false.

The "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and . . . not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers*, 610 F.3d 1253, 1266 (11th Cir. 2010). Thus, the "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)(citations omitted).

---

[6] To the extent this Court found that Yelling could establish a *prima facie* case of discrimination with respect to either the drug test or progressive discipline, the dismissal of these claims is still warranted as St. Vincent's had legitimate, nondiscriminatory reasons for these employment actions that were not pretextual.  St. Vincent's had a reasonable basis for the drug test based on the complaint originating from a nurse in another department, as well as House Supervisor Parrish's personal observation of Yelling asleep at her desk, after having received a complaint of Yelling leaving a personal prescription bottle in a patient's room a few months prior.  (Doc. 34-10 at 3-4).  With respect to the November 2015 discipline, St. Vincent's also disciplined Yelling's alleged comparator, albeit at a different level because the comparator was not under earlier discipline like Yelling. (Doc. 34-10 at 3-4).

Moreover, a plaintiff "must meet [the proffered legitimate] reason head on and rebut it, and . . . cannot succeed simply by quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Chapman*, 229 F.3d at 1024-1025. An "employee's mere suspicion of [race] discrimination, unsupported by personal knowledge of discrimination, will not constitute pretext."  *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1026 (11th Cir. 1994).  "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuition or rumors; discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by speculating about the defendant's motives."  *Lewis-Webb v. Qualico Steel Co.*, 929 F. Supp. 385, 392 (M.D. Ala. 1996), *aff'd without op.*, 113 F.3d 1251 (11th Cir. 1997) (citations omitted).

The district court properly held that Yelling had not "demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). (Doc. 45 at 27-28).

On appeal, Yelling attempts to cherry pick evidence in an effort to rebut the defendant's assessment of her conduct, but Yelling's narrow view of her misconduct fails to rebut the reasons for her termination.  *See Holifield v Reno*, 115 F.3d 155, 1565 (11th Cir. 1997) (an employee's own assessment of her conduct is irrelevant to the pretext inquiry).

Yelling tries to frame the termination of her employment as only happening after her "racist" coworkers were to blame for "padding" her file with the progressive discipline she received prior to the termination.  She also claims that she worked without *any* incident until September of 2015, which is inaccurate and unsupported by the record.  As the undisputed evidence in the record makes clear, St. Vincent's discipline and termination of Yelling were not the result of any complaints of the alleged "racist" coworkers, but rather complaints from patients and physicians.

On appeal, Yelling characterizes the complaints from physicians leading to the October 2015 discipline as "micromanaging" and over "minor patient care" issues.  *See* App. Brief at 9.  However, the physicians' complaints were that Yelling failed to administer medication and even that Yelling discontinued a patient's IV fluids – certainly not what physicians and patients and their families would refer to as "minor."  Again, this discipline was not the result of any of the

alleged "racist" coworkers "padding" Yelling's file and in fact, did not involve these coworkers at all.

Yelling also asserts on appeal that St. Vincent's "skipped" steps in its progressive discipline policy when terminating her employment which evidences pretext. However, as the district court appropriately noted, the undisputed evidence in the record is that falsification of medical records is in and of itself a terminable offense and thus does not fall under the progressive discipline policy. (Doc. 34-7 at 33). Further, St. Vincent's treatment of Yelling's coworkers Mike Pike and Felicia Parrish is not evidence of pretext because the two simply did not document or complete chart notes at all, whereas Yelling actually *falsified* records. (Doc. 34-6 at 24). As this Court repeatedly has held, federal courts do not sit as super personnel departments or decide the appropriateness of a particular punishment as St. Vincent's was free to determine the level of severity of a mistake or error versus an actual falsification. *See e.g.*, *Elrod*, 939 F.2d at 1470 (11th Cir. 1991) (federal courts do not sit "as a super-personnel department that reexamines an entity's business decisions").

Yelling claims that the fact that St. Vincent's learned of her misconduct while investigating Yelling's own complaint about a coworker shouting at her somehow demonstrates pretext. To the contrary, the discovery is actually reasonable given that the investigation into Yelling's complaint about her

coworker hinged on who was actually providing the care for this patient. It logically followed that there would be a review of the records for the care of this patient. It was this review that exposed Yelling's falsification of records leading to her termination.

