# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## DOCKET NO.: 21-10017-GG

CYNTHIA DIANE YELLING,

PLAINTIFF – APPELLANT,

v.

ST. VINCENT'S HEALTH SYSTEM,

DEFENDANT – APPELLEE.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2-17-CV-01607-SGC

## APPELLANT'S PETITION FOR REHEARING
## AND REHEARING EN BANC

COUNSEL FOR APPELLANT:

Leslie A. Palmer
PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
Telephone: (205) 285-3050
Facsimile: (205) 285-3050
leslie@palmerlegalservices.com

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellant hereby certifies the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations and any publicly held corporation which owns 10% or more of the party's stock), and other identifiable legal entities related to a party that has an interest in this case.

1. Ascension Health, a non-profit, faith-based health care system, parent to Appellee, St. Vincent's Health System – Appellee is a wholly owned subsidiary of Ascension Health.

2. Baker, Tammy L. – Counsel for Appellee;

3. Cynthia Diane Yelling – Appellant;

4. Cornelius, Hon. Staci G. – United States Magistrate Judge for the United States District Court for the Northern District of Alabama – by Consent pursuant to 28 U.S.C. § 636(c).

5. Equal Employment Opportunity Commission – Amicus Curiae;

6. Gantz, Julie Loraine – Counsel for EEOC, Amicus Curiae;

7. Goldstein, Jennifer S. – Associate General Counsel, EEOC;

8. Jackson Lewis, P.C. – Law Firm of Counsel for Appellee;

9. Miller, Shannon L. – Counsel for Appellee;

i

10. Oxford, Susan R. – Attorney, EEOC;

11. Palmer Law, LLC – Law Firm of Counsel for Appellant;

12. Palmer, Leslie A. – Counsel for Appellant;

13. Reams, Gwendolyn Young – Acting General Counsel, EEOC;

14. Sansone, Nicolas – Counsel for EEOC, Amicus Curiae;

15. St. Vincent's Health System – Appellee;

16. Theran, Elizabeth E. Assistant General Counsel, EEOC;

17. Yelling, Cynthia Diane – Appellant.

Respectfully submitted this 26th day of October, 2023.

/s/ Leslie A. Palmer
Leslie A. Palmer
Attorney for Appellant

OF COUNSEL:
PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205)285-3050
leslie@palmerlegalservice.com

ii

## <u>STATEMENT OF COUNSEL REGARDING EN BANC CONSIDERATION</u>

1.  I express a belief, based on a reasoned and studied professional judgment, that the panel decision on Appellant's hostile work environment claim is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:

    a. *Allen v. Tyson Foods*, 121 F.3d 642 (11th Cir. 1997)

    b. *Fernandez v. Trees, Inc.*, 961 F.3d 1148 (11th Cir. 2020).

    c. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)

    d. *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012)

    e. *Leake v. Drinkard*, 14 F.4th 1242 (11th Cir. 2021).

    f. *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999)

    g. *Oncale v.Sundowner Offshore Servs.*, 523 U.S. 75 (1998)

    h. Despite this Precedent, the panel affirmed the District Court's Order granting summary judgment where the employer subjected the employee to a work environment over many months that included comments that are indisputably racist and humiliating that affected the employees work relationship and trust with her co-workers and supervisors.

2.  I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance because the Panel's affirmation of dismissal on a hostile work environment claim where counsel, parties, and the Panel agreed the statements were absolutely racist, provides a green light for employers to allow racist comments in the workplace if they are cloaked political.

3.  I express a belief, based on a reasoned and studied professional judgment, that the panel decision on Appellant's retaliation claim is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:

    a.  *Bostock v. Clayton Cnty., GA*, 140 S.Ct. 1731 (2020)

    b.  *McDonnell Dougla Corp. v. Green*, 411 U.S. 792 (1973)

    c.  *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir.  2016)

    d.  Despite this Precedent, the panel affirmed the District Court's Order granting summary judgment where a reasonable jury could conclude retaliation and the proffered legitimate non-discriminatory reason were but-for causes and conflated multiple but-for causes with a same-decision defense.

4. I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: Whether the same-decision defense is implicated when an employee points to evidence of retaliation and the employer proffers an arguable legitimate non-discriminatory reason pointing to multiple but-for causes.

5. I express a belief, based on a reasoned and studied professional judgment, that the panel decision on Appellant's disparate treatment claim is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court

   a. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016)

   b. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (2011)

   c. Despite this Precedent, the panel affirmed the District Court's Order granting summary judgment where an Appellant motivating, even if not determinative, factor.

/s/ Leslie A. Palmer
Leslie A. Palmer
Attorney for Appellant

v

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT OF COUNSEL REGARDING EN BANC CONSIDERATION ... iii

TABLE OF CONTENTS ..........................................................................vi

TABLE OF AUTHORITIES ................................................................ viii

STATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC

CONSIDERATION ...............................................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS........................................2

AND DISPOSITION OF THE CASE ...................................................................2

STATEMENT OF FACTS NECESSARY TO ARGUMENT OF THE ISSUES ....3

ARGUMENT ........................................................................................9

   I.   The Panel's finding that Yelling's work environment was not objectively severe or pervasive is contrary to established precedent..................................9

   A.     Statements by the Panel during oral argument that the comments SVH exposed Yelling to were "super racist" and would offend the Panel judge demonstrate Yelling's offense was objectively reasonable...........................10

   B.     The Panel's focus on statement frequency is contrary to *Fernandez* and ignores the related conduct and context. ........................................................10

C.    The concurring opinion's focus on the First Amendment and "political" comments affected the Panel's view of the totality of the circumstances and severity ..................................................................................13

II.  The Panel's rejection of Yelling's retaliation claim is contrary to established precedent. .......................................................................14

A.    The Panel's holding conflates a same-decision defense with multiple but-for causes. .............................................................................14

B.    Yelling established a circumstantial case of retaliation. .........................15

III. The Panel's rejection of Yelling's disparate treatment disregarded and weighed evidence. .......................................................................16

CONCLUSION .................................................................16

CERTIFICATE OF COMPLIANCE ....................................................18

CERTIFICATE OF SERVICE...............................................................19

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Tyson Foods*, 121 F.3d 642 (11th Cir. 1997) ........................................ iii, 11

*Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265 (11th Cir. 2021) .....................15

*Bostock v. Clayton Cnty., GA*, 140 S.Ct. 1731 (2020) ........................................iv, 14

*Fernandez v. Trees, Inc.*, 961 F.3d 1148 (11th Cir. 2020). ................................ iii, 11

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) .................................................. iii, 9

*Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) ............................. iii

*Leake v. Drinkard*, 14 F.4th 1242 (11th Cir. 2021).................................................. iii

*McDonnell Dougla Corp. v. Green*, 411 U.S. 792 (1973) ........................................iv

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999)....................................... iii

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ...........................................9

*Oncale v.Sundowner Offshore Servs.*, 523 U.S. 75 (1998) ...................................... iii

*Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016) ..............iv, v, 14

**Rules**

Eleventh Circuit Rule 26.1-1 .......................................................................................i

Fed. R. App. P. 32(a)(7)(B)........................................................................................18

## STATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC CONSIDERATION

I.      Comments that a Black political figure looks like a monkey and should go back to Africa can support an objectively severe hostile work environment when the hearer of the insults shares the same physical and ancestorial traits as the politician.

II.      Testimony about unquestionably racist statements by multiple employees over the course of eight months is sufficiently specific to support an objectively hostile work environment claim when the testimony shows at least seven individuals made statements, would make derogatory remarks whenever anyone brought up current affairs or the Black president, or would entrench a conversation with racially insensitive comments as soon as the only Black nurse was at the nurses station and not "drop the topic."

III.      The employer's assertion of a legitimate non-discriminatory reason implicates the same-decision defense, as opposed to motivating factor analysis, when the employee points to some evidence that retaliation also made a difference in the employment decision.

IV.      A reasonable jury could determine that evidence of a racially hostile work environment supports that race played a role in a termination, even if it was not a determinative factor.

## STATEMENT OF THE COURSE OF PROCEEDINGS
## AND DISPOSITION OF THE CASE

Cynthia Yelling ("Yelling"), a Registered Nurse formerly employed by St. Vincent's Health Systems ("SVH") in Birmingham, Alabama, sued SVH alleging SVH subjected her to a racially hostile work environment, and terminated her because of her race and/or because of her protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and 42 U.S.C. § 1983.[1] At the close of discovery, SVH moved for summary judgment on all counts.[2] The District Court, parsed apart the evidence, viewed some in the light most favorable to SVH, and granted summary judgment on all counts.[3]

Yelling filed a Notice of Appeal on December 31, 2020.[4] The Eleventh Circuit heard oral argument on March 3, 2023, a transcript of which is attached as Addendum B. On October 5, 2023, in a per curium, published opinion, the Eleventh Circuit Panel affirmed the District Court's dismissal of all claims, a copy of which is attached as Addendum A.

---

[1] Doc. 9. Amended Complaint
[2] Docs. 32 to 34. Motion for Summary Judgment, Brief and Evidence
[3] Doc. 45. Memorandum Opinion
[4] Doc. 47. Notice of Appeal

## STATEMENT OF FACTS NECESSARY TO ARGUMENT OF THE ISSUES

Casi Dubose, SVH's White Nurse Manager for the Clinical Decision Unit ("CDU") staffed only one Black nurse per shift in the CDU maintaining a racially segregated workplace. White CDU employees would joke about Dubose's "quota" when Black employees would show interest in transferring into the CDU. Yelling, the only Black nurse on her shift, began complaining in the summer of 2015 about the escalation of racist statements by at least one supervisor and multiple co-workers. When SVH did not investigate her complaints, Yelling's co-workers continued making racist statements, began instigating altercations, complaining about anything related to with Yelling, and made her work environment so intimidating she obtained a second job just in case. For at least six months, SVH allowed Yelling's co-workers to continue this conduct. Yelling continued to complain and SVH fired her February 2016. SVH alleged it fired Yelling for falsifying medical records pointing to discrepancies between the records and GPS tracker information. SVH had noticed, and made note of, similar GPS tracker/medical record discrepancies with Yelling in June 2015 but was not concerned enough to address the discrepancies with Yelling.[5]

---

[5] Doc. 39-1 Plaintiff EEOC Rebuttal; 34-1 Plaintiff Depo. 30:1-10, 40 16-20, 44:9-64:18, 290:11-16; 34-6 Dubose Depo 67:16-22;

3

**Specific Racist Statements**

Yelling testified that she could not remember all the instances of racially insensitive statements but made note of some that stood out to her. She noted that the environment became "heated" with racially disparaging comments" around March 2015 when one of her White supervisors mocked, President Obama's planned visit to a Historically Black College or University was to hand out food stamps. Yelling reported her supervisor's racist statement to Nurse Manager, Casi Dubose, and Administrative Nursing Director, Chuck Lacey – higher level supervisors, but they ignored her complaint.[6]

The supervisor's behavior trickled down to the staff. Yelling's co-workers, emboldened by SVH's lack of action, began making regular "super racist" comments. Sandy Sheffield, a White pool nurse, would comment "Michelle Obama looks like a monkey" and regularly called Black patients she cared for "welfare queens" and "crack heads." Another White nurse, Tiffany Hardy made the same comments about Michelle Obama looking like a "monkey" and Black patients being on welfare. Hardy and another White nurse, Linda Powell also frequently said President Obama should "go back to Africa" and made other derogatory remarks about minorities in the news. They referred to Black patients as ghetto fabulous but did not make similar statements about White patients. In the

---

[6] Doc. 34-1, Plaintiff Depo 40:16-21, 291:9-20; Dubose Depo 67:16-22;

midst of these regular statements and aggressive opinions representing an obvious culture on the CDU, Tonya Larimore, Robin Calvert, and Charge Nurse Jennifer Laroe (another supervisor) regularly bragged about being redneck confederate flag flyers with guns they were not afraid to use– which Yelling believed was racially motivated.[7]

Because of the culture of the CDU and the regularity of the comments, Yelling could not pinpoint an exact number of instances for these comments. In her deposition in response to counsel's statement "[i]t seems like to me it wouldn't be that often" Yelling responded that "as soon as [she] walked up, that conversation [referencing racially insensitive comments] would be entrenched.". Yelling testified her supervisor Wilhite made multiple comments, but the food stamps comment was the one that stuck out to her. Yelling testified that Sheffield, who she worked with multiple times a week, would not "drop the topic" regardless of Yelling's response. Yelling's three most egregious co-workers, Powell, Sheffield, and Hardy would "always make racially insensitive comments" and it was "not unusual." When they would all be at the nurses,' station if anyone brought up conversation about current affairs or the Obamas, they would express their opinions openly during "all of those conversations." Yelling testified that the racist

---

[7] Doc. 34-1 Plaintiff Depo 44:9-11, 48:10, 50:14-20, 54:14-16, 55:18-21, 56:10-18, 59:22-67:22, 290:11-16; Doc. 39-1, p2¶2

comments were so often that she could not remember every single instance but if news reporting included Blacks "something derogatory was going to be said" by those three and they would sit around and be "very aggressive" with their words and opinions. Multiple White employees would taunt Yelling "[e]ach and every single weekend" she worked stating Dubose would fire her.[8]

## Specific Conduct

In 2015, Yelling reported these regular and racist statements to her supervisors Wilhite and Laroe and believes she also reported them to Dubose. All Yelling's supervisors ignored her complaints, Dubose could not recall even speaking with Yelling. On June 14, 2015, after Yelling's co-workers complained about her "tone" and interpersonal skills, House Supervisor Kim Parrish reprimanded her. In response Yelling reported SVH's differential treatment, continued racist statements, Dubose's Black "quota," and Dubose passing over the Black nurse on each shift for acting Charge Nurse shifts against SVH's policy. Parrish, who is White, did not address Yelling's complaints. Yelling again complained directly to Dubose and again Dubose ignored her.[9]

---

[8] Doc. 34-1 Plaintiff Depo 40:8-22, 44:9-11, 48:10, 50:14-20, 51:19-52:21, 54:11-56:18, 66,:14-21, 71:17-72:1, 270:5-6, 309:10-12.
[9] Doc. 34-1 Plaintiff Depo 51:3-18, 53:3-13, 58:4-17, 70:17-71:13, 80:14-81:23, 250:2-7; Doc. 34-6 Dubose Depo 67:16-22; Doc. 34-4 Lacy Depo 79:11-22.

Immediately after she complained to Dubose about co-workers' racist and aggressive comments, on June 21, 2015, they reported issues with her "interpersonal work relationships" and accused her of needing a drug test at work. SVH allowed Yelling to continue direct patient care, unassisted, for several hours before testing and suspending her. Yelling immediately reported the humiliating drug testing to HR as retaliation. Five days later, Yelling complained again to HR about the "culture" on the unit. HR recognized this as a complaint of racial discrimination but did not investigate.[10]

Once Yelling complained to HR, Dubose instructed staff interacting with Yelling to document everything and always wear GPS trackers. Dubose did not tell Yelling to document other employee conduct, discuss tracker issues with her, or address her complaints. Yelling's co-workers taunted her after her return, telling her every weekend "Casi [Dubose] will fire you." Following Dubose's directive, Yelling's coworkers, including some she had complained about, began papering Yelling's file with e-mails to Dubose about everything including her "tone," patient care issues while Yelling was on lunch, and Yelling using a "smell good spray" in a patient's room or moving furniture. Dubose forwarded even the trivial e-mails to HR.[11]

---

[10] Doc. 39-3, Drug Test, HR Depo 34-7, 26:12-18, 56:10-16, 66:7-67:1, 72:6-18.
[11] Doc. 34-6 Dubose Depo 57:13-22; Doc. 34-1, Plaintiff Depo 309:5-19; Doc. 39-4 Meeting Notes; Doc. 39-5 Petty Complaints.

7

Yelling continued to complain, and her relationships strained further. Citing isolated incidents spanning months, SVH put her on a corrective action plan in October of 2015 that instructed her to go to every staff member to see how she could better improve the relationship, SVH still did not address any of Yelling's complaints or raise any issue with charting/tracker inconsistencies SVH noted in her file.[12]

Because of her co-workers' continued taunts about getting fired, and continued racist statements tensions grew and Yelling struggled with the Team Nursing required by SVH. On at least three instances between November 2015 and January 2016, White co-workers initiated aggressive tones with raised voices or curse words at Yelling, leading her to file workplace violence complaints. SVH did not discipline the three White employees. Instead, after the last instance in January of 2016, SVH investigated Yelling and noted GPS tracking/charting inconsistencies, like those noticed but not mentioned to Yelling just six months earlier[13].

Claiming she falsified records because of the inconsistencies, SVH bypassed two progressive discipline steps and fired Yelling on February 2, 2016, after ignoring months of complaints by Yelling. SVH relied on the trackers it knew were

---

[12] Doc. 39-7 Emails with Lacey; 39-6 Meeting Notes 8/15; 39-9 Discipline Policy; 34-4 Lacy Depo. 56:11-57:6, 97:19-98:1.
[13] Doc. 34-6 Dubose Depo 29:3-7, Doc. 34-7 HR Depo 124:6-8.

not reliable. Yelling had reported problems with her tracker, and the unit secretary, who had helped paper Yelling's file, said Yelling "rarely tracked." The tracker report also showed hours long gaps of zero movement and random tracking at hours after the end of Yelling's shift. SVH went to the six or seven people on Yelling's shift, some of who she had complained about, to collect statements. SVH did not terminate others who had charting inconsistences from failing to round or failing to document rounds. SVH replaced Yelling with a White RN.[14]

## ARGUMENT

### I.     The Panel's finding that Yelling's work environment was not objectively severe or pervasive is contrary to established precedent.

"[E]mployees [have] the right to work in an environment free from discriminatory intimidation, ridicule, and insult[.]" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Whether conduct is so "severe or pervasive" that it alters the employment conditions and creates an abusive working environment is measured by if "a reasonable person would find [it] hostile or abusive." *Id.* at 67; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). The Panel's holding contradicts established precedent and requires en banc consideration.

---

[14] Doc. 39-12 Termination; Doc. 34-6 Dubose Depo 84:7-13, 86:3-6, 98:12-18, 117:10-22; Doc. 34-5 Laroe Depo 29:13-30:3, 32:21-33:5; Doc. 34-4 Lacy Depo 141:2-142; Doc. 39-14 Interrogatory ¶6.