As at the district court, Yelling repeats her claim that the tracking system was "faulty" and "unreliable" and claims that the district court erroneously adopted St. Vincent's claim that it conducted an independent investigation. *See* App. Brief at 40. The tracker report documenting Yelling's movement on the date of the falsification did not contain "gaps," but rather only registered when Yelling was moving and where she was located that day. (Doc. 34-4 at 34 and 40). Far from "gaps," the tracker report, along with chart notes, properly reflected what occurred – Yelling's falsification of records. Yelling's mere self-serving denial of the falsification does not alone demonstrate her termination was motivated by race. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (holding that a plaintiff's "self-serving assertion that she was not insubordinate does not alone establish that she was terminated because of her sex").

More importantly, as the district court properly held, St. Vincent's investigation into Yelling's movement "was not limited to blind adherence to information gathered from her tracking device." (Doc. 45 at 28). At the district court, Yelling failed to even mention, much less rebut the fact, that St. Vincent's

had two individuals, neither of whom Yelling complained about in her lawsuit, who independently verified Yelling's falsification. The district court properly relied on the testimony of both Yelling's direct supervisor Haynes and HR Business Partner Caitlin Griffin in determining Yelling's lack of pretext.[7] (Doc. 45 at 28). On appeal, Yelling argues that these independent investigations should be ignored because some of her alleged "racist" coworkers were interviewed for the investigations, but there is no evidence in the record as to which coworkers were interviewed, much less that they were the same coworkers who Yelling claims made offensive comments. Rather than refute this independent investigation, Yelling claims without any evidentiary support that it was Dubose who initiated the investigation and solicited statements from these coworkers. The citation Yelling points to for this claim is actually Costanzo's testimony that it was Lacey who had initiated the investigation. *See* App. Brief at 42 compared to Doc. 34-7 at 34. Again, the district court properly held that the independent investigation of Haynes and Griffin was not tainted and that Yelling failed to demonstrate pretext. (Doc. 45 at 28).

---

[7] The district court also properly explained that Yelling's efforts to demonstrate pretext by pointing to a prior discussion over discrepancies in Yelling's tracking in July of 2015 did not demonstrate pretext because that earlier meeting with Yelling focused on the complaint from the patient that related to the quality of Yelling's care and her unwanted prayers. (Doc. 45 at 28 note 15). This differs in focus from the January 2016 investigation over which associate (Yelling or Edwards who complained of having to do Yelling's job) actually cared for the patient.

Likewise, Yelling failed to show that St. Vincent's did not truly rely on the proffered reasons for discipline and termination, which constitutes another basis for affirming the district court's dismissal of her race discrimination claims. *See Damon v. Fleming Supermarkets of Fl.,* 196 F.3d 1354 at 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.")

### F.    No Convincing Mosaic

Yelling's attempts to assert a claim under the convincing mosaic theory likewise fall short. "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements…, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis* II).

As laid out in the above pretext discussion, the timing of Yelling's termination is hardly suspicious. St. Vincent's terminated Yelling for falsification of records after Haynes and Griffin completed their independent investigations. There is no evidence of ambiguous statements suggesting other reasons for Yelling's termination; the only reason St. Vincent's ever gave to anyone for firing Yelling was for the falsification of records. Also, as discussed above, there is no

evidence of the existence of any similarly situated employees, and certainly no evidence that there were any employees who were systematically treated better. Finally, there is no evidence of pretext.

Viewing the circumstances surrounding Yelling's termination in the complete context (and not just the incomplete and inaccurate rendition in the appellant brief) further supports the accuracy of the district court's grant of summary judgment to St. Vincent's.   The following sequence of events is instructive:

- St. Vincent's received complaints from patients and coworkers of Yelling's rudeness and belittling tone;
- Yelling, who admittedly had many "run-ins" with both black and white coworkers over the years, had a run-in with a black Patient Care Tech who complained about Yelling on June 14, 2015;
- That same day Yelling claims she complained about the alleged racist comments of a few coworkers;
- The following weekend, a nurse from a different unit reported that Yelling appeared under the influence, after which Parrish (who had a few months earlier received a complaint about Yelling's personal prescription bottle being left in a patient's room) found Yelling asleep at her desk and sent Yelling for a drug test;
- Yelling returned after the negative drug test result and a few weeks later, a patient (and not one of Yelling's alleged "racist" coworkers) complained about Yelling not providing appropriate care and Yelling's unsolicited and unwanted prayers;
- On July 21, 2015, another coworker (and not one of Yelling's alleged "racist" coworkers) complained to St. Vincent's managers that Yelling was a bully and degrading to her;
- Following these complaints, Yelling's direct supervisor Haynes and other managers met with Yelling in early August of 2015 to