A. **Statements by the Panel during oral argument that the comments SVH exposed Yelling to were "super racist" and would offend the Panel judge demonstrate Yelling's offense was objectively reasonable.**

The reasonable person standard is measured from the viewpoint of an individual in Yelling's position considering the full circumstances and social context of the conduct and experience. *Oncale*, 524 U.S. 75, 81 As the Panel opinion correctly notes, Yelling's "subjective perception [of severe or pervasive harassment] must be objectively reasonable." (Panel Opinion at 9). During oral argument, Judge Brasher noted he "would be very offended" if someone said the Obamas looked like monkeys and needed to go back to Africa in his presence. (OA Transcript 8:21-9:5). Judge Brasher separated the comments about the Obamas from the other comments citing political motive, but considering his offense, it is objectively reasonable that a person in Yelling's position with her life experiences, would find the "super racist" comments about their shared physical and ancestorial traits highly offensive and severe.

B. **The Panel's focus on statement frequency is contrary to *Fernandez* and ignores the related conduct and context.**

In considering whether racist statements and conduct create an objectively hostile work environment, the Panel leaned on the four non-exclusive factors outlined by the Supreme Court,[15] and relied heavily on Yelling's description of the

---

[15] These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

10

frequency. The Panel determined the most racist statements were "isolated epithets" despite Yelling's multiple examples over the last months of her employment. (Panel Opinion at 10-11). The Panel's interpretation that Yelling's description lacked specificity failed to draw all reasonable inferences in Yelling's favor. While Yelling could not state all the conduct was "nearly every day" like in *Fernandez*, Yelling's testimony, as a whole, was more specific that vague terms like "constantly." Fernandez v. Trees, Inc., 961 F.3d 1148, 1153-54 (11th Cir. 2020). The record showed the following about Yelling's last eight months of employment:

- The environment became "heated,"

- Wilhite, a White supervisor, made multiple comments, the one that stood out most inferred a Black politician was going to an HBCU to hand out food stamps,

- Dubose's, a White supervisor, had a Black staffing quota,

- Multiple supervisors ignored all her complaints but investigated complaints about her from White employees,

- Three co-workers regularly made "super racist" comments calling the Obamas monkeys and saying they should go back to Africa,

---

interferes with an employee's work [**12] performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)

11

- It was not uncommon for them to call Black patients welfare queens, ghetto fabulous, or crack heads,

- Where anyone brought up current affairs or the Obamas, or if the news reporting included Blacks, they "[were] going to" say "something derogatory,"

- They bragged about being confederate flag flyers, rednecks, or owning a gun and not being afraid to use it despite her objections,

Even without specific numbers of events, each of these comments, and conduct if only once over the course of eight months is pervasive as they would individually total more than ten in eight months. The record shows more frequency with specific descriptions when viewed as a whole. Responding to a comment by SVH counsel about the frequency, Yelling stated "as soon as I walked up, that conversation [referencing racially insensitive comments] would be entrenched" and that specifically one co-worker who was the most aggressive with her comments would not "drop the topic." Additionally, after Yelling began complaining about Dubose's quota and co-worker comments, they began taunting her "each and every single weekend" that Dubose would fire her.

Considering all the statements and conduct, Yelling's years without issue, the sudden "heated" environment, and multiple examples provided of egregious, "super-racist" statements, combined with taunting in a team nursing environment,

a reasonably jury could find the harassment severe or pervasive and the Panel's

holding is erroneous.

C. **The concurring opinion's focus on the First Amendment and "political"**
   **comments affected the Panel's view of the totality of the circumstances**
   **and severity**

Title VII creates a right to a workplace free from discrimination and

harassment. This right includes the right to be free from statements about third

parties – even politicians – with whom Yelling shares the specific physical or

ancestorial traits being referenced. At oral argument, one Panel judge stated, "I

think [the First Amendment] gives [people] the right to say racist things about the

president and the first lady." (OA Transcript 7:18-8:6). This, combined with the

Panel's holding that the comments were less severe because Yelling was not the

intended target, ignores that the most racist statements, "monkey" and "go back to

Africa" are physical and ancestorial traits which Yelling shares with subject.

Additionally, "entrenching" these conversations at the nurses' station, where

Yelling would be the only Black nurse, after Yelling expressed her objection,

would in totality, further enhance the severity and humiliation. The concurrence

directing a drilling down into the politicalness of the statements and the Panel's

opinion finding it less severe because it was about a third-party, parses the

evidence, puts less weight on some statements than others, and fails to consider the

totality of the circumstances contrary to this circuit's precedent.

13

**II.    The Panel's rejection of Yelling's retaliation claim is contrary to established precedent.**

A. **The Panel's holding conflates a same-decision defense with multiple but-for causes.**

Because a claim can have multiple but-for causes and SVH "cannot avoid liability just by citing to some other factor that also contributed to the employment decision." *Bostock,* 140 S.Ct. at 1739. When a reasonable jury could believe that an illegal motive and legal motive both made a difference, or could disregard the proffered legal motive, application of a framework built around proving a single, true reason, is improper and contrary Supreme Court and Eleventh Circuit precedent. Though "motivating factor" is only applicable to status claims, not retaliation claims, the analysis is transferable and the causation discussion in *Bostock* nearly mirrors the analysis in *Quigg*. *See Bostock v. Clayton Cnty., GA*, 140 S.Ct. 1731, at 1739 (2020), *See also Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). When an employer points to a legitimate non-discriminatory reason that a jury can believe, and the employee presents some evidence of retaliation, both can be a but-for cause. Requiring proof of a single, true reason invades the province of the jury making *McDonnell Douglas* "fatally inconsistent" in claims where there can be more than one but-for cause. Where there is or can be more than one but-for cause, the analysis shifts to whether the SVH would have made the same decision even without the retaliation. The Panel's

14

decision creates an unbeatable quagmire where Plaintiffs must prove a negative –

at a stage in litigation where weighing of evidence is not appropriate. En banc

review is necessary to clarify this important issue.

B. **Yelling established a circumstantial case of retaliation.**

The panel's rejection of Yelling's retaliation case under convincing mosaic

or otherwise failed to view all Yelling's evidence in the light most favorable to her.

*Lockheed-Martin*, 644 F.3d at 1328; *see also Bailey v. Metro Ambulance Servs.*,

992 F.3d 1265, 1273 n.1 (11th Cir. 2021). The panel disregarded several important

pieces of evidence including:

- that SVH did not have any issue with or counsel Yelling on earlier

  tracker/charting inconsistencies,

- SVH instructed co-workers to document everything,

- co-workers began targeting her with petty complaints,

- the tracker report relied on was known to be unreliable,

- the witnesses had noted bias,

- and the manager that investigated was one against whom she had

  complained.

The panel provided no analysis of a circumstantial case merely stating Yelling had

not established a convincing mosaic. This evidence, viewed in totality would allow

15

a reasonable jury to infer SVH terminated Yelling because of her protected activity and the Panel's holding is contrary to precedent.

## III.    The Panel's rejection of Yelling's disparate treatment disregarded and weighed evidence.

Disparate treatment claims need only show that race was a motivating factor – not a factor that was determinative. In rejecting Yelling's disparate treatment claim, the Panel wrongfully presumed Lacey (the Black administrator) was a decision maker and disregarded that SVH terminated Yelling after investigating her despite never investigating any of her complaints. Yelling's mountain of evidence of a racist statements and conduct, her supervisor's Black staffing quota, SVH's replacement of her with a White nurse, SVH's inaction on race complaints, co-worker targeting and taunting, close timing, differential treatment of similar – even if not comparative – conduct, and SVH investigating only Yelling, could lead a reasonable jury could infer that Yelling's race played some role, even if not a determinative one, in her termination. The Panel's holding otherwise contradicts the plain text of the statute, this circuit's precedent, and the Federal Rules of Civil Procedure requiring en banc consideration.

## <u>CONCLUSION</u>

Yelling was a good nurse and took care of her patients. SVH's ignored Yelling's repeated complaints of undisputed racist statements and the conduct ultimately strained Yelling's working relationship with the co-workers who were

16

so aggressive and open about their opinions. The totality of the circumstances show that Yelling's work environment was objectively severe or pervasive, arguably both. After Yelling complained repeatedly, SVH used a reason it had not previously had any issue with to terminate her. Even if the inconsistencies were a real reason, they combined with SVH's retaliatory intent to create multiple but-for causes and require jury resolution. Considering the totality of the circumstances, Yelling also showed that race was a motivating factor, even if not a determinative one. The holdings of the panel are contrary to the statutory text, Rule 56 of the Federal Rules of Civil Procedure, and binding precedent requiring en banc review and a setting aside of the Panel's published opinion.

Respectfully submitted this 26th day of October, 2023.

/s/ Leslie A. Palmer
Leslie A. Palmer
ATTORNEY FOR APPELLANT

PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
e-mail: leslie@palmerlegalservices.com
Tel: (205) 285-3050
Fax: (205) 285-3050

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) Fed. R. App. P. 29(d) because it contains 3,338 words as calculated by the word-counting feature of Microsoft Office 365.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type styles requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point-font, Times New Roman.

Dated: October 26, 2021                           /s/ Leslie A. Palmer
                                                  OF COUNSEL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2021, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to the following:

Tammy L. Baker
Shannon L. Miller
**Jackson Lewis, P.C.**
800 Shades Creek Parkway
Suite 870
Birmingham, AL 35209
bakert@jacksonlewis.com
millers@jacksonlewis.com

Gwendolyn Young Reams, Acting General Counsel
Jennifer S. Goldstein, Associate General Counsel
Elizabeth E. Theran, Assistant General Counsel
Julie Gantz, Attorney
**Equal Employment Opportunity Commission**
Office of General Counsel
131 M. Street N.E., 5th Floor
Washington, D.C. 20507

/s/ Leslie A. Palmer
OF COUNSEL

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**DOCKET NO.: 21-10017-GG**

---

CYNTHIA DIANE YELLING,

Plaintiff – Appellant,

v.

ST. VINCENT'S HEALTH SYSTEM,

Defendant – Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2-17-CV-01607-SGC

---

**ADDENDUM A TO
APPELLANT'S PETITION FOR REHEARING
AND REHEARING EN BANC**

**PANEL OPINION**

---

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10017

_____

CYNTHIA DIANE YELLING,

Plaintiff-Appellant,

*versus*

ST. VINCENT'S HEALTH SYSTEM,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:17-cv-01607-SGC

_____

2                    Opinion of the Court                    21-10017

Before BRANCH and BRASHER, Circuit Judges, and WINSOR,* District
Judge.

PER CURIAM:

Cynthia Yelling worked as a hospital nurse for St. Vincent's
Health System. After St. Vincent's fired her, Yelling sued, alleging
race discrimination (including hostile work environment) and re-
taliation under Title VII and 42 U.S.C. § 1981. The district court
granted summary judgment for St. Vincent's,[1] and Yelling ap-
pealed.

On appeal, Yelling contends she presented sufficient evi-
dence to survive summary judgment as to all claims. She also con-
tends that after *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), it
is not appropriate to apply the *McDonnell Douglas* framework to a
"mixed-motive" retaliation claim. After careful review, and with
the benefit of oral argument, we conclude that (i) Yelling's hostile
work environment claim fails because there is no evidence of se-
vere or pervasive harassment; (ii) *Bostock* did nothing to undermine
application of *McDonnell Douglas* to retaliation claims because but-
for causation still applies; (iii) Yelling's retaliation claim cannot sur-
vive—either under *McDonnell Douglas* or otherwise; and (iv)

_____

* Honorable Allen Winsor, United States District Judge for the Northern Dis-
trict of Florida, sitting by designation.

[1] With the parties' consent, a magistrate judge presided over the case and is-
sued the order on appeal. *See* 28 U.S.C. § 636(c).

Yelling's disparate-treatment claim fails because there is no evidence that race played a role in her termination. We therefore affirm.

## I.

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (citing *Battle v. Bd. of Regents for the State of Ga.*, 468 F.3d 755, 759 (11th Cir. 2006)). "Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

Because we resolve all factual disputes in the nonmovant's favor, the "'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). What follows are the facts as accepted for summary judgment purposes.

## II.

In 2010, Yelling began work as a pool nurse in St. Vincent's Birmingham hospital. Pool nurses were not permanently assigned to any hospital unit; instead, they worked throughout the hospital as needed. Yelling later secured a permanent registered nurse assignment in St. Vincent's Clinical Decision Unit ("CDU"). The CDU cared for patients who needed general observation, lab work, or other tests.

Yelling initially worked weekday shifts in the CDU, but she switched to weekend shifts in 2013. Her supervisors—charge nurse Casi Dubose and the patient care supervisor—sometimes had her work extra shifts during the week. Yelling would also volunteer to serve as a relief charge nurse when the CDU needed one. Dubose usually selected white pool nurses for those assignments, but she did choose Yelling—who is black—a few times.

During these first few years, things went smoothly. Dubose evaluated Yelling's job performance and reported that Yelling generally met expectations. But the employment relationship began to sour in 2015.

In March of that year, President Obama visited Lawson State Community College—a predominantly black school Yelling had attended. While nurses were chatting one day at the nurse station, charge nurse Jimmy Wilhite remarked, "What is he doing coming here? Is he handing out food stamps?"

After that, as Yelling explains, the CDU "got really kind of heated with . . . racially disparaging comments." Yelling overheard white pool nurse Sandy Sheffield say, "Michelle Obama looks like a monkey" and that the "President is a piece of shit." White staffer Tiffany Hardy made similar remarks. So too did white weekday nurse Linda Powell, who said President Obama was "stupid," was the "worst president ever," and "needs to go back to Africa."

Yelling also heard these three coworkers refer to black patients as "boy" or "girl," "crack heads," "welfare queens," or "ghetto fabulous." And three other white coworkers—Tonya

Larimore, Robin Calvert, and Jennifer Laroe—talked at the nurse station about their "redneck status," owning guns, and being "confederate flag flyers."

Yelling does not remember having any racial insult or slur directed at her personally. Still, Yelling reported the comments as offensive to the house supervisor on June 14, 2015. She also complained that Dubose maintained a "quota" of only staffing one black nurse per shift. St. Vincent's did not investigate Yelling's complaints or discipline any CDU staff for racist comments or staffing practices.

The weekend after Yelling complained, three coworkers reported that she left the CDU without explanation, acted lethargic and unsteady upon returning, and then fell asleep at the nurse station. When Dubose learned of Yelling's reported behavior that same day, she ordered the house supervisor to suspend Yelling pending a drug test. Yelling's suspension lasted only through the next weekend. The drug test came back negative, and St. Vincent's paid Yelling for the time she was suspended.

Before Yelling returned from her suspension, Dubose reached out to other CDU employees. She told each one about expected employee behavior, asked them to document any future issues with other staff, and emphasized the importance of wearing trackers. (St. Vincent's required CDU nurses to wear devices that tracked their physical locations throughout each day.)

CDU employees began reporting Yelling for not following doctors' patient-care orders and not respecting patients' personal

boundaries. They specifically reported that Yelling disconnected a patient's IV, made that patient uncomfortable by praying with her in an unwanted way, delayed another patient's blood transfusion, and did not properly administer another's antibiotic. Citing this conduct, St. Vincent's placed Yelling in step one of its four-step disciplinary program by giving her a "coaching agreement" in October 2015. The coaching agreement outlined St. Vincent's expectations of Yelling, but it did not carry with it any suspension or loss of pay.

On November 22, 2015, Yelling accused her coworkers of stealing lab orders she printed. Yelling and Calvert got into a heated argument over the accusation, and Yelling shouted that the act of stealing the lab slips was "wicked." She warned that the act would "curse" the perpetrator's children, their children's children, and so on. Dubose learned of the incident and ordered the house supervisor to send Yelling home for the rest of the day. Calvert was not suspended.

When Yelling returned to work the next day, she met with Dubose and three other supervisors. Yelling complained that personnel issues with non-white CDU staff were "dealt with differently" than those with white staff. She filed an EEOC charge that same day, alleging race discrimination, hostile work environment, and other types of discrimination not at issue in this case (age, sex, religion, disability).

On November 24, and despite Yelling's complaints, St. Vincent's moved Yelling to step two of its disciplinary process by

giving her a "verbal agreement." The verbal agreement cited Yelling's outburst toward her coworkers regarding the lab slips. By signing it, Yelling agreed to communicate more appropriately with her coworkers and not call them names. But the verbal agreement, like the coaching agreement, did not require any suspension or loss of pay.

Friction between Yelling and her coworkers continued. On January 10, 2016, Yelling had another heated argument with a nurse. It began while Yelling was at the nurse station talking to the son of a patient in Room 610. The other nurse approached and accused Yelling of not taking care of the Room 610 patient, forcing that nurse to step in and do Yelling's job. (The patient was assigned to Yelling.) Yelling filed a workplace violence complaint against the nurse over the incident, although it involved no violence.

When investigating her complaint, Yelling's supervisors checked her tracking report. The report showed that Yelling did not enter Room 610 any time after 4:01 p.m. Yelling, though, had written on the patient's chart that she observed the patient between 7 and 8 p.m. Six CDU employees separately reported that they saw Yelling at the nurse station after 4:01 p.m., but not in Room 610.

In February 2016, Yelling met with Dubose, another supervisor (who was black), and a human-resources representative to discuss the investigation. These supervisors told Yelling about the tracking report, about its inconsistency with her written reports, and about their belief that she falsified the patient's record. And

citing the alleged falsification, they fired Yelling effective immediately. Yelling professed her innocence, telling them that her tracker did not always work, which she said she had told them before. But Dubose and her colleagues stuck with their decision to fire Yelling.

Although Yelling had not progressed through all four steps of St. Vincent's disciplinary process, her supervisors told her falsifying patient records prompts automatic termination. Before February 2016, white CDU staffers Felicia Parrish, Michael Pike, and Powell had failed to document making patient rounds or did so inaccurately. St. Vincent's disciplined these employees but did not immediately fire them.

St. Vincent's later replaced Yelling with a white nurse, and this suit followed.

## III.

As noted above, Yelling alleged discrimination and retaliation under Title VII and § 1981. Her discrimination claims included separate claims for hostile work environment and disparate treatment. We address each claim in turn.