29

coach her on following physicians' orders and conducting herself appropriately with patients or coworkers;

- Yelling's supervisor administered discipline in October 2015 after continued complaints from physicians and patients (which were once again, not based on any complaints by Yelling's alleged "racist" coworkers);

- St. Vincent's disciplined Yelling in November of 2015 after she admittedly cursed her coworkers and their families over a missing print-out;

- Yelling filed her first EEOC Charge on November 23, 2015 alleging disability, age, religion, sex, color and race discrimination;

- In December 2015, Yelling made a workplace violence complaint (containing no allegations of race discrimination) after a coworker told Yelling she did "not give a s$%* what Yelling did;"

- In January of 2016, Yelling filed a second workplace violence complaint (containing no allegations of race discrimination) after a new coworker raised her voice to Yelling when expressing frustration over having to care for Yelling's patient;

- Following Yelling's second workplace violence complaint, St. Vincent's initiated an independent investigation into Yelling's complaint, necessarily reviewing records for care of the patient at issue, and confirmed Yelling's falsification of records; and

- St. Vincent's terminated Yelling's employment based on substantiated evidence of medical record falsification while on corrective action for failure to follow physicians' orders.

Far from a pattern of any race discrimination, the sequence of events shows a history of Yelling's poor interactions with her coworkers, failure to follow physicians' orders, and conduct resulting in patients' complaints. In Yelling's rendition of the events, she skips entire sections of discipline, tries to lay the blame with the coworkers she accuses of making racist comments and acts as if St.

Vincent's never spoke to her about her performance until they terminated her in 2016.

Because Yelling's convincing mosaic theory requires ignoring events and making assumptions rather than applying the evidence in the record, the district court appropriately dismissed her claims by holding that "even stepping away from the *McDonnell Douglas* framework, Yelling had not shown 'enough circumstantial evidence to raise a reasonable inference of intentional discrimination.'" (Doc. 45 at 28 *citing Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)).

### G.    Race Was Not a Motivating Factor

Citing to this Court's decision in *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016), Yelling claims that the district court should have denied summary judgment because she allegedly demonstrated that race was a motivating factor in the employment decisions at issue in this case.  To succeed on a mixed-motive claim outlined in *Quigg*, Yelling must show that illegal bias "was a motivating factor for an adverse employment action, even if other factors also motivated the action."  *Quigg*, 814 F.3d at 1235.  Under this theory, the ultimate burden of persuasion is on the employee, not the employer, to demonstrate that her race was a motivating factor.  *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 364 (2013).

First, the mixed-motive theory is not applicable in the context of Yelling's Section 1981 claim. *Mabra v. United Food & Commercials Workers Local Union No. 1996,* 176 F.3d 1357, 1357 (11th Cir. 1999). More importantly, in order to advance this theory under Title VII, Yelling must acknowledge that St. Vincent's had a legitimate basis upon which to terminate her employment (or take other employment actions). *See Quigg*, 814 F.3d at 1235. However, as evidenced throughout Yelling's appellate brief, Yelling does not admit or concede she did anything worthy of discipline or termination. Instead Yelling focuses her arguments on her claims that St. Vincent's had no legitimate bases for these employment decisions. As such, Yelling does not truly advance a mixed-motive claim.

Regardless, for the reasons detailed above, Yelling has failed to demonstrate race was a motivating factor and there is simply no evidence to support this theory of relief. The case at hand is unlike *Quigg*, where there was actual evidence of decisionmakers admitting that gender was actually one of the reasons for the termination decision at issue. *Quigg*, 814 F.3d at 1239-1240.

In support of her mixed-motive claim, Yelling points to the denial of shifts as an acting charge nurse, the offensive comments of her coworkers, and the discipline she received for cursing her coworkers as evidence that race was a motivating factor in St. Vincent's employment decisions. *See* App. Brief at 35. In

actuality, Yelling admitted she did on occasion work as an acting charge nurse, was only suspended after admittedly cursing her coworkers and their families, and none of the individuals allegedly making offensive comments to Yelling were decisionmakers with respect to any employment decisions impacting Yelling.