### A.

To succeed on a racially hostile work environment claim under Title VII or § 1981, Yelling must prove: (1) she belongs to a protected class, (2) she experienced unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment, and (5) employer responsibility under a theory of vicarious or

direct liability. *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1283 n.3, 1284 (11th Cir. 2018) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

Yelling has certainly provided evidence from which a jury could find she satisfied the first two elements. (St. Vincent's does not contend otherwise.) But Yelling has not provided sufficient evidence from which a jury could conclude the CDU was "permeated with 'discriminatory intimidation, ridicule, and insult, . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

Showing that harassment is sufficiently severe or pervasive requires showing both a subjective and objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). Specifically, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive . . . and this subjective perception must be objectively reasonable." *Id.* (quoting *Harris*, 510 U.S. at 21). Yelling has met her burden as to the subjective showing; she presented evidence clearly showing she subjectively perceived her coworkers' conduct as severe or pervasive. But she falls short as to the objective component.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at

23). The Supreme Court, this court, and other Circuits have identified a nonexhaustive list of factors "to delineate a minimum level of severity or pervasiveness necessary for harassing conduct." *Mendoza*, 195 F.3d at 1246 (citations omitted). Those factors are (1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than "mere offensive utterance[s]," and (4) whether it unreasonably interfered with the employee's job performance. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23).

We examine the conduct in its context, "not as isolated acts." *Mendoza*, 195 F.3d at 1246 (citing *Allen*, 121 F.3d at 647). And this context includes comments and conduct beyond the timeframe otherwise actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002) (holding that the scope of harassment claims includes conduct that occurred outside 42 U.S.C. § 2000e-5(e)(1)'s EEOC filing period so long as the last-contributing act occurred within that period). We therefore recognize that the district court—by declining to consider Wilhite's statements about President Obama that were outside the EEOC charge period—did not consider the entire scope of Yelling's claim. But with a de novo review, it makes no difference now whether the district court did (or did not) consider all appropriate factors.

We conclude that Yelling has not presented evidence that would allow a reasonable jury to find in her favor. Yelling cites her own testimony that St. Vincent's became "kind of heated" with racist comments, or that her coworkers generally made racist

comments multiple times. But that testimony lacks the specificity necessary to show frequency. *Cf. Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153-54 (11th Cir. 2020) (reasoning that employee's testimony harassment occurred "every other day" or "nearly every day," which coworkers corroborated, was more specific than vague testimony harassment occurred "constantly"); *Nitkin v. Main Line Health*, 67 F.4th 565, 570-71 (3d Cir. 2023) (similar). And Yelling has not cited evidence that her coworkers' conduct was so extreme as to make up for the infrequency. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1253-54 (11th Cir. 2014) (reasoning that where harassment is isolated but extreme, an employee may still have an actionable claim).

We begin with the comments about the former President and First Lady. We cannot say that all of these comments were race-based—as opposed to political or personal disagreement. For example, comments that the President was "stupid," the "worst," or a "piece of shit" are not inherently racial. But even if we considered these comments race-based, and even drawing all reasonable inferences in Yelling's favor, we conclude no reasonable jury could conclude these comments evince extreme harassment.

This is true even when considering these comments together with other comments—several of which plainly were racist. Those comments were only isolated epithets rather than extreme harassment. The mere fact that a supervisor (Wilhite) uttered at least one does not automatically transform the conduct (still inexcusable) from boorish or crude to extreme. *Cf. Adams*, 754 F.3d at

1254-55 (considering a supervisor who uttered "n-----" in front of plaintiff). And Yelling does not cite any evidence that her coworkers aimed these or any comments at her personally. To be sure, Yelling need not be the intended target of harassment to succeed. *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982). But overhearing offensive comments is less severe or humiliating than being the intended target of direct harassment. *See Adams*, 754 F.3d at 1251-57; *cf. Miller*, 277 F.3d at 1277 (reasoning that the plaintiff cited evidence of severe harassment where he "did not suffer from overhearing occasional off-color comments," but instead experienced a coworker's shouting derogatory names at him). Even *Smelter*, on which Yelling relies heavily, drew this distinction. 904 F.3d at 1285-86 ("[The harassing coworker] did not simply use the epithet in [the plaintiff's] presence; instead, she directed it at [the plaintiff] as a means of insulting her in the midst of an argument.").

Yelling also points to the Larimore, Calvert, and Laroe comments about being "confederate flag flyers" or "redneck" gun owners, which the district court did not view as race-based. She argues at length that we must view these statements as racial harassment because of the context in which they were made. But the problem is that Yelling does not cite evidence adequately illuminating the context she says we must consider. She instead relies heavily on generalizations about changing "societal norms"—such as recent civil rights protests and confederate monument removals—that shed no light on what she experienced at St. Vincent's. The evidence that Yelling does cite to that end is that she was regularly the only black nurse on her shift and that coworkers other than

Larimore, Calvert, and Laroe made racist statements about the Obamas and patients. But that does not speak to the context of the conversations in which the statements were uttered. Nothing cited suggests, for example, that a coworker called herself a "confederate flag flyer" in conjunction with a racial slur or in the same discussion as one.

We cannot conclude that the comments about the confederate flag or being gun-carrying rednecks were racial harassment since Yelling only offers them in a vacuum. But even if we agreed with Yelling that they were race-based harassment, the comments still would not—alone or with everything else Yelling offers—be sufficient to show a hostile work environment.

There is no question that Yelling overheard race-based comments that do not belong in any workplace. But it is a "bedrock principle" that not all subjectively offensive language in the workplace violates Title VII. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Title VII only prohibits harassment that is "so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81; *see also Smelter*, 904 F.3d at 1283 n.3, 1284. On this summary judgment record, no reasonable jury could conclude Yelling experienced that. Accordingly, the district court did not err in granting summary judgment as to Yelling's hostile work environment claims.

*B.*

Next is Yelling's retaliation claim, which she based on circumstantial evidence. This court has "primarily" relied on the

*McDonnell Douglas* framework to evaluate circumstantial-evidence-based employment claims at summary judgment. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344-45 (11th Cir. 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc)) (*McDonnell Douglas* applicable to Title VII claims); *Gogel*, 967 F.3d at 1134 (same for § 1981 claims). Under that familiar framework, a plaintiff must first make out a prima facie case by showing (1) she engaged in a statutorily protected activity, (2) she experienced an adverse employment action, and (3) causation. *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) (citing *Coutu v. Martin Cnty. Bd. of Cnty. Cmm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)). If the plaintiff makes out a prima facie case, the employer must then "articulate a legitimate, non-discriminatory reason or reasons" for its actions. *Patterson*, 38 F.4th at 1345 (citing *Gogel*, 967 F.3d at 1135). If the employer does, the plaintiff must show that the proffered reasons were pretext and that the employer's real reason was retaliation. *Id.*; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Yelling contends that test does not apply here. She contends the Supreme Court's recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), shows that *McDonnell Douglas* has no application in "mixed motive Title VII retaliation" claims. Init. Br. at 36 (arguing that *Bostock* "made it clearer than ever that where an employee can point to *any* evidence of discrimination or retaliation,

the case must go to a jury" (emphasis added)).[2] She contends the appropriate standard for her retaliation claim is akin to the standard used for mixed-motive discrimination claims under Title VII. *Cf. Quigg,* 814 F.3d at 1235.[3] She alternatively contends that if *McDonnell Douglas* does apply, she has shown enough to survive it. Finally, she contends that—*McDonnell Douglas* aside—she has presented

_____

[2] Yelling did not plead a mixed motive in her complaint, and it is an open question in this Circuit whether that is necessary. Some unpublished decisions suggest pleading mixed-motive causation is not required, *see Williams v. Fla. Atl. Univ.,* 728 F. App'x 996, 999 (11th Cir. 2018); *Williams v. Housing Auth. of Savannah, Inc.,* 834 F. App'x 482, 489 (11th Cir. 2020), while others have suggested it is, *Stevenson v. City of Sunrise,* 2021 WL 4806722, at *7 (11th Cir. Oct. 15, 2021); *Fonte v. Lee Mem'l Health Sys.,* 2021 WL 5368096, at *4 (11th Cir. Nov. 18, 2021); *Smith v. Vestavia Hills Bd. of Ed.,* 791 F. App'x 127, 130-31 (11th Cir. 2019). St. Vincent's did not argue any pleading deficiency, so we assume (without deciding) that there is none.

[3] A plaintiff can survive summary judgment on a Title VII discrimination claim under 42 U.S.C. § 2000e-2(a)(1) by showing that, although an employer was motivated by more than one reason to take a particular action, a discriminatory reason was "a motivating factor" for the adverse employment action. *Quigg,* 814 F.3d at 1239; *see also* 42 U.S.C. § 2000e-2(a)(1). This theory is known as a "motivating factor" or "mixed-motive" discrimination claim. In other words, under the mixed-motive standard, when a plaintiff claims that the employer acted with mixed motives—and one of those motives was discriminatory—the plaintiff's claim can proceed, and the plaintiff is not required to prove that the employer's stated reason for the adverse action was pretextual. *Id.* at 1238-39.

Importantly, however, Yelling's Title VII retaliation claim is brought under 42 U.S.C. § 2000e-3(a), not § 2000e-2(a)(1). Thus, as explained further in this opinion, the mixed-motive framework does not apply to claims under § 2000e-3(a). Yelling's arguments to the contrary are unpersuasive.

enough evidence to show a convincing mosaic of retaliation. Yelling is incorrect on each contention.

### 1.

Though available for Title VII discrimination claims, it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[4] Rather, to succeed on her retaliation claim, Yelling must show that her "protected activity was a but-for cause of the alleged adverse action." *Id.* at 362; *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (same standard for § 1981 case). The but-for standard asks whether "a particular outcome would not have happened 'but for' the purported cause." *Bostock*, 140 S. Ct. at 1739 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). "Stated another way, a plaintiff must prove that had she not complained, she would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

---

[4] We use the term "mixed motive" to refer to claims based on the "motivating-factor" standard applicable in Title VII discrimination claims. *See Quigg*, 814 F.3d at 1235 ("An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." (quoting 42 U.S.C. § 2000e–2(m))). At any rate, to the extent a retaliation claim based on multiple but-for causes is fairly called a "mixed-motive" claim, but-for causation still applies. *Cf. Gross*, 557 U.S. at 177-78.

As the Supreme Court explained in *Nassar*, the motivating-factor standard under § 2000e-2(m), on the other hand, requires a "lessened" showing. 570 U.S. at 349. That "lessened" showing is sufficient for a Title VII discrimination claim, which requires only a showing that race "was *a* motivating factor for the defendant's adverse employment action," even if some other (lawful) consideration would have led to the same outcome. *Quigg*, 814 F.3d at 1239 (citation omitted). In other words, the motivating-factor standard only asks whether "illegal bias played a role" even if bias was not a necessary link in the causal chain. *Id.* at 1241. If it did, the claim can proceed.

But, as the Supreme Court made clear in *Nassar*, that "lessened" showing has no application to retaliation claims—like Yelling's—or any other claim that requires but-for causation. 570 U.S. at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

*Bostock*, which involved a Title VII sex discrimination claim—not a retaliation claim—did nothing to change this. *Bostock* noted that Title VII bars discrimination "because of" sex, *see* 42 U.S.C. § 2000e-2(a)(1); that "because of" incorporates traditional but-for causation; and that sometimes "events have multiple but-for causes." *Bostock*, 140 S. Ct. at 1739-40. That means an employer

cannot escape liability by pointing to some factor other than sex it considered if sex "was one but-for cause."[5] *Id.* at 1739.

*Bostock*'s description of but-for causation—and the idea that outcomes can have multiple but-for causes—was nothing new. The Court articulated the longstanding traditional test for but-for causation: "a but-for test directs us to change one thing at a time and see if the outcome changes." *Id.* That standard is "textbook tort law," *Nassar*, 570 U.S. at 347, and reflects "the common understanding" of factual causation, *Burrage v. United States*, 571 U.S. 204, 211-12 (2014) (illustrating the point with a baseball hypothetical).

In arguing that *Bostock* undermines application of *McDonnell Douglas* in the retaliation context, Yelling conflates the concept of multiple but-for causes with the concept of mixed motives. If there are multiple but-for causes, the removal of any one would change the outcome. Each would be a "necessary condition for the outcome," Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. b (Am. L. Inst. 2010), regardless of whether there was another such "necessary condition." Each could be viewed as "the straw that broke the camel's back." *Burrage*, 571 U.S. at 211; *cf. also Bostock*, 140 S. Ct. at 1742 ("If an employer would not have discharged

---

[5] *Bostock* also noted that the motivating-factor (*i.e.*, mixed-motive) test was alive and well for discrimination claims under § 2000e-2(a)(1), meaning that "liability [could] sometimes follow even if sex wasn't a but-for cause of the employer's challenged decision." *Bostock*, 140 S. Ct. at 1739–40. Nevertheless, *Bostock* focused its analysis on the traditional but-for causation standard because the motivating-factor test was not at play. *Id.* at 1740.

an employee but for that individual's sex, the statute's causation
standard is met . . . .").

With a mixed-motive (or motivating-factor) claim, on the
other hand, a plaintiff need only show that a protected considera-
tion contributed in some way to the outcome—even if it ultimately
changed nothing. *Quigg*, 814 F.3d at 1235. Consider the Supreme
Court's example in *Babb v. Wilkie*:

> Suppose that a decision-maker is trying to decide
> whether to promote employee A, who is 35 years old,
> or employee B, who is 55. Under the employer's pol-
> icy, candidates for promotion are first given numerical
> scores based on non-discriminatory factors. Candi-
> dates over the age of 40 are then docked five points,
> and the employee with the highest score is promoted.
> Based on the non-discriminatory factors, employee A
> (the 35-year-old) is given a score of 90, and employee
> B (the 55-year-old) gets a score of 85. But employee B
> is then docked 5 points because of age and thus ends
> up with a final score of 80. The decision-maker looks
> at the candidates' final scores and, seeing that em-
> ployee A has the higher score, promotes employee A.

140 S. Ct. 1168, 1174 (2020). Age bias factored into (or motivated)
the decision, meaning the decision was not "free from" discrimina-
tion. *Id.* (quoting 29 U.S.C. § 633a(a)). But the younger employee
would have secured the promotion either way, meaning "age was
not a but-for cause of the decision." *Id.* Rather than serving as one
of several but-for causes, it was no but-for cause at all; it did not
break the camel's back. But that did not defeat the claim because

(unlike here) the statute at issue, 29 U.S.C. § 633a(a), did not require but-for causation. Rather, the statute required "that personnel actions be untainted by any consideration of age." *Babb*, 140 S. Ct. at 1171.

Yelling's case is different. A Title VII retaliation claim requires "proof that the desire to retaliate was the but-for-cause of the challenged employment action." *Nassar*, 570 U.S. at 352; *id*. at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)."). Where but-for causation is required, a plaintiff with evidence of only a tagalong "forbidden consideration" cannot meet her summary judgment burden because she cannot show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*.

Here, Yelling alleges multiple but-for causes: she contends St. Vincent's took its adverse action because of unlawful retaliation and because of other lawful reasons. But this does not transform her claim into a mixed-motive claim, and it does not relieve her of her obligation to show an *unlawful* but-for cause resulted in the alleged wrongful action. Moreover, in the context of the *McDonnell Douglas* framework, it does not relieve Yelling of her obligation to respond to St. Vincent's legitimate reason with a showing of pretext.

It is true that if Yelling were correct that there were two but-for causes—unlawful retaliation and a lawful factor—she could

have a claim if the two combined to result in an adverse action that
would not have occurred without that combination. In that in-
stance, the retaliation would be a but-for cause because the adverse
action would not have occurred without it. The fact that a lawful
consideration was also a necessary factor would not defeat her
claim. *See Bostock*, 140 S. Ct. at 1739.

But in this situation—and assuming Yelling makes a prima
facie case—St. Vincent's can still meet its burden of production by
showing that the adverse action was based on the lawful consider-
ation. At this stage, where St. Vincent's burden is "exceedingly
light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir.
1983), all St. Vincent's must do is produce evidence that it had a
legitimate reason for its decision. "The defendant need not per-
suade the court that it was actually motivated by the proffered rea-
sons. It is sufficient if the defendant's evidence raises a genuine is-
sue of fact as to whether it discriminated against the plaintiff." *Tex.
Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981). Thus, by
articulating a legitimate reason—rather than remaining "silent in
the face of the presumption" that follows a prima facie showing—
St. Vincent's meets its burden, leaving Yelling to show that retalia-
tion was a but-for cause of the adverse action. *Id.* at 254-56. "Im-
portantly, throughout this entire process, the ultimate burden of
persuasion remains on the employee." *Gogel*, 967 F.3d at 1135
(quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)). In
short, nothing about *Bostock* is inconsistent with applying *McDon-
nell Douglas* to claims requiring but-for causation—even if a plaintiff
asserts multiple but-for causes. The district court therefore did not

err in applying it. And as we explain next, the district court did not err in concluding that Yelling could not succeed under that framework.

2.

Below, Yelling proffered four adverse employment actions: (1) the drug test and related suspension, (2) progressive discipline by the coaching and verbal agreement, (3) Dubose's not always choosing her as a relief charge nurse, and (4) her firing. The district court held that the first three did not qualify as "adverse employment actions." *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (holding that in the retaliation context, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))). As for Yelling's firing, the court applied *McDonnell Douglas*. It reasoned that Yelling did not show but-for causation because there was no evidence that St. Vincent's justification—falsification of patient records—was pretextual.

We need not address whether the district court erred in holding that the first three events were not adverse actions. Even if all the events qualify, Yelling has not shown retaliatory intent was a but-for cause behind any of them.

First, assuming Yelling made out a prima facie case that the drug test and suspension were retaliatory, St. Vincent's satisfied its light burden of identifying a nonretaliatory reason for its actions: three witnesses reported that Yelling left the CDU without

explanation and looked under the influence when she returned. *See Chapman*, 229 F.3d at 1030. The question, then, is whether Yelling has pointed to evidence sufficient to allow a reasonable inference of pretext and that her protected conduct was a but-for cause. She has not.

Yelling cites the short time between her June 2015 complaints of racism and the subsequent drug test, but timing alone is not enough to show pretext. *See Gogel*, 967 F.3d at 1137 n.15. In short, Yelling has not rebutted St. Vincent's justification head on or plausibly suggested retaliation was the reason for the drug test and suspension. *Id*. at 1136.

Second, assuming Yelling made a prima facie showing as to St. Vincent's placing her in progressive discipline, she has again not shown pretext. St. Vincent's offered justifications that could motivate a reasonable employer: that Yelling ignored doctors' orders and made a patient uncomfortable by praying with her in an unwanted manner. Yelling contends she had good reasons for these actions. But it is not enough to quibble with St. Vincent's reasons. *Id*. at 1148-49 ("An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason.'" (alteration in original) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999))); *Elrod v. Sears, Robuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). And Yelling has not shown that but for her protected conduct she would not have faced the same outcome.