There is simply no evidence of Yelling's race playing any role whatsoever in the decisions impacting her employment. As such, Yelling's race was not a motivating factor in these decisions, and the district court correctly held that Yelling had not shown "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." (Doc. 45 at 28 *citing Hamilton*, 680 F.3d at 1320). Regardless of the theory utilized, Yelling's claims of race discrimination claims were properly dismissed.

## III.  <u>District Court Properly Dismissed Retaliation Claims</u>

### A.    **Yelling's Falsification Constitutes Intervening Act**

The district court properly analyzed Yelling's retaliation claim, and this Court should affirm the dismissal of this claim. (Doc. 45 at 29-34). To establish a *prima facie* case of retaliation, plaintiff must show (1) she engaged in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Crawford*, 529 F.3d at 970. Yelling concedes the first time she complained of any alleged race discrimination at St. Vincent's was on June 14,

33

2015 and Yelling filed her first EEOC Charge alleging discrimination on the basis of disability, age, religion, sex, color and race in late November 2015. (Doc. 34-1 at 20). The district court properly held that these activities constituted engaging in protected activity. (Doc. 45 at 30).

Yelling claims that the district court failed to credit the temporal proximity between her November 2015 EEOC Charge and the adverse action of the termination of her employment in February of 2016. However, the district court did credit this temporal proximity, but correctly held that Yelling failed to establish a *prima facie* case of retaliation because her falsification of medical records constituted intervening conduct that defeated any inference of causation. *See* Doc. 45 at 30 citing *Henderson v. Fedex Express*, 442 Fed. Appx. 502, 507 (11th Cir. 2011) (holding that the plaintiff's "falsification of his time card was an intervening act of misconduct that diminished any inference of causation that may have arisen out of the temporal proximity").

Yelling also claims that St. Vincent's only had problems with her performance after she complained about a few of her coworker's alleged comments and filed her EEOC Charge; however, it is undisputed that St. Vincent's had complaints of Yelling's performance before June of 2015 and ongoing through the termination of her employment. Further, there is no evidence that patients and/or physicians making complaints about Yelling's performance were aware of any of

Yelling's complaints of alleged discrimination. As such, these complaints could not possibly support her retaliation claims. *See e.g. Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 590 (11th Cir. 2000) (decisionmaker must be aware of the protected conduct).

For the reasons discussed in Section II above, Yelling is unable to demonstrate that St. Vincent's nonretaliatory reasons for its employment actions are pretextual. Notably, in retaliation cases, a plaintiff must show that the adverse action would not have occurred "but-for" the protected activity. *Nassar*, 570 U.S. at 364. Yelling failed to offer any evidence demonstrating that, but for the filing of her November 2015 EEOC charge (or any alleged internal complaints), St. Vincent's would not have terminated her for falsifying medical records.

Even if mistaken (and there is no evidence to believe that it was), St. Vincent's had a good faith belief that Yelling engaged in the conduct leading to the termination. The evidence overwhelmingly shows that St. Vincent's reasonably believed Yelling falsified the medical records after interviewing multiple employees, reviewing the patient charts, reviewing the tracking records, and independently verifying the reports in an in-depth investigation. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) ("An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate [nonretaliatory] reason for termination"). As explained in detail in Section II

35

above, Yelling is unable to demonstrate pretext to support her race discrimination claims and therefore, Yelling is unable to demonstrate the *stricter* standard in retaliation cases that any of her alleged complaints were the *but for* cause of any employment actions at issue in this case. *See Nassar*, 570 U.S. at 364.

### B.    Drug Test Not Retaliatory

Yelling criticizes the district court claiming that the district court failed to assess whether the June 2015 drug test was retaliatory, but by doing so ignores the in-depth discussion on pages 32 – 34 of the lower court's opinion. (Doc. 45 at 32-34).  With this discussion, the district court properly held that even under the more liberal construction applied to retaliation claims, the drug test did not reach the level of an adverse employment action. (Doc. 45 at 32).  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). (action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination".)