Yelling points to no specific evidence to support her claim as to the relief charge nurse assignments. So she has made no prima facie case as to this proffered adverse action.

That leaves the fourth proffered action—Yelling's firing. Like the drug test, the adverse action occurred a short time (about two months) after Yelling complained of racism and filed an EEOC complaint. But St. Vincent's cited its belief, based on Yelling's tracking report and six witnesses, that Yelling falsified the Room 610 patient's treatment information. And Yelling does not rebut that explanation head on. Instead, citing how she told her supervisors her tracker sometimes malfunctioned, her argument boils down to a mere disagreement with the proffered explanation.

That is where Yelling's retaliatory-firing claim fails—she cites no evidence beyond mere temporal proximity indicating retaliatory intent. Her theory is that once she first reported racist comments in June, St. Vincent's began building a case against her—pointing to the drug test, her coworkers' complaints about her conduct, and the coaching and verbal agreements. While this court has reasoned before that intensive monitoring or harassment by supervisors can suggest pretext,[6] the evidence here does not allow an inference that St. Vincent's deliberately searched for a fabricated reason to fire Yelling.

_____

[6] See *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522-23 (11th Cir. 1991), superseded on other grounds as stated in *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000).

In short, then, Yelling cannot survive summary judgment under the *McDonnell Douglas* framework.

3.

Yelling alternatively argues that her retaliation claims survive under a "broader" convincing mosaic analysis. As she correctly notes, plaintiffs relying on circumstantial evidence can always survive summary judgment if "circumstantial evidence raises a reasonable inference that the employer discriminated." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (explaining that *McDonnell Douglas* is not "the *sine qua non*" for employee plaintiffs).

This court has used the phrase "convincing mosaic" simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment. *See id.* That entire evidentiary picture may include, "among other things," (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citing *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011), *overruled by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). "Convincing mosaic," however, is not a "legal test of any kind." *Ortiz*, 834 F.3d at 764-65. At the end of the day, a retaliation plaintiff's "mosaic" of evidence must still be enough to allow a reasonable jury to infer but-for causation. *Cf. Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273-74 & n.2, 1277-81 (11th Cir. 2021). Yelling's evidence is insufficient to allow that inference.

*C.*

Last is Yelling's disparate-treatment claim. Yelling cites no direct evidence of intentional race discrimination. So to survive summary judgment, she had to point to sufficient circumstantial evidence of discriminatory intent. *See EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir. 2002).

Yelling proffered the same four adverse actions for her discrimination claim as for her retaliation claim. We need only address Yelling's firing, which is indisputably an adverse employment action. The district court held that the drug test, progressive discipline, and not being assigned as a relief charge nurse did not qualify as adverse actions for purposes of a discrimination claim. Yelling did not develop any detailed argument on appeal on why that was error, and she thus abandoned any claim challenging those three actions as racially discriminatory.[7] *See NLRB v. McClain of Ga., Inc.,* 138 F.3d 1418, 1422 (11th Cir. 1998).

As to her firing, Yelling argues that she presented a mixed-motive race discrimination claim and that the district court erred by applying *McDonnell Douglas*'s framework instead of *Quigg*'s mixed-motive standard. But even applying *Quigg*'s more lenient motivating-factor analysis, Yelling's discrimination claim still fails.

---

[7] Our conclusion here is not inconsistent with our earlier assumption that Yelling pointed to qualifying adverse actions for her retaliation claim. Employer conduct may be "adverse action" for purposes of a retaliation claim, but not under the narrower standard that governs disparate-treatment claims. *See Crawford v. Carroll,* 529 F.3d 961, 973-74 (11th Cir. 2008).

She cites no evidence by which a reasonable jury could conclude that race at least "played a role" in her firing.[8] *Quigg*, 814 F.3d at 1241. Yelling relies on the same evidence she cites to support her hostile work environment claim, namely that some people made racist comments about the Obamas and patients, St. Vincent's inaction on Yelling's complaints, and Dubose's "quota." That evidence does not remotely suggest St. Vincent's decisionmakers—one of whom was black—considered race when firing Yelling based on the tracking report. Nor does it suggest Yelling's race motivated any of the six witnesses who reported seeing her at the nurse station instead of Room 610. She says these were biased witnesses who made the racist comments discussed earlier, but she cites no evidence to support that.

Yelling also points to white staffers Felicia Parrish, Pike, and Powell, whom St. Vincent's did not fire for misconduct. But St. Vincent's disciplined them for mere negligent conduct—for not documenting patient-care information accurately or at all. Yelling, in contrast, allegedly committed a more severe intentional offense—*falsifying* patient information. St. Vincent's treatment of these three, therefore, does not support a reasonable inference that race played a role in Yelling's terminations.

---

[8] To the extent Yelling alternatively says the district court erred in its application of *McDonnell Douglas* (assuming a plaintiff can even argue both *McDonnell Douglas* and *Quigg* at the same time), she could not succeed under a true-motive theory for the same reason.

The district court did not err by granting summary judgment in St. Vincent's favor on the discrimination claim.

## IV.

The order granting summary judgment for St. Vincent's is **AFFIRMED.**

21-10017                BRASHER, J., Concurring                1

BRASHER, Circuit Judge, concurring:

I concur in the Court's opinion. I write separately to discuss the First Amendment implications of Ms. Yelling's request that we hold her employer liable under Title VII for failing to censor her co-workers' speech. To be clear, a private hospital can (and probably should) discourage its nurses from disparaging politicians and discussing divisive social issues in the hallway. But this case is ultimately about whether Title VII requires employers to adopt that kind of policy.

As many judges have noted, a Title VII hostile work environment claim is "unusual." *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 793 (9th Cir. 2005) (Fletcher, J., concurring). Title VII bars discriminatory treatment in the terms, conditions, or privileges of employment. But a harassment claim isn't based on "inequality in hiring, firing, promotions, or duties;" instead, it holds an employer liable because of "abusive behavior by [a plaintiff's] coworkers in the workplace." *Id.* Because an employer's liability for harassment sometimes turns on an employee's speech—what they said, how often they said it, and what they meant by it—avoiding liability for harassment requires an employer to prohibit certain kinds of speech in its workplace. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (en banc).

Although a private employer can adopt a speech code if it wants, the government usually cannot force people to speak in a particular way. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). For this reason, Title VII harassment law has always had an uneasy

coexistence with the First Amendment. The government can penalize speech when that speech is merely incidental to tortious conduct. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). And nonexpressive conduct is often the root of a workplace harassment claim. *Id.* But "[w]here pure expression is involved, Title VII steers into the territory of the First Amendment." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995). After all, when a plaintiff brings a Title VII "harassment claim[] founded solely on verbal insults" or other speech, she is necessarily asking a court to impose "content-based, viewpoint-discriminatory restrictions on speech," *id.* at 596–97, and these kinds of restrictions are subject to strict judicial scrutiny. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 172 (2015).

To be clear, not every application of harassment law raises free speech concerns. As I've already noted, the government can regulate non-expressive conduct, even if doing so has an incidental effect on speech. The First Amendment also "permit[s] restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Most relevant to workplace harassment, the government may ban: (1) obscenity, *Miller v. California*, 413 U.S. 15, 24 (1973), (2) "true threats" of violence, *Virginia v. Black*, 538 U.S. 343, 360 (2003), and (3) "fighting words"— "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," *Cohen v. California*, 403 U.S. 15, 20 (1971).

Turning to the facts of this case, Ms. Yelling's hostile work environment claim is based on pure speech. The Court's opinion fulsomely catalogues the boorish comments that Ms. Yelling overheard. No one would confuse Ms. Yelling's co-workers with Marcus Cicero or Henry Clay. But the question remains: how should we assess this claim in light of the First Amendment?

The EEOC—which filed a thoughtful amicus brief in support of Yelling's position—says we should disregard any free-speech implications. Its position at oral argument, which is contrary to decades of precedent, was that the First Amendment has no role to play in tort litigation between private parties. That's the wrong answer. A court cannot enforce a law in a dispute between private parties if doing so requires it to "impose invalid restrictions on [a person's] constitutional freedoms of speech and press." *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (noting "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988) (same).

For my part, I don't think we can ignore the tension between the First Amendment and Title VII harassment law. Instead, I think the objective prong of our hostile-work-environment standard must be applied consistent with First Amendment principles. That means that the closer objectionable workplace speech is to conduct or to traditionally unprotected areas of speech, the more leeway a court should have to find an objectively hostile work environment. But the closer objectionable speech comes to the heart of the First

Amendment, the more reluctant a court should be to impose tort liability because of it.

Our harassment law already draws many lines consistent with the First Amendment. Consider our conclusion that a supervisor's objectionable comments are objectively more severe than a co-worker's. The reason is that a supervisor's objectionable comments carry an implicit threat of illegal *conduct*—discriminatory treatment in promotion or termination—and a co-worker's may not. *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) (noting a supervisor's "advocacy of discriminatory ideas can connote an implicit threat of discriminatory treatment"). Likewise, we have recognized that overhearing an offensive comment is less severe than being the target of that comment. *See e.g.*, *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250–57 (11th Cir. 2014) (finding direct racist comments to be inherently more harassing than indirect ones). That line makes sense, in part, because the latter is much closer to "fighting words" than the former. Direct insults do not "seek to disseminate a message to the general public, but to intrude upon the targeted [listener], and to do so in an especially offensive way." *Frisby v. Schultz,* 487 U.S. 474, 486 (1988).

Likewise, I would hold that speech on public matters is inherently less likely to create a hostile work environment than speech on private matters. "[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). But we give the

highest degree of protection to speech on matters of public concern—that is, speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). For this reason, "even those commentators who conclude the First Amendment generally permits application of harassment laws to workplace speech recognize exceptions" for "debate on issues of public concern." *Avis Rent A Car Sys., Inc. v. Aguilar*, 529 U.S. 1138, 1141–42 (2000) (Thomas, J., dissenting from denial of certiorari) (citing Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark*, 1994 SUP. CT. REV. 1, 41, 47 (1994)). *See generally* Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1849 (1992).

In any event, these principles are one reason I agree with the Court that Ms. Yelling's hostile work environment claim fails as a matter of law. As Justice Sotomayor recently reminded us, "First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it." *Counterman v. Colorado*, 143 S. Ct. 2106, 2121-22 (2023) (Sotomayor, J., concurring). I think we should apply the objective element of workplace harassment law consistent with that idea.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

## DOCKET NO.: 21-10017-GG

---

CYNTHIA DIANE YELLING,

PLAINTIFF – APPELLANT,

v.

ST. VINCENT'S HEALTH SYSTEM,

DEFENDANT – APPELLEE.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2-17-CV-01607-SGC

---

## ADDENDUM B TO
## APPELLANT'S PETITION FOR REHEARING
## AND REHEARING EN BANC

## MARCH 3, 2023 ORAL ARGUMENT TRANSCRIPT

---

# Transcription of Audio

## October 10, 2023

## Yelling v. St. Vincent's Health System

## 2:17-CV-01607-SGC



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1    IN THE UNITED STATES COURT OF APPEALS
2        FOR THE ELEVENTH CIRCUIT
3    _____
4    No. 21-10017
5    _____
6    CYNTHIA DIANE YELLING,
7    Plaintiff-Appellant,
8    Versus
9    ST. VINCENT'S HEALTH SYSTEM,
10    Defendant-Appellee.
11
12
13        MARCH 3, 2033
14    11TH CIRCUIT COURT OF APPEALS
15        ATLANTA, GEORGIA
16
17
18    BEFORE:
19    Honorable Elizabeth Branch, Circuit Judge
20    Honorable Andrew Brasher, Circuit Judge
21    Honorable Allen Winsor, District Judge
22
23    AUDIO TRANSCRIBED BY:  Tanya D. Cornelius, RPR

Page 2

1        SPEAKERS OF RECORD
2
3    FOR THE APPELLANT:
4        PALMER LAW, LLC
5        BY:  Leslie Palmer, Esquire
6        104 23rd Street South
7        Suite 100
8        Birmingham, Alabama 35233
9
10    FOR THE EEOC:
11        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
12        Office of General Counsel
13        BY:  Julie L. Gantz, Esquire
14        131 Main St., N.E., 5th Floor
15        Washington, D.C. 20507
16
17    FOR THE APPELLEE:
18        JACKSON, LEWIS
19        BY:  Shannon L. Miller, Esquire
20        800 Shades Creek Parkway, Suite 870
21        Birmingham, Alabama 35209
22
23

Page 3

1        P R O C E E D I N G S
2
3        JUDGE BRANCH:  And our final case,
4    Cynthia Yelling versus St. Vincent's Health
5    System, 21-10017, and I'll give the attorneys a
6    chance to get set up.
7        So we're going to have some time
8    sharing today.  Ms. Leslie Palmer for the
9    appellant, and then sharing time with Julie Gantz
10    for the EEOC, and then Shannon Miller for the
11    appellee.
12        Ms. Palmer, you may proceed, and I
13    see that you've reserved two minutes for
14    rebuttal.
15        MS. PALMER:  Yes, Your Honor.  Good
16    morning.  May it please the Court, my name is
17    Leslie Palmer, and I am excited to be here today
18    on my first ever 11th Circuit argument
19    representing my client, Nurse Cynthia Yelling,
20    and these important issues before the Court.
21        We are asking the Court today to
22    reverse the district court's order, because the
23    discriminatory, retaliatory, and abusive acts of

Page 4

1    St. Vincent's Hospital violated Title VII.
2        The EEOC will also be addressing the
3    hostile work environment claim today, but I want
4    to point out an important note.  The district
5    court's parsing apart of the evidence and
6    minimizing Nurse Yelling's hostile work
7    environment did not just affect the analysis of
8    the hostile work environment claim.  That parsing
9    apart affected and tainted every aspect of the
10    opinion negatively and affected the analysis of
11    all the claims.
12        This Court has repeatedly held that
13    context matters, and I cannot think of a more
14    important situation than one like this where we
15    have a hostile work environment claim where there
16    is a complaint that ultimately culminates in
17    termination.
18        JUDGE BRANCH:  Let me ask you a
19    question about your hostile work environment
20    claim.  In reading your brief, I honestly can't
21    decide if you're relying on our case law or if
22    you're telling us that our case law is out of
23    date and we need to depart from it, which,

Page 5

1  obviously, this panel cannot do.  Can you clarify
2  that point?
3       MS. PALMER:  Yes, Your Honor.  I'm
4  not saying that we need to depart from the case
5  law.  I'm saying we need to consider the context.
6  Mendoza is not a bright-line test of a number of
7  incidents crystalized in time.  We have to look
8  to the circumstances, the totality of the
9  circumstances, all of the evidence, the body of
10  evidence as a whole, and every way that a
11  reasonable person in Nurse Yelling's position
12  with her life experiences and her social context
13  could see these acts and conduct and statements.
14       And because of that, we can't depend
15  on the four corners of an opinion from a quarter
16  century ago or even ten years ago.  The opinions
17  do not stand for the premise that is the conduct
18  in those cases that is or isn't illegal.  I would
19  argue that if those cases say that it is illegal,
20  obviously, I don't think the pendulum has swung
21  the other way.
22       But there is evidence.  You can look
23  at the actions of governmental entities to show

Page 6

1  that society is taking a step in the right
2  direction, and that conduct that wasn't
3  considered by this Court to be illegal fifteen
4  years ago isn't necessarily not illegal today.
5       JUDGE BRANCH:  Let me drill down on
6  one of the cases that you're relying on in the
7  hostile work environment case.  Let me ask you a
8  question about that.  In Fernandez, we concluded
9  that the plaintiff met its burden on the
10  pervasive factor when he specified the comments
11  occurred nearly every day, and we specifically
12  said this was different from vague terms such as
13  constantly.
14       Is there enough evidence in this case
15  to satisfy the sphere of pervasive prong when Ms.
16  Yelling did not specify how often she heard some
17  of the insensitive comments, only saying they
18  happened often?
19       MS. PALMER:  There is, Your Honor.
20  And the reason for that, again, is the totality
21  of the circumstances and the context.  In some
22  instances she said often.  In some instances she
23  said it wasn't unusual.  In some instances she

Page 7

1  said every weekend, and you have to look at the
2  entire body of evidence.
3       You cannot put the ingredients to a
4  cake on the counter and call it a cake.  You
5  cannot look at the butter and say, That's a cake;
6  or an egg and say, That's a cake.  You have to
7  look at it as a whole.  You have to put it all
8  together, and you have to --
9       JUDGE BRANCH:  But you're saying that
10  her testimony is different than just saying
11  constantly, which we said was too vague.
12       MS. PALMER:  Exactly, Your Honor.
13  She provided some concrete incidents and some
14  context.  And when asked if there was more than
15  that, she said yes.  She said those were the ones
16  that she made the note of, but there was more
17  than that.
18       JUDGE BRASHER:  What are we to do
19  with the fact -- and I'm going to ask the EEOC
20  this, too, because this is something I've been
21  struggling with for a while.  The first amendment
22  gives people the right to say negative things
23  about the president and the first lady, right?  I

Page 8

1  think it gives them the right to say racist
2  things about the president and the first lady.  I
3  don't think Congress could pass a law that, you
4  know, said that employers have to pay money if
5  their employees criticize the president in harsh
6  terms, right?
7       Given that, what do we do with the
8  fact that so many of these comments were racist
9  about the president and the first lady?
10       MS. PALMER:  Again, Your Honor, I'm
11  going to bring you back to we have to look at the
12  context, and the context --
13       JUDGE BRASHER:  The context is this
14  was not -- this is 2015, so President Obama is
15  the president.
16       MS. PALMER:  Exactly.  And the
17  statements that were being made about the Obamas
18  in this incident are, using this Court's words,
19  immutable characteristics.  They're
20  characteristics that --
21       JUDGE BRASHER:  Yeah, they are
22  absolutely racist, no question.  I mean, I would
23  be very offended if people said this about

Page 9

1 President Obama to me in my presence, but they
2 were about the president. They are not about a
3 nurse. They are not about a co-worker. They are
4 not about -- I mean, they are about the president
5 and the first lady.
6          And I guess that's what I'm
7 struggling with is it seems very problematic to
8 me for a federal court to tell an employer, you
9 have to pay money because your employee was
10 criticizing the president of the United States in
11 very harsh terms.
12          MS. PALMER: It's important to
13 understand, Your Honor, that it wasn't harsh
14 terms. It was personal traits and
15 characteristics that Nurse Yelling shares with
16 the Obamas, and this Court held in Jones versus
17 UPS that those comments are enough. Those
18 comments in that case were about the Obamas.
19 That's exactly what happened here, and this Court
20 has precedence to rely on.
21          JUDGE WINSOR: I have a question
22 about your Quigg argument. So you are arguing in
23 the alternative that there was a single reason

Page 10

1 and that there's a mixed motive also? Those are
2 alternative arguments?
3          MS. PALMER: No, Your Honor. My
4 argument is that there is not a single reason.
5          JUDGE WINSOR: So you are exclusively
6 going on mixed motive? Because you were arguing
7 McDonnell Douglas in the district court, weren't
8 you?
9          MS. PALMER: I was not, Your Honor.
10 So the defendant argued McDonnell Douglas. I
11 responded, and then relied heavily on convincing
12 mosaic and the other frameworks that this Court,
13 the statute, and the United States Supreme
14 Court --
15          JUDGE WINSOR: So on the
16 discrimination, it's exclusively a mixed-motive
17 claim?
18          MS. PALMER: Yes, Your Honor.
19          JUDGE WINSOR: What is the motive
20 other than race?
21          MS. PALMER: Arguably, a jury could
22 draw an inference that the motive presented by
23 the defendant -- by the appellees in this case

Page 11

1 was a motive; and because of that, we concede
2 that there could be a mixed motive.
3          Additionally, we have race and
4 retaliation. So we ourselves say it's two
5 things. It's three things. It's race,
6 retaliation, and the hostile work environment.
7 Everything has to be taken in context.
8          JUDGE BRANCH: So you are conceding
9 that one of the motives in this case can be that
10 the employer believed she was falsifying records?
11          MS. PALMER: That is one way that a
12 jury could look at it, Your Honor. That is only
13 one way. That is not the only way, and that is
14 not a decision for this Court or frankly the
15 district court to make.
16          JUDGE BRANCH: Not just in Quigg,
17 though, there was a situation where that motive
18 was admitted to. Like yes, I was fired for, in
19 this case, falsifying records, but this is what
20 also happened. But your client is in no way
21 admitting that that is an accurate -- that that
22 is, in fact, a legitimate motive.
23          MS. PALMER: Exactly, Your Honor.