Regardless, the district court went on to hold that even assuming that Yelling established a *prima facie* case of retaliation with respect to the drug test, Yelling could not show pretext. (Doc. 45 at 33).  The district court properly held that Yelling was unable to demonstrate that the drug test was retaliatory given the unrebutted evidence that after receiving reports of Yelling's impaired behavior, Parrish waited on a call from St. Vincent's HR for guidance on how to proceed and

after Parrish personally observed Yelling asleep at her desk, she sent Yelling for the drug test.  The district court noted that this occurred after Parrish had received a complaint of Yelling's personal prescription bottle being left in a patient's bed. (Doc. 45 at 34).  Given these circumstances, the district court properly held that Yelling failed to demonstrate pretext with respect to Yelling's claim of retaliation related to the June 2015 drug test.  The district court's decision regarding Yelling's retaliation claims is due to be affirmed.[8]

## IV.    Yelling's Hostile Work Environment Claim Properly Dismissed

In criticizing the district court's dismissing of Yelling's hostile work environment claim, Yelling and the EEOC, in its amicus brief, present an exaggerated version of the facts in an effort to try and satisfy this Court's high threshold for establishing such a claim.  Analyzing Yelling's actual allegations devoid of hyperbolic repetition demonstrates the correctness of the district court's decision below.

---

[8] The district court also properly concluded that Yelling was not subjected to any scrutiny rising to the level of "intensive monitoring" described by this Court in *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991).  This is particularly true given that many of the actions Yelling points to were not directed at her alone.  For example, Dubose instructed Charge Nurse Laroe to document issues for *all* associates, and not just Yelling.  (Doc. 34-6 at 18).  Further, Dubose's instruction on how to interact with Yelling were actually designed to protect Yelling from rumors after her return from the drug test.  (Doc. 34-6 at 17).

## A.    District Court Utilized Proper Factors in Analysis

To establish a race-based hostile work environment claim, a plaintiff must prove that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race; and (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment.  To succeed with her hostile environment claim, a plaintiff must demonstrate that the alleged racially motivated conduct altered the conditions of her employment, creating a subjectively and objectively abusive and hostile atmosphere.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The fourth element of the *prima facie* case is the element that tests the legitimacy of most harassment claims and therefore is regarded as "crucial." *See Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 583 (11th Cir. 2000).  In determining whether the fourth element has been met, "the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's

job performance." *Id.* at 1330. Title VII does not provide redress for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [racial] jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). On the contrary, the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

As this Court has noted, conduct that is merely offensive, unprofessional, or boorish, even if it contains racial references, is not actionable. *See, e.g. Edwards v. Wallace Community Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (holding that racial slurs must be so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility"). "The 'mere utterance of an … epithet which engenders offensive feelings in an employee, …does not sufficiently affect the conditions of employment to implicate Title VII.'" *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008)(quoting *Harris*, 510 U.S. at 21).

The "totality of the circumstances" test as applied by courts in hostile work environment cases is designated to evaluate subjectively and objectively a plaintiff's work environment. The focus is on the cumulative alleged harassment a particular employee claims made her work environment hostile, whether direct or indirect. *McCann*, 526 F.3d at 1379. Contrary to Yelling's assertion, this is precisely the analysis that the district court performed when correctly concluding

that Yelling failed to establish a *prima facie* case of hostile work environment. (Doc. 45 at 15-11).

As the EEOC concedes, Yelling's allegations are not extreme and as discussed below, the alleged comments were far less severe than those involved in cases in which this Court has found sufficient evidence to create a hostile work environment.   Yelling's tactic throughout the appellate brief appears to be deflecting attention from the the actual evidence and repeating the same alleged one-time comment in an effort to paint a picture that simply did not occur.   An analysis of the facts in evidence demonstrates that Yelling's hostile work environment claim was appropriately dismissed.

### B.    Yelling Rarely Worked with Those Making Offensive Comments

To read the briefs filed by Yelling and the EEOC, it would seem as if Yelling's coworkers hurled racist rhetoric directed at her on a daily basis.  Notably, Yelling completely ignores her *own* offensive comments and threats in the exchanges with her coworkers and the many complaints from coworkers and patients alike of Yelling's own rudeness, bullying and belittling tone.  Regardless, this is not a case where Yelling alleges that anyone directed any offensive comment *at* Yelling herself, but rather a case where Yelling heard racist comments from a few coworkers, which even the EEOC concedes, were not extreme.

It is undisputed that Yelling claims the only racially offensive comments were made at the nurse's station. (Doc. 34-1 at 12, 19). Yelling claims the district court improperly asserted that it was unusual for all of the nurses to be at the station together. *See* App. Brief at 28. This was not an improper assertion, but a conclusion properly reached based on Yelling's actual testimony. Yelling regularly worked two days a week (or approximately eight times a month) and as Yelling herself describes, there were six employees in the unit routinely caring for thirty patients and she rarely stood at the nurse's station because she was providing patient care or talking with patients' families. (Doc. 34-1 at 12-19).