Page 12

1 And I'm out of time, but may I answer your
2 question?
3          JUDGE BRANCH: Please.
4          MS. PALMER: So our position in that
5 instance would be that the courts are conflating
6 a mixed-motive affirmative defense with a mixed-
7 motive pleading or a mixed-motive analytical
8 framework.
9          JUDGE BRANCH: So you're saying you
10 can proceed under Quigg even if your client would
11 deny the other motive?
12          MS. PALMER: Correct, Your Honor.
13 And that is clear in the plain text of Title VII.
14          JUDGE BRANCH: Thank you. Ms. Gantz?
15 And you have five minutes.
16          MS. GANTZ: Thank you, Your Honor,
17 and may it please the Court. I wanted to just
18 start in order of the questions raised. The 11th
19 Circuit case law actually supports reversal of
20 summary judgment in this case. I wanted to
21 particularly cite Reeves, this Court's en banc
22 decision that held that you can have a hostile
23 work environment, in that case it was a sexually

Page 13

1  hostile work environment, by overhearing comments
2  denigrating your protected group.  They don't
3  have to be directed personally towards you.
4        This Court's decision in Fernandez
5  also said the same thing involving a Cuban
6  plaintiff, and this Court's decisions in Smelter
7  and in Jones versus UPS Ground also compel
8  reversal of summary judgment in this case in my
9  opinion.
10       JUDGE BRANCH:  You've also argued
11 that the district court erred in failing to
12 consider comments made before the one-eighty-day
13 cutoff period on May 27th --
14       MS. GANTZ:  Oh, yes, Your Honor.
15       JUDGE BRANCH:  Wait.  I'm not done
16 with my question.  You've claimed that racial
17 insults were happening regularly and repeatedly
18 throughout 2015, but let me pin you down on this.
19       MS. GANTZ:  Okay.
20       JUDGE BRANCH:  Aside from Wilhite's
21 comments that occurred in March of that year,
22 what other specific comments were made outside of
23 the one-eighty-day period?

Page 14

1        MS. GANTZ:  Okay.  I actually made a
2  list of the testimony that would go to frequency.
3  So when asked -- so the comment about students --
4  was Obama handing out food stamps was one of
5  several comments according to Yelling.  She said
6  that, quote, Linda and Sandy and Tiffany would
7  always make racially-insensitive comments.  That
8  was not unusual for them.  She said things like,
9  When there were blacks portrayed in the media,
10 every time she would come up to the nurse's
11 station, someone would be making a comment.  And
12 she mentioned that at the time of the food stamps
13 comment, it had become heated in terms of it had
14 escalated, the number and type of comments.
15       So the -- and I wanted to address the
16 comment about the Obamas.  So while -- it's been
17 a while since I've taken first amendment law, but
18 I don't believe that would be implicated in a
19 private workplace, but the comments about the
20 Obamas --
21       JUDGE BRASHER:  Yeah, because the way
22 you're asking us to -- you know, the way you're
23 asking us to read this statute is that it imposes

Page 15

1  liability on the employer for the speech, the
2  political speech of its employee.  And so the
3  only way the employer could avoid that liability
4  would be to silence its employees' political
5  speech.  So that's why the first amendment comes
6  into play is that you're basically fining the
7  employer for its employee's political speech.
8        I'm not saying it -- it seems to me
9  that in light of the first amendment fact that we
10 can all criticize the president, we have to
11 consider criticisms of the president a little
12 differently than we would consider, you know,
13 criticisms of some private person.
14       MS. GANTZ:  Again, we didn't actually
15 take a position on political speech, but the
16 comments about Michelle Obama resembling a monkey
17 or is a monkey and Obama should go back to Africa
18 were part of a whole -- I think of it as like a
19 toxic cloud, a hostile work environment where you
20 look at the totality of the circumstances, and
21 black patients were called ghetto fabulous, crack
22 heads, welfare recipients, that kind of thing.
23       JUDGE BRASHER:  See, that's the

Page 16

1  thing, and this may not necessarily resolve the
2  case at the end of the day, but, I mean, the most
3  racist stuff that these people said were about
4  the Obamas.  I mean, the monkey comment and the
5  go back to Africa, like that's super racist.
6        MS. GANTZ:  Agreed.
7        JUDGE BRASHER:  The other stuff, you
8  know, I don't know, right?  I mean, I looked up
9  ghetto fabulous, because I didn't know what it
10 means, and I don't know, it doesn't seem to be
11 racist.  That seems to be like a fashion term.
12       MS. GANTZ:  This Court in Smelter
13 recognized that suggesting that blacks were
14 welfare recipients or drug addicts was because of
15 race.  And, again, if there's any ambiguity, that
16 would have to go to a jury to determine, in the
17 same way that the comments about flying a
18 Confederate flag were also improperly --
19       JUDGE BRASHER:  That's the thing is
20 you talk about the context.  You know, when this
21 occurred, the State of Alabama's capital, there
22 was a Confederate flag that flew over the State
23 of Alabama's capital.

Page 17

1    So, again, the context, I'm not sure
2 that that -- and this is something that I'm
3 struggling with. But, I mean, you know, if
4 someone had said, I live in a state that flies
5 the Confederate flag over the capital, that would
6 have been a true statement, and it's hard to read
7 that as creating a hostile work environment given
8 that that's just what was happening in 2015.
9    MS. GANTZ: This Court's case in
10 Jones versus UPS, the Court held that that could
11 be part of a hostile work environment that people
12 were wearing --
13    JUDGE BRASHER: That's when they were
14 wearing it, right, yeah. They weren't just
15 talking about it, I guess, is my point.
16    MS. GANTZ: There isn't really a
17 measurable difference between voicing support for
18 the flag and wearing a T-shirt with it or at
19 least --
20    JUDGE BRASHER: Well, isn't there,
21 though? I mean, the T-shirt is kind of putting
22 it in someone's face, voicing support. I mean,
23 like I said, in 2015 a big issue in Alabama was

Page 18

1 whether to have the Confederate flag be in the
2 capital or not.
3    MS. GANTZ: Yes. And this is
4 something that's going on all over the South, I
5 would say.
6    JUDGE BRASHER: Right.
7    MS. GANTZ: So the fact that Yelling
8 testified that she heard it as a
9 racially-offensive comment supporting, because of
10 what it stands for, white supremacy, slavery, it
11 doesn't mean that everyone meant it that way or
12 heard it that way, but it's enough. It's a
13 reasonable inference according to Jones and
14 according to this Court's case in Scott that
15 called it a racial symbol, that a jury would have
16 to sort out whether it was because of race. So
17 the Court excising it from the case --
18    JUDGE BRASHER: Let's just -- I mean,
19 I'll just give it to you that certainly someone
20 could be offended -- could take that sort of
21 racially offensive if people were talking about
22 the Confederate flag. I guess my issue is the
23 standard is severe and pervasive.

Page 19

1    MS. GANTZ: Correct.
2    JUDGE BRASHER: And so, you know, I
3 mean, you've got people saying negative things
4 about the president that are super racist,
5 negative things about the first lady that are
6 super racist, and they are talking about -- they
7 are talking about Confederate flags. Where do
8 you get to severe and pervasive? You know, let's
9 just say that's racist stuff, but where do you
10 get to severe and pervasive, I guess, is the
11 issue?
12    MS. GANTZ: It goes to how often
13 those comments were made, the severity of those
14 comments, some that were made --
15    JUDGE BRASHER: Severity of the
16 comments, I guess, that's my like -- the severity
17 of the comments seems different if you're talking
18 about -- it seems like we would have to say
19 that's different if you're talking about the
20 president or some other public figure that you
21 have a first amendment right to criticize or a
22 controversial issue going on at the time, which
23 is flying the Confederate flag versus something

Page 20

1 else, you know, maybe calling the patients
2 welfare queens. I think that's kind of a
3 different issue.
4    Should we -- in our questioning the
5 severity of this, how do we weigh -- do we weigh
6 comments like that?
7    MS. GANTZ: Yes, you do. You look at
8 the totality of the circumstances. You look at a
9 reasonable person in the plaintiff's position,
10 and she was the only black nurse on her shift.
11 She was hearing comments about her protected
12 racial group, people being compared to monkeys,
13 which courts have compared to the N word. She's
14 hearing black indigent patients who she is caring
15 for being called crack heads where white patients
16 that had addiction issues were not. She's
17 hearing her colleagues basically brag about
18 flying the Confederate flag, which to her meant
19 they were supporting white supremacy and slavery.
20 That's how she heard it.
21    So, again, this all goes to a jury.
22 We're on summary judgment. So you have to give
23 her all reasonable inferences, evaluate the facts

Page 21

1 and the like most reasonable to her, again,
2 taking into account all the circumstances, all
3 the comments she heard over this basically year
4 she worked there.
5         So the comments became heated in
6 March, but she certainly testified that they had
7 been going on before that.  She also complained
8 repeatedly.
9         JUDGE BRANCH:  Let me loop back to
10 what I had asked before, because you're saying
11 we've got to go back outside this one-eighty-day
12 period.  But Ms. Yelling's EEOC charge specifies
13 that no discriminatory conduct occurred before
14 June 21 of 2015.  How do we --
15         MS. GANTZ:  Her charge said that?
16         JUDGE BRANCH:  Yes, that she filed on
17 November 23rd of 2015.
18         MS. GANTZ:  Well, that's not
19 consistent at all with her deposition testimony.
20 She talked about those comments by the supervisor
21 being several, but the one that stuck out was the
22 one about the food stamps.  She mentioned that
23 her colleagues had always made these

Page 22

1 racially-offensive comments about black patients,
2 and she mentioned it had been going on throughout
3 2015.
4         And the Court, the district court,
5 read that testimony as being repeated and
6 ongoing.  So --
7         JUDGE BRANCH:  Let's assume I'm
8 correct on citing this date in the EEOC charge.
9 So we make that -- that just doesn't matter?
10         MS. GANTZ:  I don't think that would
11 affect anything given that the case developed
12 after that.
13         JUDGE BRANCH:  All right.  And you
14 have now -- you've answered my question, and you
15 have exceeded your time.
16         MS. GANTZ:  Oh, sorry.  Thank you
17 very much.
18         JUDGE BRANCH:  Ms. Miller?
19         MS. MILLER:  Thank you, Your Honor,
20 and may it please the Court.  I'm Shannon Miller
21 here on behalf of the appellee, St. Vincent's
22 Health Systems, and I would like to start by
23 addressing the great points that were brought up

Page 23

1 by both Judge Brasher and you, Judge Branch, that
2 the very essence of the hostile work environment
3 claim in this case was properly decided at the
4 district court below, and the district court did,
5 in fact, take into account the context of the
6 situation.
7         But when we're talking about the
8 totality of the circumstances, we also have to
9 address the fact that Ms. Yelling in some of the
10 instances was herself an instigator in the
11 discussions that she is claiming had racist
12 overtones with the comments by her co-workers.
13         The other thing that must be made
14 clear is that none of the alleged racist comments
15 were ever directed at her herself.  Nobody said
16 any type of racial slur to Ms. Yelling, and we
17 would argue that nobody said any racial slur at
18 all.
19         It is our position that the term
20 monkey in and of itself is not the same and not
21 as severe as the term -- the N word, which is
22 absolutely offensive.  And there were -- Judge
23 Brasher and Judge Branch, you're right.  Some of

Page 24

1 these comments, the alleged comments, were
2 absolutely offensive.  We're not saying that they
3 are not.  But there has to be --
4         JUDGE BRANCH:  They are more than
5 offensive.  They are racist.
6         MS. MILLER:  Absolutely, Your Honor.
7 Absolutely.  No one is trying to argue that
8 comments about the Obamas were anything but
9 racist.
10         There were other comments that she
11 pointed to -- that Ms. Yelling pointed to that
12 the district court considered not related to
13 race, one of those being -- or some of those
14 being the comments about being rednecks.  Some of
15 the food stamp comments were more, in our
16 submission, a socioeconomic comment as opposed to
17 a truly racist comment.
18         JUDGE BRANCH:  Let me ask you
19 something that has been bothering me.  In your
20 brief, you argue that St. Vincent's investigated
21 and moved to remedy the situation when Yelling
22 reported the racially-insensitive comments being
23 used around her, but I didn't see anything that

Page 25

1  showed me where that is, in fact, true.
2        What evidence supports that claim?
3  We have Dubose admitting that she couldn't
4  remember what investigation, if any, she did into
5  these concerns.
6        MS. MILLER:  Yes, Your Honor.  There
7  were times that -- you're correct, that the
8  record does not reflect an investigation.
9  However, part of the issues that makes it
10  confusing on the record is the the
11  investigations that St. Vincent's was undergoing
12  during Ms. Yelling's employment were intertwined
13  with complaints raised about Ms. Yelling herself.
14        So, for example, there was a black
15  patient care tech who made a complaint that Ms.
16  Yelling was dismissive, bullying, and some other
17  complaint along those lines.  And as part of that
18  investigation, Ms. Yelling responded with the
19  allegations about her co-workers.
20        JUDGE BRANCH:  So you said these
21  investigations are intertwined.  All I see is one
22  investigation really going on, the complaints
23  against Ms. Yelling.  I just don't see anything

Page 26

1  in the record to show that there was another
2  investigation dealing with her complaints.  Those
3  two things can be true at the same time.
4        So if you say intertwined, it
5  suggests two investigations, but I only see
6  evidence of one.
7        MS. MILLER:  No, Your Honor.  And my
8  apologies if that was -- what I meant by
9  intertwined was the fact that she had made --
10  that there had been a complaint about her that
11  prompted it.  I'm not trying to argue that there
12  were two different investigations to that, but
13  there were investigations such as when Ms.
14  Yelling cursed her co-workers and their
15  grandchildren.  That investigation -- there were
16  separate investigations throughout the course of
17  her employment.  There was certainly the
18  investigation into the falsification of the
19  records that led to her termination.
20        However, with respect to the hostile
21  work environment, this Court need not reach the
22  second step of whether there was a newer should
23  have known and whether or not St. Vincent's

Page 27

1  remedied it, because it doesn't meet that
2  stringent standard of the severe pervasiveness
3  that's required of hostile work environments.
4        That's particularly true with the
5  distinction between, for example, the Jones case
6  that my colleagues have brought up.  In Jones the
7  co-workers wore T-shirts displaying the
8  Confederate flag.  They had crowbars in their
9  hands while they were making racist statements to
10  the plaintiff about the plaintiff.  That is a
11  clear distinction in the fact scenario that we
12  have.
13        JUDGE BRASHER:  What if -- so I
14  pushed on the Confederate flag stuff a little bit
15  with the lawyers on the other side.  But, I mean,
16  what if these people had said in the presence of
17  an African-American colleague, Hey, you know, we
18  support the Klan, right?  They are not wearing a
19  hood, right?  They are not wearing Klan stuff to
20  work, but they are saying, We support the Klan;
21  we love the Klan; and we like what they do?
22  Wouldn't that be -- wouldn't that be a serious
23  problem?  I mean, wouldn't that rise to the level

Page 28

1  of severe and pervasive if someone said that in
2  the presence of an African-American colleague?
3        MS. MILLER:  Your Honor, absolutely,
4  it would be offensive.  There's no doubt about
5  that.  No one is trying to argue that any comment
6  related to the Klan would not be anything but
7  racist.
8        JUDGE BRASHER:  Yeah.  Well, I guess,
9  and then so I think their point is the
10  Confederate flag is the same thing.  Is that
11  saying that -- you know, I support the
12  Confederacy and what it stood for is the same
13  thing?  So why isn't saying I support that
14  equivalent to wearing a T-shirt that has it on
15  it?  You know what I mean?
16        MS. MILLER:  So, Your Honor, as
17  everybody has said today, context matters, and it
18  would depend on the context of the situation
19  where somebody was saying the Klan.  But I do not
20  think that the evidence in the record in this
21  particular case where Ms. Yelling said that the
22  only place that any of the alleged racist
23  comments occurred were at the nurse's station