Further as to frequency, Yelling's counsel and the EEOC repeat comments that Yelling herself heard only one time. The briefs filed by Yelling and the EEOC are replete with references to the Obamas but when actually reviewing the evidence in the record, Yelling could recall only a handful of specific offensive comments over a ten-month period about the Obamas, and some of those Yelling concedes were political in nature, and not race-related.[9] (Doc. 34-1 at 74).

Yelling's counsel and the EEOC focus on an alleged comment by Charge Nurse Wilhite referring to President Obama and food stamps upon his visit to a historically black college. *See* App. Brief at 16, 29; EEOC Brief at 3, 13.

---

[9] The district court appropriately disregarded complained-of comments that were entirely devoid of racial content in assessing the racially hostile work environment claim. (Doc. 45 at 17-18 discussing "redneck" references are not in and of themselves race-related).

However, this was a *one-time* comment in March of 2015, which Yelling did not even complain about until months after Wilhite allegedly made it. (Doc. 34-1 at 64). Repeating a comment that was made one time in an effort to make it seem more commonplace does not demonstrate the frequency required for establishing a hostile work environment claim.[10]

In fact, Yelling's actual testimony, stripped away of repetition and hyperbole, boils down to only one coworker with whom she actually routinely worked who allegedly made offensive comments about the Obamas; frequently referred to black patients requesting pain medication as "welfare queens" or, when the patient was requesting that drug, "crack heads who wanted dilaudid" (Doc. 34-1 at 14). However, Yelling admits this same coworker also complimented Yelling (which Yelling did not find offensive) and the two prayed together about raising their daughters. (Doc. 34-1 at p. 65-66). The district court properly held that Yelling could not demonstrate the frequency required to establish a hostile work environment.

As the district court properly held, Yelling's citation to the *Smelter* case is unavailing, as the plaintiff in that case heard *daily* racial comments over the two

---

[10] Additionally, conclusory statements of the elements are insufficient to survive summary judgment. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion"); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (holding court may consider only evidence that can be reduced to an admissible form).

months she worked for the company and one of her coworkers even went so far as to call her a "dumb black n****r" to her face during an argument. *Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1285-1286 (11th Cir. 2018).  In sharp contrast to the underlying facts in *Smelter*, no one made any racial slurs in Yelling's presence, much less directed a racial slur at her and, far from constant or daily, Yelling conceded she rarely worked with most of the individuals she claimed made racist comments. (Doc. 34-1 at 12, 17, 19).

As such, this case is clearly distinguishable from *Smelter* and nothing in this Court's precedent does anything other than support the district court's dismissal of this claim.  *See e.g., Edwards*, 49 F.3d at 1521 (racial slurs must be so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility").  In fact, given the infrequency of Yelling's time working with those who allegedly made offensive comments, it is simply not possible for an "atmosphere charged with racial hostility" to have existed.

### C.    EEOC Concedes Yelling's Allegations Not Extreme

Of note is the EEOC's concession[11] in the amicus brief that the evidence in Yelling's case is "not as extreme as other cases." (EEOC Brief at 27).  As summarized above, Yelling's allegations entail a few of her coworkers, most of

---

[11] Also, of note, the EEOC did not address any other issue on this appeal, including Yelling's discriminatory and retaliatory discipline and termination claims. (EEOC Brief at 10, fn. 1).

whom she did not frequently work or interact, making racist comments. (Doc. 34-1 at 13, 16-17, 79).

The cases cited by the EEOC and Yelling on appeal involve comments made *to the plaintiff about the plaintiff* and not, like here, involving the political diatribes of coworkers with whom Yelling rarely worked.  Indeed, the EEOC concedes that "directing a racial slur at an employee herself can heighten its severity." (EEOC Brief at 17-18).  It is undisputed that no one ever directed *any* alleged offensive comment at Yelling, providing further support for the district court's dismissal of the hostile work environment claim.  *See Adams v. Austal, U.S.A., L.L.C.,* 754 F.3d 1250, 1251-57 (11th Cir. 2014) (explaining difference between employees who merely overheard coworkers use the "n-word" and employees to whom racial slur was directed).