Page 29

1  where she was not frequently sitting because she
2  was caring for patients could rise to the level
3  of the severe or pervasiveness that is required.
4       JUDGE BRANCH:  But, obviously, she
5  was hearing -- I mean, I know you've made that
6  point that she wasn't at the nurse's station, but
7  she's clearly passing by it and hearing these
8  comments.  So I guess I'm not following that part
9  of the argument.
10      MS. MILLER:  Sure.  Absolutely, Your
11 Honor.  And if I may, she was -- it wasn't -- it
12 goes to the pervasiveness and the constancy that
13 you were concerned about earlier in this
14 argument, that the -- that if she is not there
15 frequently, that goes to one of the levels of
16 trying to determine whether or not this rises to
17 the level of an actionable hostile work
18 environment.
19      And the district court below didn't
20 disagree that she was offended by it, but it
21 didn't reach that level, and there has to be some
22 level, some guidepost, which this Court has held
23 throughout, that, you know, it can't be

Page 30

1  everything.  You know, we have to put up with a
2  level of worseness at the workplace, because
3  otherwise the flood gates would open up.
4  Everybody would be offended about everything all
5  the time, and that this is -- under the guidepost
6  of the totality of the circumstances that the
7  district court properly held below did not reach
8  the severe or pervasive standard that's required.
9       And, again, the Jones case being the
10 one that was cited, again, the individuals in
11 that case were -- had a crowbar out with the
12 Confederate flags.  They threw banana peels at
13 the individual.  That's certainly different than
14 the diatribes of co-workers about politicians
15 that they dislike.
16      Again, not saying that the comments
17 about the Obamas weren't racist.  They just
18 simply in this instance did not reach that level
19 that would be an actionable workplace --
20      JUDGE BRASHER:  What about the
21 statements about the patients?  I mean, I'll just
22 say, I think -- I'm having difficulty figuring
23 out how to assess all these comments, but to me

Page 31

1  the political stuff is kind of in a separate
2  category.  But the comments about patients seems
3  very different in the degree to which it would
4  create a hostile work environment.
5       What do you say about that?
6       MS. MILLER:  So, Your Honor, the
7  comments about the patients, one of which was
8  ghetto fabulous, which to your point, Your Honor,
9  I was unfamiliar with that term.  I can see how
10 that could be a socioeconomic term as much as it
11 could be a racist term.  The welfare queens the
12 same way, right?  I mean, the idea of -- the food
13 stamp comment could be as much a socioeconomic
14 statement as it could be a racist statement.
15      But no matter what the comments were
16 and whether we assume all of the comments were
17 racist, they simply did not reach that high
18 standard that is required for the severe or
19 pervasiveness to substantiate such a claim.
20      The other thing is that as part of
21 that, it has to determine whether or not it
22 interferes with her ability to conduct her job.
23 And there's no evidence that she wasn't able to

Page 32

1  care for patients because of these comments.
2  There's no evidence that that took place.  The --
3  and she testified that she was -- she pushed back
4  and made positive comments about the Obamas when
5  and if she heard those comments.
6       JUDGE WINSOR:  The question about the
7  retaliation, specifically, the drug testing, I
8  know you say it's not an adverse action at least
9  for purposes of the discrimination claim, but if
10 she gets a drug test and then is out of work for
11 a couple of days, why does that not at least meet
12 the lesser standard for retaliation?
13      MS. MILLER:  Yes, Your Honor.  So for
14 the drug test, if you were uncomfortable in
15 ruling that or affirming that this did not reach
16 an adverse employment action, she does not have
17 any evidence that her complaints of --
18      JUDGE WINSOR:  No.  I understand
19 that.  You've got other arguments.  But I just
20 wondered if you could address that, you know,
21 something that would make a reasonable person
22 less likely to -- or to sway somebody from making
23 a complaint.  Here someone gets a drug test right

Page 33

1 afterwards and then misses a bunch of work from
2 it. Wouldn't that meet that standard?
3      MS. MILLER: Your Honor, it could
4 absolutely consider a case where such a drug test
5 could and would be an adverse employment action.
6 In this particular instance, the drug test was
7 after a complaint that a black patient care tech
8 made about Ms. Yelling herself and was on the
9 heels of her -- the house supervisor finding a
10 patient -- Ms. Yelling's prescription bottle in a
11 patient's room.
12      So given that context and the fact
13 that she missed two shifts and was paid for
14 those, we do not believe it reaches that level of
15 the adverse employment action whether under the
16 race discrimination claim or the retaliation
17 claim.
18      But, again, if this Court is
19 uncomfortable and finds that that was an adverse
20 employment action, there's no evidence that it
21 was her complaints of discrimination that were
22 the but-for reason for that.
23      JUDGE WINSOR: Let me ask one

Page 34

1 question. You heard my question about Quigg.
2 Can someone -- can a plaintiff bring in the
3 alternative a single-motive claim and a
4 mixed-motive claim? It seems like they usually
5 elect. I don't know if there's a reason for
6 that, but it's a little peculiar here to have
7 both.
8      MS. MILLER: Yes, Your Honor. And
9 our position is that it's either/or. And --
10      JUDGE WINSOR: Is there case law that
11 supports that?
12      MS. MILLER: I will submit that from
13 my reading of the case law, it's somewhat
14 unclear. But in this particular instance, it
15 doesn't matter which of the burden shifting or
16 analyses this Court chooses to use. The district
17 court was very focused on the traditional
18 McDonnell Douglas where she was not able to --
19 where Ms. Yelling was not able to substantiate
20 any comparators. Some of the adverse actions
21 were outside of the hundred-and-eighty-day
22 period, and there was no evidence of pretext.
23      But with the mixed-motive claim,

Page 35

1 there has to be some evidence of race as a
2 motivating factor, and just an allegation that
3 race may have been a motivating factor is not
4 enough. There has to be some actual evidence of
5 that, and I'm not aware of any evidence that --
6 the decision makers didn't use racist terms.
7 There was no -- there's no pointing to the
8 decision makers in this case having a racial
9 motive for any of the adverse employment actions
10 that were taken against her, which --
11      JUDGE WINSOR: If this Court --
12 looking just at the mixed-motive claim, if this
13 Court determined that you're right, there's not
14 evidence that would support there was any motive
15 based on race, they would do that, obviously,
16 without McDonnell Douglas, and then there
17 wouldn't be any need if that were the case to
18 separately address the alternative single-motive
19 claim; would there be? I mean, that would just
20 be the end of that in terms of the
21 discrimination.
22      MS. MILLER: Yes, Your Honor, that
23 would be accurate. And in Quigg, to your point,

Page 36

1 Judge Branch, that absolutely was the case there,
2 that they admitted -- the decision makers in that
3 case admitted that gender, I believe was the
4 protected class in that case, was a reason for
5 the decisions that were at issue. That is wildly
6 different than what we have here where no one has
7 admitted that race was a motivating factor.
8      JUDGE WINSOR: There wouldn't have to
9 be an admission to bring that. I'm just not sure
10 you can kind of do both, but maybe you can.
11      MS. MILLER: And, Your Honor, we
12 would -- I mean, we raised those arguments to
13 make sure that we covered whatever this Court
14 would want to analyze the claims under with that,
15 and we submit that whether it is the traditional
16 McDonnell Douglas burden shifting, whether it's a
17 mixed-motive analysis, whether it's a convincing
18 mosaic analysis, it matters not. The result is
19 the same, that the district court properly
20 dismissed both the race and retaliation claims
21 under that.
22      And so for that reason, we
23 respectfully request that this Court affirm the

Page 37

1  decision below.
2       JUDGE BRANCH:  Thank you.  Ms.
3  Palmer, you have two minutes for rebuttal.
4       MS. PALMER:  Your Honors, if I could
5  briefly address Judge Winsor's question again
6  about the mixed motive.  It's important to
7  understand that mixed motive is not a pleading
8  standard.  The plaintiffs cannot be forced into
9  pleading their individual claims under a
10  particular motive.
11       It's an evidentiary framework.  It's
12  something that can develop.  It's a theory of the
13  case that can change along the way.  There is no
14  precedent that I'm aware of that requires a
15  plaintiff to plead mixed motive or single motive,
16  and to do so would violate Rule 8 of the Rules of
17  Civil Procedure.
18       JUDGE WINSOR:  I guess it's not a
19  pleading issue, but why wouldn't then every
20  single-motive plaintiff say, And if you disagree
21  with me or if I lose on McDonnell Douglas, at the
22  very least it was a motivating factor, and I'm
23  not going to say what the other factor was or I'm

Page 38

1  not going to concede that there was another valid
2  factor?  Why wouldn't that be present in every
3  case?
4       MS. PALMER:  It could be, Your Honor.
5  I'm not saying it is, but if you look to the text
6  --
7       JUDGE BRASHER:  Maybe you just have
8  to have better lawyers that are going to make
9  those arguments.  Maybe that's the idea.
10       MS. PALMER:  So if we look to the
11  text of Title VII, we have to prove the "because
12  of," which is the "but for" that Bostock talks
13  about.  And then Bostock goes on to recognize
14  that Title VII also says motivating factor.  And
15  Bostock by the United States Supreme Court
16  recognizes that, at least as they understand it,
17  motivating factor may, in fact, be less than the
18  "but for" causation required under the, you know,
19  choosing -- finding one reason or finding a
20  reason that makes it different.
21       And I want to make that clear.  It is
22  a reason.  It is not the reason.  And that's the
23  problem that we have with these cases is we're

Page 39

1  being held to a higher standard than what even
2  the jury charges represent.
3       JUDGE BRASHER:  What do you mean
4  these cases?
5       MS. PALMER:  Employment
6  discrimination and retaliation cases, Your Honor.
7  So the jury charges just say we have to show
8  motivating factor.  At summary judgment we're
9  being held to some quasi "but-for" cause
10  standard, and that's inappropriate.
11       Additionally, I just want to point
12  out to Judge Brasher, the standard is severe or
13  pervasive.  We don't have to prove both.  And I
14  see I'm out of time.  Can I wrap up?
15       JUDGE WINSOR:  Can I ask just out --
16  so just what's your best -- I mean just your best
17  argument, your argument that you're going to make
18  to the jury at the end of the case that this was
19  a hostile work environment, that it meets this
20  high standard, and that it was so severe or
21  pervasive that it changed, you know, the status
22  of her employment?  What's your best argument
23  there?

Page 40

1       MS. PALMER:  The elevator pitch, Your
2  Honor, is that you have to consider every piece
3  of evidence in totality.  That includes
4  statements.  That includes acts, and you have to
5  do so from a reasonable person's perspective in
6  Nurse Yelling's condition -- I'm sorry -- in
7  Nurse Yelling's position with her life
8  experiences and her social context.
9       Respectfully, Your Honor.  That's not
10  you.  That's not me.  That's Nurse Yelling.
11  Thank you.
12       JUDGE BRANCH:  Thank you.  We have
13  your case under advisement, and court is
14  adjourned.
15
16       END OF PROCEEDINGS
17
18
19
20
21
22
23

## WORD INDEX

< 1 >
**100**   2:7
**104**   2:6
**11TH**   1:14
3:18   12:18
**131**   2:14

< 2 >
**2015**   8:14
13:18   17:8,
23   21:14,
17   22:3
**2033**   1:13
**20507**   2:15
**21**   21:14
**21-10017**
1:4   3:5
**23rd**   2:6
21:17
**27th**   13:13

< 3 >
**3**   1:13
**35209**   2:21
**35233**   2:8

< 5 >
**5th**   2:14

< 8 >
**8**   37:16
**800**   2:20
**870**   2:20

< A >
**a**   3:5   4:13,
15, 16, 18
5:6, 10, 15
6:1, 7   7:3,

4, 5, 6, 7, 21
8:3   9:2, 3,
8, 21, 23
10:1, 4, 16,
21   11:1, 2,
11, 14, 17,
22   12:6, 7,
22, 23   13:5
14:1, 11, 17,
18   15:11,
15, 16, 17,
18, 19
16:11, 16,
17, 22   17:4,
6, 7, 11, 16,
18, 23   18:8,
12, 15
19:21   20:2,
8, 21   24:16,
17   25:14,
15   26:10,
22   27:10,
14, 18, 22
28:14   30:1,
11   31:1, 4,
10, 11, 13,
14, 19
32:10, 11,
21, 23   33:1,
4, 7, 9, 10
34:2, 3, 5, 6
35:1, 3, 8
36:4, 7, 16,
17   37:7, 9,
12, 14, 18,
22   38:19,
22   39:1, 19
40:5
**ability**
31:22
**able**   31:23
34:18, 19

**absolutely**
8:22   23:22
24:2, 6, 7
28:3   29:10
33:4   36:1
**abusive**
3:23
**account**
21:2   23:5
**accurate**
11:21
35:23
**action**
32:8, 16
33:5, 15, 20
**actionable**
29:17
30:19
**actions**
5:23   34:20
35:9
**acts**   3:23
5:13   40:4
**actual**   35:4
**addiction**
20:16
**addicts**
16:14

**Additionally**
11:3   39:11
**address**
14:15   23:9
32:20
35:18   37:5
**addressing**
4:2   22:23
**adjourned**
40:14
**admission**
36:9

**admitted**
11:18   36:2,
3, 7
**admitting**
11:21   25:3
**adverse**
32:8, 16
33:5, 15, 19
34:20   35:9
**advisement**
40:13
**affect**   4:7
22:11
**affirm**
36:23
**affirmative**
12:6
**affirming**
32:15
**Africa**
15:17   16:5
**African-
American**
27:17   28:2
**ago**   5:16
6:4
**Agreed**
16:6
**Alabama**
2:8, 21
17:23
**Alabama's**
16:21, 23
**allegation**
35:2
**allegations**
25:19
**alleged**
23:14   24:1
28:22
**Allen**   1:21

**alternative**
9:23   10:2
34:3   35:18
**ambiguity**
16:15
**amendment**
7:21   14:17
15:5, 9
19:21
**an**   4:4
5:15   7:6
9:8   10:22
11:21
23:10   25:8
27:17   28:2
29:17
30:19   32:8,
16   33:5, 19
35:2   36:9
37:11
**analyses**
34:16
**analysis**
4:7, 10
36:17, 18
**analytical**
12:7
**analyze**
36:14
**And**   3:3, 5,
9, 10, 12, 17,
20, 23   4:5,
9, 10, 13, 23
5:10, 12, 13,
14   6:2, 11,
20, 21   7:1,
4, 5, 6, 8, 13,
14, 19, 23
8:2, 9, 12,
16   9:5, 6,
14, 16, 19
10:1, 11, 12,

13  11:*1, 3, 6, 13*  12:*1, 13, 15, 17*  13:*6, 7, 17*  14:*6, 11, 14, 15*  15:*2, 17, 20*  16:*1, 4, 10, 15*  17:*2, 6, 18*  18:*3, 13, 23*  19:*2, 6, 8, 10*  20:*10, 19*  21:*1*  22:*2, 4, 5, 13, 14, 20, 22*  23:*1, 4, 16, 20, 22, 23*  24:*21*  25:*16, 17*  26:*7, 14, 23*  27:*21*  28:*1, 9, 12, 17*  29:*7, 11, 12, 19, 21*  30:*5, 9*  31:*16, 23*  32:*3, 4, 5, 10*  33:*1, 5, 8, 12, 13, 19*  34:*3, 8, 9, 22*  35:*2, 5, 16, 23*  36:*11, 15, 20, 22*  37:*16, 20, 22*  38:*13, 14, 21, 22*  39:*6, 10, 13, 20*  40:*4, 8, 13*

**Andrew** 1:*20*

**answer** 12:*1*

**answered** 22:*14*

**apart** 4:*5, 9*

**apologies** 26:*8*

**APPEALS** 1:*1, 14*

**APPELLANT** 2:*3*  3:*9*

**APPELLEE** 2:*17*  3:*11*  22:*21*

**appellees** 10:*23*

**Arguably** 10:*21*

**argue** 5:*19*  23:*17*  24:*7, 20*  26:*11*  28:*5*

**argued** 10:*10*  13:*10*

**arguing** 9:*22*  10:*6*

**argument** 3:*18*  9:*22*  10:*4*  29:*9, 14*  39:*17, 22*

**arguments** 10:*2*  32:*19*  36:*12*  38:*9*

**Aside** 13:*20*

**asked** 7:*14*  14:*3*  21:*10*

**asking** 3:*21*  14:*22, 23*

**aspect** 4:*9*

**assess** 30:*23*

**assume** 22:*7*  31:*16*

**ATLANTA** 1:*15*

**attorneys** 3:*5*

**AUDIO** 1:*23*

**avoid** 15:*3*

**aware** 35:*5*  37:*14*

**< B >**

**back** 8:*11*  15:*17*  16:*5*  21:*9, 11*  32:*3*

**banana** 30:*12*

**banc** 12:*21*

**based** 35:*15*

**basically** 15:*6*  20:*17*  21:*3*

**behalf** 22:*21*

**believe** 14:*18*  33:*14*  36:*3*

**believed** 11:*10*

**best** 39:*16, 22*

**better** 38:*8*

**big** 17:*23*

**Birmingham** 2:*8, 21*

**bit** 27:*14*

**black** 15:*21*  20:*10, 14*  22:*1*  25:*14*  33:*7*

**blacks** 14:*9*  16:*13*

**body** 5:*9*  7:*2*

**Bostock** 38:*12, 13, 15*

**bothering** 24:*19*

**bottle** 33:*10*

**brag** 20:*17*

**Branch** 1:*19*  3:*3*  4:*18*  6:*5*  7:*9*  11:*8, 16*  12:*3, 9, 14*  13:*10, 15, 20*  21:*9, 16*  22:*7, 13, 18*  23:*1, 23*  24:*4, 18*  25:*20*  29:*4*  36:*1*  37:*2*  40:*12*

**Brasher** 1:*20*  7:*18*  8:*13, 21*  14:*21*  15:*23*  16:*7, 19*  17:*13, 20*  18:*6, 18*  19:*2, 15*  23:*1, 23*  27:*13*  28:*8*  30:*20*  38:*7*  39:*3, 12*