On appeal, Yelling argues that the district court erred in concluding that the comments Yelling alleged were not physically threatening.  *See* App. Brief at 25-27.  However, examples of this Court's finding of actual physically threatening conduct highlights the difference in the conduct at issue in this case.  For example, in *Jones v UPS Ground Freight*, 683 F.3d 1283, 1299-1300 (11th Cir. 2012), this Court found that racial epithets directed at plaintiff, banana peels repeatedly placed on plaintiff's equipment, displays of the confederate flag on coworkers' shirts and hats, and confrontation by two coworkers holding a crowbar and a metal tool were

44

physical threatening and severe and pervasive enough to constitute a hostile work environment. In sharp contrast, no one at St. Vincent's brandished any weapon, no one displayed any confederate flag or other racist symbol, no one threatened Yelling, and no one directed any racist comments to Yelling. Again, the sum total of Yelling's complaints is that she overheard allegedly racist comments from a few of her coworkers, a far cry from the facts in the *Jones* case.

On appeal, Yelling also claims the district court did not properly consider her perception of the alleged offensive comments. To the contrary, the district court correctly assessed the objective component of Yelling's evidence of severe and pervasive harassment from the standpoint of a reasonable person as required by *Harris*. In making this assessment, the district court in no way stated that the confederate flag was not an offensive image but properly noted that *no one ever displayed the flag* at St. Vincent's. (Doc. 45 at 18). In fact, Yelling actually testified that these coworkers commented that they were rednecks without any reference to the confederate flag. (Doc. 34-1 at 18-19). This is vastly different than a coworker coming to work displaying confederate flags such as in the cases cited by Yelling and the EEOC. Again, this is not a case where there was *any* display of the confederate flag in the workplace *at all*.

### D.    Comments Did Not Interfere with Yelling's Performance

Additionally, the district court properly held that Yelling failed to present evidence that the alleged comments interfered with her job performance. (Doc. 45 at 21).  Upon hearing the alleged offensive comments, Yelling made positive comments about the Obamas or patients, as well as sarcastic comments back to her coworkers. (Doc. 34-1 at 14).  As explained above and as the district court properly held, Yelling spent most of her time caring for patients and away from the nurse's station, which was the only place she claims to have heard any offensive comments. (Doc. 45 at 21).  As such, Yelling failed to demonstrate the offensive comments interfered with her performance and as such failed to establish a hostile work environment under *Harris*.

Weighing the evidence cumulatively, the district court correctly held that Yelling failed to establish that the alleged harassment was objectively severe or pervasive enough to support her hostile environment claim as a matter of law and this Court should affirm the decision.

### E.    Comments Mistakenly Excluded Do Not Change Analysis

Yelling and the EEOC argue on appeal that the district court failed to include all alleged offensive comments in the hostile work environment analysis. What Yelling and the EEOC fail to acknowledge is that the district court's discussion regarding the 180-day period prior to Yelling's EEOC Charge was

relevant to some of the alleged *actions* in this case. (Doc. 45 at 14-15). As discussed above, the district court properly held that Yelling's claim for alleged denial of shifts as an acting charge nurse occurring at least one year prior to her EEOC Charge was in fact untimely. The district court's discussion of timeliness primarily focused on the untimeliness of actions and not solely on any alleged comments.

Yelling and the EEOC argue that the district court's failure to consider Wilhite's one-time comment about President Obama and food stamps in March of 2015 constituted reversible error and somehow tips the scales to constituting a hostile work environment. The EEOC and Yelling's counsel acknowledge that this was the only comment by Wilhite that stood out because Yelling could not recall *any* other specific comment by Wilhite. (Doc. 34-1 at 12). Moreover, the district court *did* consider Yelling's coworkers' other alleged comments about the Obamas. (Doc. 45 at 17).

Even if district court mistakenly excluded Wilhite's one-time comment and other alleged unspecified comments, this error was harmless and would not materially change the analysis. Further, even if this were error on the part of the district court, this Court has independent reasons for affirming the decision below. *See Harris*, 608 F.3d at 1227 (noting this Court's ability to affirm based on independent reasons).

47

As described in detail above, whether considering six months of infrequent comments or ten, none of the comments were severe, pervasive, threatening, or even directed at Yelling herself. Even if, as the EEOC claims, the district court somehow truncated its assessment, nothing changes the fact that Yelling rarely worked with these individuals and adding a handful of alleged offensive comments does not change the fact that the "totality of the circumstances" simply does not rise to the level of a hostile work environment.

### F.    St. Vincent's Investigations Constitute Prompt Remedial Action

The district court did not address the issue of St. Vincent's response to Yelling's complaints, but St. Vincent's investigations provide an alternative argument supporting the dismissal of Yelling's hostile work environment claims.