**brief** 4:*20*  24:*20*

**briefly** 37:*5*

**bright-line** 5:*6*

**bring** 8:*11*  34:*2*  36:*9*

**brought** 22:*23*  27:*6*

**bullying** 25:*16*

**bunch** 33:*1*

**burden** 6:*9*  34:*15*  36:*16*

**but-for** 33:*22*  39:*9*

**butter** 7:*5*

**< C >**

**cake** 7:*4, 5, 6*

**call** 7:*4*

**called** 15:*21*  18:*15*  20:*15*

**calling** 20:*1*

**capital** 16:*21, 23*  17:*5*  18:*2*

**care** 25:*15*  32:*1*  33:*7*

**caring** 20:*14*  29:*2*

**case** 3:*3*  4:*21, 22*  5:*4*  6:*7, 14*  9:*18*  10:*23*  11:*9, 19*  12:*19, 20, 23*  13:*8*

16:*2*  17:*9*
18:*14, 17*
22:*11*  23:*3*
27:*5*  28:*21*
30:*9, 11*
33:*4*  34:*10,*
*13*  35:*8, 17*
36:*1, 3, 4*
37:*13*  38:*3*
39:*18*
40:*13*
**cases**  5:*18,*
*19*  6:*6*
38:*23*  39:*4,*
*6*
**category**
31:*2*
**causation**
38:*18*
**cause**  39:*9*
**century**
5:*16*
**certainly**
18:*19*  21:*6*
26:*17*
30:*13*
**chance**  3:*6*
**change**
37:*13*
**changed**
39:*21*
**characteristi
cs**  8:*19, 20*
9:*15*
**charge**
21:*12, 15*
22:*8*
**charges**
39:*2, 7*
**chooses**
34:*16*

**choosing**
38:*19*
**CIRCUIT**
1:*2, 14, 19,*
*20*  3:*18*
12:*19*
**circumstanc
es**  5:*8, 9*
6:*21*  15:*20*
20:*8*  21:*2*
23:*8*  30:*6*
**cite**  12:*21*
**cited**  30:*10*
**citing**  22:*8*
**Civil**  37:*17*
**claim**  4:*3,*
*8, 15, 20*
10:*17*  23:*3*
25:*2*  31:*19*
32:*9*  33:*16,*
*17*  34:*3, 4,*
*23*  35:*12,*
*19*
**claimed**
13:*16*
**claiming**
23:*11*
**claims**
4:*11*  36:*14,*
*20*  37:*9*
**clarify**  5:*1*
**class**  36:*4*
**clear**  12:*13*
23:*14*
27:*11*
38:*21*
**clearly**  29:*7*
**client**  3:*19*
11:*20*
12:*10*
**cloud**
15:*19*

**colleague**
27:*17*  28:*2*
**colleagues**
20:*17*
21:*23*  27:*6*
**come**  14:*10*
**comes**  15:*5*
**comment**
14:*3, 11, 13,*
*16*  16:*4*
18:*9*  24:*16,*
*17*  28:*5*
31:*13*
**comments**
6:*10, 17*
8:*8*  9:*17,*
*18*  13:*1, 12,*
*21, 22*  14:*5,*
*7, 14, 19*
15:*16*
16:*17*
19:*13, 14,*
*16, 17*  20:*6,*
*11*  21:*3, 5,*
*20*  22:*1*
23:*12, 14*
24:*1, 8, 10,*
*14, 15, 22*
28:*23*  29:*8*
30:*16, 23*
31:*2, 7, 15,*
*16*  32:*1, 4,*
*5*
**COMMISSIO
N**  2:*11*
**comparator
s**  34:*20*
**compared**
20:*12, 13*
**compel**
13:*7*

**complained**
21:*7*
**complaint**
4:*16*  25:*15,*
*17*  26:*10*
32:*23*  33:*7*
**complaints**
25:*13, 22*
26:*2*  32:*17*
33:*21*
**concede**
11:*1*  38:*1*
**conceding**
11:*8*
**concerned**
29:*13*
**concerns**
25:*5*
**concluded**
6:*8*
**concrete**
7:*13*
**condition**
40:*6*
**conduct**
5:*13, 17*
6:*2*  21:*13*
31:*22*
**Confederac
y**  28:*12*

**Confederate**
16:*18, 22*
17:*5*  18:*1,*
*22*  19:*7, 23*
20:*18*  27:*8,*
*14*  28:*10*
30:*12*
**conflating**
12:*5*
**confusing**
25:*10*

**Congress**
8:*3*
**consider**
5:*5*  13:*12*
15:*11, 12*
33:*4*  40:*2*
**considered**
6:*3*  24:*12*
**consistent**
21:*19*
**constancy**
29:*12*
**constantly**
6:*13*  7:*11*
**context**
4:*13*  5:*5,*
*12*  6:*21*
7:*14*  8:*12,*
*13*  11:*7*
16:*20*  17:*1*
23:*5*  28:*17,*
*18*  33:*12*
40:*8*
**controversi
al**  19:*22*
**convincing**
10:*11*
36:*17*
**Cornelius**
1:*23*
**corners**
5:*15*
**Correct**
12:*12*  19:*1*
22:*8*  25:*7*
**Counsel**
2:*12*
**counter**  7:*4*
**couple**
32:*11*
**course**
26:*16*

**COURT**
1:*1, 14*
3:*16, 20, 21*
4:*12*  6:*3*
9:*8, 16, 19*
10:*7, 12, 14*
11:*14, 15*
12:*17*
13:*11*
16:*12*
17:*10*
18:*17*  22:*4,
20*  23:*4*
24:*12*
26:*21*
29:*19, 22*
30:*7*  33:*18*
34:*16, 17*
35:*11, 13*
36:*13, 19,
23*  38:*15*
40:*13*
**courts**
12:*5*  20:*13*
**court's**
3:*22*  4:*5*
8:*18*  12:*21*
13:*4, 6*
17:*9*  18:*14*
**covered**
36:*13*
**co-worker**
9:*3*
**co-workers**
23:*12*
25:*19*
26:*14*  27:*7*
30:*14*
**crack**
15:*21*
20:*15*
**create**  31:*4*

**creating**
17:*7*
**Creek**  2:*20*
**criticisms**
15:*11, 13*
**criticize**
8:*5*  15:*10*
19:*21*
**criticizing**
9:*10*
**crowbar**
30:*11*
**crowbars**
27:*8*
**crystalized**
5:*7*
**Cuban**  13:*5*
**culminates**
4:*16*
**cursed**
26:*14*
**cutoff**
13:*13*
**CYNTHIA**
1:*6*  3:*4, 19*

**< D >**
**D**  1:*23*  3:*1*
**D.C**  2:*15*
**date**  4:*23*
22:*8*
**day**  6:*11*
16:*2*
**days**  32:*11*
**dealing**
26:*2*
**decide**  4:*21*
**decided**
23:*3*
**decision**
11:*14*
12:*22*  13:*4*

35:*6, 8*
36:*2*  37:*1*
**decisions**
13:*6*  36:*5*
**defendant**
10:*10, 23*
**Defendant-
Appellee**
1:*10*
**defense**
12:*6*
**degree**
31:*3*
**denigrating**
13:*2*
**deny**  12:*11*
**depart**
4:*23*  5:*4*
**depend**
5:*14*  28:*18*
**deposition**
21:*19*
**determine**
16:*16*
29:*16*
31:*21*
**determined**
35:*13*
**develop**
37:*12*
**developed**
22:*11*
**DIANE**  1:*6*
**diatribes**
30:*14*
**difference**
17:*17*
**different**
6:*12*  7:*10*
19:*17, 19*
20:*3*  26:*12*

30:*13*  31:*3*
36:*6*  38:*20*
**differently**
15:*12*
**difficulty**
30:*22*
**directed**
13:*3*  23:*15*
**direction**
6:*2*
**disagree**
29:*20*
37:*20*
**discriminati
on**  10:*16*
32:*9*  33:*16,
21*  35:*21*
39:*6*
**discriminato
ry**  3:*23*
21:*13*

**discussions**
23:*11*
**dislike**
30:*15*
**dismissed**
36:*20*
**dismissive**
25:*16*
**displaying**
27:*7*
**distinction**
27:*5, 11*
**District**
1:*21*  3:*22*
4:*4*  10:*7*
11:*15*
13:*11*  22:*4*
23:*4*  24:*12*
29:*19*  30:*7*

34:*16*
36:*19*
**doubt**  28:*4*
**Douglas**
10:*7, 10*
34:*18*
35:*16*
36:*16*
37:*21*
**draw**  10:*22*
**drill**  6:*5*
**drug**  16:*14*
32:*7, 10, 14,
23*  33:*4, 6*
**Dubose**
25:*3*

**< E >**
**E**  3:*1*
**earlier**
29:*13*
**EEOC**  2:*10*
3:*10*  4:*2*
7:*19*  21:*12*
22:*8*
**egg**  7:*6*
**either/or**
34:*9*
**elect**  34:*5*
**elevator**
40:*1*
**ELEVENTH**
1:*2*
**Elizabeth**
1:*19*
**employee**
9:*9*  15:*2*
**employees**
8:*5*  15:*4*
**employee's**
15:*7*

employer
  9:8  11:10
  15:1, 3, 7
employers
  8:4
EMPLOYME
NT  2:11
  25:12
  26:17
  32:16  33:5,
  15, 20  35:9
  39:5, 22
en  12:21
entire  7:2
entities
  5:23
environmen
t  4:3, 7, 8,
  15, 19  6:7
  11:6  12:23
  13:1  15:19
  17:7, 11
  23:2  26:21
  29:18  31:4
  39:19
environmen
ts  27:3
EQUAL
  2:11
equivalent
  28:14
erred  13:11
escalated
  14:14
Esquire
  2:5, 13, 19
essence
  23:2
evaluate
  20:23
everybody
  28:17  30:4

evidence
  4:5  5:9, 10,
  22  6:14
  7:2  25:2
  26:6  28:20
  31:23  32:2,
  17  33:20
  34:22  35:1,
  4, 5, 14
  40:3
evidentiary
  37:11
Exactly
  7:12  8:16
  9:19  11:23
example
  25:14  27:5
exceeded
  22:15
excising
  18:17
excited
  3:17
exclusively
  10:5, 16

experiences
  5:12  40:8

< F >
fabulous
  15:21  16:9
  31:8
face  17:22
fact  7:19
  8:8  11:22
  15:9  18:7
  23:5, 9
  25:1  26:9
  27:11
  33:12
  38:17

factor  6:10
  35:2, 3
  36:7  37:22,
  23  38:2, 14,
  17  39:8
facts  20:23
failing
  13:11
falsification
  26:18
falsifying
  11:10, 19
fashion
  16:11
federal  9:8
Fernandez
  6:8  13:4
fifteen  6:3
figure
  19:20
figuring
  30:22
filed  21:16
final  3:3
finding
  33:9  38:19
finds  33:19
fining  15:6
fired  11:18
first  3:18
  7:21, 23
  8:2, 9  9:5
  14:17  15:5,
  9  19:5, 21
five  12:15
flag  16:18,
  22  17:5, 18
  18:1, 22
  19:23
  20:18  27:8,
  14  28:10

flags  19:7
  30:12
flew  16:22
flies  17:4
flood  30:3
Floor  2:14
flying
  16:17
  19:23
  20:18
focused
  34:17
following
  29:8
food  14:4,
  12  21:22
  24:15
  31:12
forced  37:8
four  5:15
framework
  12:8  37:11
frameworks
  10:12
frankly
  11:14
frequency
  14:2
frequently
  29:1, 15

< G >
G  3:1
Gantz  2:13
  3:9  12:14,
  16  13:14,
  19  14:1
  15:14  16:6,
  12  17:9, 16
  18:3, 7
  19:1, 12
  20:7  21:15,

18  22:10,
16
gates  30:3
gender
  36:3
General
  2:12
GEORGIA
  1:15
ghetto
  15:21  16:9
  31:8
give  3:5
  18:19
  20:22
Given  8:7
  17:7  22:11
  33:12
gives  7:22
  8:1
go  14:2
  15:17  16:5,
  16  21:11
goes  19:12
  20:21
  29:12, 15
  38:13
going  3:7
  7:19  8:11
  10:6  18:4
  19:22  21:7
  22:2  25:22
  37:23  38:1,
  8  39:17
Good  3:15
government
al  5:23
grandchildr
en  26:15
great  22:23
Ground
  13:7

group 13:2 20:12
guess 9:6 17:15 18:22 19:10, 16 28:8 29:8 37:18
guidepost 29:22 30:5

< H >
handing 14:4
hands 27:9
happened 6:18 9:19 11:20
happening 13:17 17:8
hard 17:6
harsh 8:5 9:11, 13
heads 15:22 20:15
HEALTH 1:9 3:4 22:22
heard 6:16 18:8, 12 20:20 21:3 32:5 34:1
hearing 20:11, 14, 17 29:5, 7
heated 14:13 21:5
heavily 10:11
heels 33:9

held 4:12 9:16 12:22 17:10 29:22 30:7 39:1, 9
Hey 27:17
high 31:17 39:20
higher 39:1
honestly 4:20
Honor 3:15 5:3 6:19 7:12 8:10 9:13 10:3, 9, 18 11:12, 23 12:12, 16 13:14 22:19 24:6 25:6 26:7 28:3, 16 29:11 31:6, 8 32:13 33:3 34:8 35:22 36:11 38:4 39:6 40:2, 9
Honorable 1:19, 20, 21
Honors 37:4
hood 27:19
Hospital 4:1
hostile 4:3, 6, 8, 15, 19 6:7 11:6 12:22 13:1 15:19 17:7, 11 23:2

26:20 27:3 29:17 31:4 39:19
house 33:9
hundred-and-eighty-day 34:21

< I >
I 3:1, 12, 17 4:3, 13, 20 5:18, 20 7:23 8:2, 22 9:4, 6, 21 10:9, 10 11:18 12:1, 17, 20 14:1, 15, 18 15:18 16:2, 4, 8, 9, 10 17:3, 4, 15, 21, 22, 23 18:4, 18, 22 19:2, 10, 16 20:2 21:10 22:10, 22 24:23 25:21, 23 26:5, 8 27:13, 15, 23 28:8, 9, 11, 13, 15, 19 29:5, 8, 11 30:21, 22 31:9, 12 32:7, 18, 19 34:5, 12 35:19 36:3, 12 37:4, 18, 21 38:21 39:11, 13, 14, 15, 16

idea 31:12 38:9
illegal 5:18, 19 6:3, 4
immutable 8:19
implicated 14:18
important 3:20 4:4, 14 9:12 37:6
imposes 14:23
improperly 16:18
inappropriate 39:10
incident 8:18
incidents 5:7 7:13
includes 40:3, 4
indigent 20:14
individual 30:13 37:9
individuals 30:10
inference 10:22 18:13
inferences 20:23
ingredients 7:3
insensitive 6:17
instance 12:5 30:18 33:6 34:14

instances 6:22, 23 23:10
instigator 23:10
insults 13:17
interferes 31:22
intertwined 25:12, 21 26:4, 9

investigated 24:20
investigation 25:4, 8, 18, 22 26:2, 15, 18
investigations 25:11, 21 26:5, 12, 13, 16
involving 13:5
issue 17:23 18:22 19:11, 22 20:3 36:5 37:19
issues 3:20 20:16 25:9
its 6:9 15:2, 4, 7

< J >
JACKSON 2:18
job 31:22

Jones  9:16 13:7  17:10 18:13  27:5, 6  30:9
Judge 1:19, 20, 21 3:3  4:18 6:5  7:9, 18 8:13, 21 9:21  10:5, 15, 19  11:8, 16  12:3, 9, 14  13:10, 15, 20 14:21 15:23  16:7, 19  17:13, 20  18:6, 18 19:2, 15 21:9, 16 22:7, 13, 18 23:1, 22, 23 24:4, 18 25:20 27:13  28:8 29:4  30:20 32:6, 18 33:23 34:10 35:11  36:1, 8  37:2, 5, 18  38:7 39:3, 12, 15 40:12
judgment 12:20  13:8 20:22  39:8
Julie  2:13 3:9
June  21:14
jury  10:21 11:12

16:16 18:15 20:21  39:2, 7, 18

< K >
kind  15:22 17:21  20:2 31:1  36:10
Klan  27:18, 19, 20, 21 28:6, 19
know  8:4 14:22 15:12  16:8, 9, 10, 20 17:3  19:2, 8  20:1 27:17 28:11, 15 29:5, 23 30:1  32:8, 20  34:5 38:18 39:21
known 26:23

< L >
L  2:13, 19
lady  7:23 8:2, 9  9:5 19:5
LAW  2:4 4:21, 22 5:5  8:3 12:19 14:17 34:10, 13
lawyers 27:15  38:8
led  26:19

legitimate 11:22
Leslie  2:5 3:8, 17
lesser 32:12
level  27:23 29:2, 17, 21, 22  30:2, 18 33:14
levels 29:15
LEWIS  2:18
liability 15:1, 3
life  5:12 40:7
light  15:9
Linda  14:6
lines  25:17
list  14:2
little  15:11 27:14  34:6
live  17:4
LLC  2:4
look  5:7, 22  7:1, 5, 7 8:11  11:12 15:20  20:7, 8  38:5, 10
looked 16:8
looking 35:12
loop  21:9
lose  37:21
love  27:21

< M >
Main  2:14

makers 35:6, 8 36:2
making 14:11  27:9 32:22
MARCH 1:13  13:21 21:6
matter 22:9  31:15 34:15
matters 4:13  28:17 36:18
McDonnell 10:7, 10 34:18 35:16 36:16 37:21
mean  8:22 9:4  16:2, 4, 8  17:3, 21, 22  18:11, 18  19:3 27:15, 23 28:15  29:5 30:21 31:12 35:19 36:12  39:3, 16
means 16:10
meant 18:11 20:18  26:8
measurable 17:17
media  14:9

meet  27:1 32:11  33:2
meets 39:19
Mendoza 5:6
mentioned 14:12 21:22  22:2
met  6:9
Michelle 15:16
Miller  2:19 3:10  22:18, 19, 20  24:6 25:6  26:7 28:3, 16 29:10  31:6 32:13  33:3 34:8, 12 35:22 36:11
minimizing 4:6
minutes 3:13  12:15 37:3
missed 33:13
misses 33:1
mixed  10:1, 6  11:2 12:6  37:6, 7, 15
mixed-motive 10:16  12:6, 7  34:4, 23 35:12 36:17

**money** 8:*4*
9:*9*
**monkey**
15:*16, 17*
16:*4* 23:*20*
**monkeys**
20:*12*
**morning**
3:*16*
**mosaic**
10:*12*
36:*18*
**motivating**
35:*2, 3*
36:*7* 37:*22*
38:*14, 17*
39:*8*
**motive**
10:*1, 6, 19,*
*22* 11:*1, 2,*
*17, 22* 12:*7,*
*11* 35:*9, 14*
37:*6, 7, 10,*
*15*
**motives**
11:*9*
**moved**
24:*21*