The only individuals Yelling points to as making offensive comments with any supervisory responsibilities over Yelling were Charge Nurses Wilhite and Laroe. It is undisputed that neither Wilhite nor Laroe took any tangible action against Yelling. Neither were involved in the decision to terminate Yelling's employment. As such, the standard with respect to liability for alleged hostile work environment applicable to the facts of this case is whether once St. Vincent's knew of the alleged harassment, it took prompt corrective action. *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (employer not

liable for harassment if it takes immediate and appropriate action after notice of harassment).

On appeal neither Yelling nor the EEOC address the testimony of St. Vincent's HR Business Partner Caitlin Griffin. It is undisputed that Griffin met with Yelling in June 2015 after her initial complaint, investigated Yelling's concerns, was unable to substantiate Yelling's concerns and kept lines of communication open with Yelling. (Doc. 34-9 at 3). Not only did Griffin meet with Yelling, but other HR representatives and members of management met with Yelling to hear her concerns. (Doc. 34-10 at 3, Doc. 34-7 at 11-12).

Notably, Yelling made many complaints that were unrelated to any alleged racial discrimination such as her complaint about another black coworker.[12] (Doc. 34-9 at 3). As detailed above, St. Vincent's received a number of complaints that Yelling herself used a bullying and belittling tone, which were at times intertwined with the investigations into Yelling's complaints of others. St. Vincent's investigations revealed that Yelling herself was at fault for inappropriate comments, failure to follow physicians' orders, and falsifying records. The fact that the investigations of Yelling's complaints resulted in St. Vincent's also addressing Yelling's misconduct does not negate the fact that St. Vincent's did, in

---

[12] Even in Yelling's charges filed with the EEOC and her original Complaint in federal court, she complained of disability, religion, age, and sex discrimination, along with race discrimination.

fact, investigate Yelling's complaints.    As such, this provides an additional independent reason for dismissal of Yelling's hostile work environment claim.  *See e.g. Kilgore*, 93 F.3d at 754 (finding defendants' actions were sufficient to show "prompt remedial action" when it conducted investigatory interviews but found no support for the harassment allegations) .

## CONCLUSION

In light of the lack of evidence in the record creating a genuine issue of fact as to Yelling's race discrimination, hostile work environment and retaliation claims, the district court properly granted summary judgment in favor of St. Vincent's Health System.

Respectfully submitted this 23rd day of July, 2021.

*/s/ Shannon L. Miller*
Tammy L. Baker (ASB-9522-B62T)
tammy.baker@jacksonlewis.com
Shannon L. Miller (ASB- 8026-R60S)
shannon.miller@jacksonlewis.com
JACKSON LEWIS P.C.
800 Shades Creek Parkway, Ste. 870
Birmingham, Alabama 35209
Telephone:  205-332-3106/3102
Facsimile:  205-332-3131

## <u>CERTIFICATE OF COMPLAINT WITH TYPE-VOLUME LIMIT,</u>
## <u>TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS</u>

1.    This brief complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) and Fed.R.App.P. 29(d) because it contains 11,468 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f), as calculated by the word-counting feature of Microsoft Word.

2.    The foregoing brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) and is presented in proportionally spaced font typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Shannon L. Miller*
Tammy L. Baker (ASB-9522-B62T)
tammy.baker@jacksonlewis.com
Shannon L. Miller (ASB- 8026-R60S)
shannon.miller@jacksonlewis.com
JACKSON LEWIS P.C.
800 Shades Creek Parkway, Ste. 870
Birmingham, Alabama 35209
Telephone:  205-332-3106/3102
Facsimile:  205-332-3131

51

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 23rd day of July, 2021, a true and correct copy of the foregoing has been served via the Court's CM/ECF filing system:

> Leslie A. Palmer, Esq.
> Palmer Law, LLC
> 104 23rd Street South, Suite 100
> Birmingham, Alabama 35233
>
> Gwendolyn Young Reams, Acting General Counsel
> Jennifer S. Goldstein, Associate General Counsel
> Elizabeth E. Theran, Assistant General Counsel
> Susan R. Oxford, Attorney
> Equal Employment Opportunity Commission
> Office of General Counsel
> 131 M Street, N.E., 5th Floor
> Washington, D.C. 20507

> */s/ Shannon L.  Miller*
> Counsel of Record

4844-2241-3043, v. 1