**< N >**
**N** 3:*1*
20:*13*
23:*21*
**N.E** 2:*14*
**name** 3:*16*
**nearly** 6:*11*
**necessarily**
6:*4* 16:*1*
**need** 4:*23*
5:*4, 5*
26:*21*
35:*17*

**negative**
7:*22* 19:*3,*
*5*
**negatively**
4:*10*
**newer**
26:*22*
**note** 4:*4*
7:*16*
**November**
21:*17*
**number**
5:*6* 14:*14*
**Nurse** 3:*19*
4:*6* 5:*11*
9:*3, 15*
20:*10* 40:*6,*
*7, 10*
**nurse's**
14:*10*
28:*23* 29:*6*

**< O >**
**O** 3:*1*
**Obama**
8:*14* 9:*1*
14:*4* 15:*16,*
*17*
**Obamas**
8:*17* 9:*16,*
*18* 14:*16,*
*20* 16:*4*
24:*8* 30:*17*
32:*4*
**obviously**
5:*1, 20*
29:*4* 35:*15*
**occurred**
6:*11* 13:*21*
16:*21*
21:*13*
28:*23*

**offended**
8:*23* 18:*20*
29:*20* 30:*4*
**offensive**
18:*21*
23:*22* 24:*2,*
*5* 28:*4*
**Office** 2:*12*
**Oh** 13:*14*
22:*16*
**Okay**
13:*19* 14:*1*
**one-eighty-**
**day** 13:*12,*
*23* 21:*11*
**ones** 7:*15*
**ongoing**
22:*6*
**open** 30:*3*
**opinion**
4:*10* 5:*15*
13:*9*
**opinions**
5:*16*
**OPPORTUNI**
**TY** 2:*11*
**opposed**
24:*16*
**order** 3:*22*
12:*18*
**outside**
13:*22*
21:*11*
34:*21*

**overhearing**
13:*1*
**overtones**
23:*12*

**< P >**

**P** 3:*1*
**paid** 33:*13*
**PALMER**
2:*4, 5* 3:*8,*
*12, 15, 17*
5:*3* 6:*19*
7:*12* 8:*10,*
*16* 9:*12*
10:*3, 9, 18,*
*21* 11:*11,*
*23* 12:*4, 12*
37:*3, 4*
38:*4, 10*
39:*5* 40:*1*
**panel** 5:*1*
**Parkway**
2:*20*
**parsing**
4:*5, 8*
**part** 15:*18*
17:*11* 25:*9,*
*17* 29:*8*
31:*20*
**particular**
28:*21* 33:*6*
34:*14*
37:*10*
**particularly**
12:*21* 27:*4*
**pass** 8:*3*
**passing**
29:*7*
**patient**
25:*15* 33:*7,*
*10*
**patients**
15:*21* 20:*1,*
*14, 15* 22:*1*
29:*2* 30:*21*
31:*2, 7*
32:*1*

**patient's**
33:*11*
**pay** 8:*4*
9:*9*
**peculiar**
34:*6*
**peels** 30:*12*
**pendulum**
5:*20*
**people**
7:*22* 8:*23*
16:*3* 17:*11*
18:*21* 19:*3*
20:*12*
27:*16*
**period**
13:*13, 23*
21:*12*
34:*22*
**person**
5:*11* 15:*13*
20:*9* 32:*21*
**personal**
9:*14*
**personally**
13:*3*
**person's**
40:*5*
**perspective**
40:*5*
**pervasive**
6:*10, 15*
18:*23* 19:*8,*
*10* 28:*1*
30:*8* 39:*13,*
*21*
**pervasivene**
**ss** 27:*2*
29:*3, 12*
31:*19*
**piece** 40:*2*

pin   13:*18*
pitch   40:*1*
place
  28:*22*   32:2
plain   12:*13*
plaintiff
  6:*9*   13:*6*
  27:*10*   34:2
  37:*15, 20*
Plaintiff-
Appellant
  1:*7*
plaintiffs
  37:*8*
plaintiff's
  20:*9*
play   15:*6*
plead   37:*15*
pleading
  12:*7*   37:*7,*
  *9, 19*
please
  3:*16*   12:*3,*
  *17*   22:*20*
point   4:*4*
  5:*2*   17:*15*
  28:*9*   29:*6*
  31:*8*   35:*23*
  39:*11*
pointed
  24:*11*
pointing
  35:*7*
points
  22:*23*
political
  15:*2, 4, 7,*
  *15*   31:*1*
politicians
  30:*14*
portrayed
  14:*9*

position
  5:*11*   12:*4*
  15:*15*   20:*9*
  23:*19*   34:*9*
  40:*7*
positive
  32:*4*
precedence
  9:*20*
precedent
  37:*14*
premise
  5:*17*

prescription
  33:*10*
presence
  9:*1*   27:*16*
  28:*2*
present
  38:*2*
presented
  10:*22*
president
  7:*23*   8:*2, 5,*
  *9, 14, 15*
  9:*1, 2, 4, 10*
  15:*10, 11*
  19:*4, 20*
pretext
  34:*22*
private
  14:*19*
  15:*13*
problem
  27:*23*
  38:*23*
problematic
  9:*7*
Procedure
  37:*17*

proceed
  3:*12*   12:*10*
PROCEEDIN
GS   40:*16*
prompted
  26:*11*
prong   6:*15*
properly
  23:*3*   30:*7*
  36:*19*
protected
  13:2   20:*11*
  36:*4*
prove
  38:*11*
  39:*13*
provided
  7:*13*
public
  19:*20*
purposes
  32:*9*
pushed
  27:*14*   32:3
put   7:*3, 7*
  30:*1*
putting
  17:*21*

< Q >
quarter
  5:*15*
quasi   39:*9*
queens
  20:2   31:*11*
question
  4:*19*   6:*8*
  8:*22*   9:*21*
  12:2   13:*16*
  22:*14*   32:*6*
  34:*1*   37:*5*

questioning
  20:*4*
questions
  12:*18*
Quigg   9:*22*
  11:*16*
  12:*10*   34:*1*
  35:*23*
quote   14:*6*

< R >
R   3:*1*
race   10:*20*
  11:*3, 5*
  16:*15*
  18:*16*
  24:*13*
  33:*16*   35:*1,*
  *3, 15*   36:*7,*
  *20*
racial
  13:*16*
  18:*15*
  20:*12*
  23:*16, 17*
  35:*8*
racially
  18:*21*
racially-
insensitive
  14:*7*   24:*22*
racially-
offensive
  18:*9*   22:*1*
racist   8:*1,*
  *8, 22*   16:*3,*
  *5, 11*   19:*4,*
  *6, 9*   23:*11,*
  *14*   24:*5, 9,*
  *17*   27:*9*
  28:*7, 22*
  30:*17*

31:*11, 14,*
  *17*   35:*6*
raised
  12:*18*
  25:*13*
  36:*12*
reach
  26:*21*
  29:*21*   30:*7,*
  *18*   31:*17*
  32:*15*
reaches
  33:*14*
read   14:*23*
  17:*6*   22:*5*
reading
  4:*20*   34:*13*
really
  17:*16*
  25:*22*
reason
  6:*20*   9:*23*
  10:*4*   33:*22*
  34:*5*   36:*4,*
  *22*   38:*19,*
  *20, 22*
reasonable
  5:*11*   18:*13*
  20:*9, 23*
  21:*1*   32:*21*
  40:*5*
rebuttal
  3:*14*   37:*3*
recipients
  15:*22*
  16:*14*
recognize
  38:*13*
recognized
  16:*13*
recognizes
  38:*16*

**RECORD**
2:*1*  25:*8*,
*10*  26:*1*
28:*20*
**records**
11:*10, 19*
26:*19*
**rednecks**
24:*14*
**Reeves**
12:*21*
**reflect**  25:*8*
**regularly**
13:*17*
**related**
24:*12*  28:*6*
**relied**
10:*11*
**rely**  9:*20*
**relying**
4:*21*  6:*6*
**remedied**
27:*1*
**remedy**
24:*21*
**remember**
25:*4*
**repeated**
22:*5*
**repeatedly**
4:*12*  13:*17*
21:*8*
**reported**
24:*22*
**represent**
39:*2*
**representin
g**  3:*19*
**request**
36:*23*
**required**
27:*3*  29:*3*

30:*8*  31:*18*
38:*18*
**requires**
37:*14*
**resembling**
15:*16*
**reserved**
3:*13*
**resolve**
16:*1*
**respect**
26:*20*
**respectfully**
36:*23*  40:*9*
**responded**
10:*11*
25:*18*
**result**
36:*18*
**retaliation**
11:*4, 6*
32:*7, 12*
33:*16*
36:*20*  39:*6*
**retaliatory**
3:*23*
**reversal**
12:*19*  13:*8*
**reverse**
3:*22*
**right**  6:*1*
7:*22, 23*
8:*1, 6*  16:*8*
17:*14*  18:*6*
19:*21*
22:*13*
23:*23*
27:*18, 19*
31:*12*
32:*23*
35:*13*

**rise**  27:*23*
29:*2*
**rises**  29:*16*
**room**  33:*11*
**RPR**  1:*23*
**Rule**  37:*16*
**Rules**
37:*16*
**ruling**
32:*15*

**< S >**
**S**  1:*9*  3:*1*
**Sandy**  14:*6*
**satisfy**  6:*15*
**saying**  5:*4,
5*  6:*17*  7:*9,
10*  12:*9*
15:*8*  19:*3*
21:*10*  24:*2*
27:*20*
28:*11, 13,
19*  30:*16*
38:*5*
**says**  38:*14*
**scenario**
27:*11*
**Scott**  18:*14*
**second**
26:*22*
**see**  3:*13*
5:*13*  15:*23*
24:*23*
25:*21, 23*
26:*5*  31:*9*
39:*14*
**separate**
26:*16*  31:*1*
**separately**
35:*18*
**serious**

27:*22*
**set**  3:*6*
**severe**
18:*23*  19:*8,
10*  23:*21*
27:*2*  28:*1*
29:*3*  30:*8*
31:*18*
39:*12, 20*
**severity**
19:*13, 15,
16*  20:*5*
**sexually**
12:*23*
**Shades**
2:*20*
**Shannon**
2:*19*  3:*10*
22:*20*
**shares**
9:*15*
**sharing**
3:*8, 9*
**shift**  20:*10*
**shifting**
34:*15*
36:*16*
**shifts**
33:*13*
**show**  5:*23*
26:*1*  39:*7*
**showed**
25:*1*
**side**  27:*15*
**silence**
15:*4*
**simply**
30:*18*
31:*17*
**single**  9:*23*
10:*4*  37:*15*

**single-
motive**
34:*3*  35:*18*
37:*20*
**sitting**  29:*1*
**situation**
4:*14*  11:*17*
23:*6*  24:*21*
28:*18*
**slavery**
18:*10*
20:*19*
**slur**  23:*16,
17*
**Smelter**
13:*6*  16:*12*
**social**  5:*12*
40:*8*
**society**  6:*1*
**socioecono
mic**  24:*16*
31:*10, 13*
**somebody**
28:*19*
32:*22*
**someone's**
17:*22*
**somewhat**
34:*13*
**sorry**
22:*16*  40:*6*
**sort**  18:*16,
20*
**South**  2:*6*
18:*4*
**SPEAKERS**
2:*1*
**specific**
13:*22*
**specifically**
6:*11*  32:*7*

**specified** 6:*10*

**specifies** 21:*12*

**specify** 6:*16*

**speech** 15:*1, 2, 5, 7, 15*

**sphere** 6:*15*

**ST** 1:*9* 2:*14* 3:*4* 4:*1* 22:*21* 24:*20* 25:*11* 26:*23*

**stamp** 24:*15* 31:*13*

**stamps** 14:*4, 12* 21:*22*

**stand** 5:*17*

**standard** 18:*23* 27:*2* 30:*8* 31:*18* 32:*12* 33:*2* 37:*8* 39:*1, 10, 12, 20*

**stands** 18:*10*

**start** 12:*18* 22:*22*

**State** 16:*21, 22* 17:*4*

**statement** 17:*6* 31:*14*

**statements** 5:*13* 8:*17*

27:*9* 30:*21* 40:*4*

**STATES** 1:*1* 9:*10* 10:*13* 38:*15*

**station** 14:*11* 28:*23* 29:*6*

**status** 39:*21*

**statute** 10:*13* 14:*23*

**step** 6:*1* 26:*22*

**stood** 28:*12*

**Street** 2:*6*

**stringent** 27:*2*

**struggling** 7:*21* 9:*7* 17:*3*

**stuck** 21:*21*

**students** 14:*3*

**stuff** 16:*3, 7* 19:*9* 27:*14, 19* 31:*1*

**submission** 24:*16*

**submit** 34:*12* 36:*15*

**substantiate** 31:*19* 34:*19*

**suggesting** 16:*13*

**suggests** 26:*5*

**Suite** 2:*7, 20*

**summary** 12:*20* 13:*8* 20:*22* 39:*8*

**super** 16:*5* 19:*4, 6*

**supervisor** 21:*20* 33:*9*

**support** 17:*17, 22* 27:*18, 20* 28:*11, 13* 35:*14*

**supporting** 18:*9* 20:*19*

**supports** 12:*19* 25:*2* 34:*11*

**supremacy** 18:*10* 20:*19*

**Supreme** 10:*13* 38:*15*

**sure** 17:*1* 29:*10* 36:*9, 13*

**sway** 32:*22*

**swung** 5:*20*

**symbol** 18:*15*

**SYSTEM** 1:*9* 3:*5*

**Systems** 22:*22*

**< T >**

**tainted** 4:*9*

**take** 15:*15* 18:*20* 23:*5*

**taken** 11:*7* 14:*17* 35:*10*

**talk** 16:*20*

**talked** 21:*20*

**talking** 17:*15* 18:*21* 19:*6, 7, 17, 19* 23:*7*

**talks** 38:*12*

**Tanya** 1:*23*

**tech** 25:*15* 33:*7*

**tell** 9:*8*

**telling** 4:*22*

**ten** 5:*16*

**term** 16:*11* 23:*19, 21* 31:*9, 10, 11*

**termination** 4:*17* 26:*19*

**terms** 6:*12* 8:*6* 9:*11, 14* 14:*13* 35:*6, 20*

**test** 5:*6* 32:*10, 14, 23* 33:*4, 6*

**testified** 18:*8* 21:*6* 32:*3*

**testimony** 7:*10* 14:*2* 21:*19* 22:*5*

**testing** 32:*7*

**text** 12:*13* 38:*5, 11*

**Thank** 12:*14, 16* 22:*16, 19* 37:*2* 40:*11, 12*

**theory** 37:*12*

**thing** 13:*5* 15:*22* 16:*1, 19* 23:*13* 28:*10, 13* 31:*20*

**things** 7:*22* 8:*2* 11:*5* 14:*8* 19:*3, 5* 26:*3*

**think** 4:*13* 5:*20* 8:*1, 3* 15:*18* 20:*2* 22:*10* 28:*9, 20* 30:*22*

**three** 11:*5*

**threw** 30:*12*

**Tiffany** 14:*6*

**time** 3:*7, 9* 5:*7* 12:*1* 14:*10, 12* 19:*22* 22:*15* 26:*3* 30:*5* 39:*14*

**times** 25:*7*

**Title** 4:*1* 12:*13* 38:*11, 14*

**today** 3:*8, 17, 21* 4:*3* 6:*4* 28:*17*

**totality** 5:*8* 6:*20* 15:*20*

20:8  23:8
30:6  40:3
**toxic**  15:19
**traditional**
34:17
36:15
**traits**  9:14
**TRANSCRIB
ED**  1:23
**true**  17:6
25:1  26:3
27:4
**truly**  24:17
**trying**  24:7
26:11  28:5
29:16
**T-shirt**
17:18, 21
28:14
**T-shirts**
27:7
**two**  3:13
11:4  26:3,
5, 12  33:13
37:3
**type**  14:14
23:16

**< U >**
**ultimately**
4:16
**unclear**
34:14
**uncomforta
ble**  32:14
33:19
**undergoing**
25:11
**understand**
9:13  32:18
37:7  38:16

**unfamiliar**
31:9
**UNITED**
1:1  9:10
10:13
38:15
**unusual**
6:23  14:8
**UPS**  9:17
13:7  17:10
**use**  34:16
35:6
**usually**
34:4

**< V >**
**vague**  6:12
7:11
**valid**  38:1
**Versus**  1:8
3:4  9:16
13:7  17:10
19:23
**VII**  4:1
12:13
38:11, 14
**VINCENT**
1:9
**Vincent's**
3:4  4:1
22:21
24:20
25:11
26:23
**violate**
37:16
**violated**
4:1
**voicing**
17:17, 22

**< W >**
**Wait**  13:15
**want**  4:3
36:14
38:21
39:11
**wanted**
12:17, 20
14:15

**Washington**
2:15
**way**  5:10,
21  11:11,
13, 20
14:21, 22
15:3  16:17
18:11, 12
31:12
37:13
**wearing**
17:12, 14,
18  27:18,
19  28:14
**weekend**
7:1
**weigh**  20:5
**welfare**
15:22
16:14  20:2
31:11
**Well**  17:20
21:18  28:8
**we're**  3:7
20:22  23:7
24:2  38:23
39:8
**we've**
21:11
**white**
18:10

20:15, 19
**wildly**  36:5
**Wilhite's**
13:20
**Winsor**
1:21  9:21
10:5, 15, 19
32:6, 18
33:23
34:10
35:11  36:8
37:18
39:15
**Winsor's**
37:5
**wondered**
32:20
**word**
20:13
23:21
**words**  8:18
**wore**  27:7
**work**  4:3, 6,
8, 15, 19
6:7  11:6
12:23  13:1
15:19  17:7,
11  23:2
26:21  27:3,
20  29:17
31:4  32:10
33:1  39:19
**worked**
21:4
**workplace**
14:19  30:2,
19
**worseness**
30:2
**wrap**  39:14

**< Y >**

**Yeah**  8:21
14:21
17:14  28:8
**year**  13:21
21:3
**years**  5:16
6:4
**YELLING**
1:6  3:4, 19
6:16  9:15
14:5  18:7
23:9, 16
24:11, 21
25:13, 16,
18, 23
26:14
28:21  33:8
34:19
40:10
**Yelling's**
4:6  5:11
21:12
25:12
33:10  40:6,
7